# Exhibit C

Electronically Filed
1/22/2026 4:55 PM
Steven D. Grierson
CLERK OF THE COURT

1  CSRE
Mark H Hutchings, Esq.
2  Nevada Bar No. 12783
John B Lanning, Esq.
3  Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
4  400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
5  Telephone: (702) 660-7700
Facsimile: (702) 552-5202
6  MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
7  *Attorney for Plaintiffs*

CASE NO: A-26-937783-W
Department 20

8                    **EIGHTH JUDICIAL DISTRICT COURT**

9                        **CLARK COUNTY, NEVADA**

10  OPTIMUMEDICINE, LLC, a Nevada limited
liability company;

11                                                    Case No.

        Plaintiffs,
12      v.                                            Dept. No.

13  HIGHTAIL AIR CHARTER, LLC, a Delaware    **CONSENT TO SERVICE BY ELECTRONIC**
limited liability company; CHRONOS AIR       **MEANS**
14  GROUP, LLC, a Delaware limited liability
company, CHRONOS AIR MRO, LLC, a
15  Delaware limited liability company; SCOTT
SALDANA, an individual; DOES I through XX;
16  ROE CORPORATIONS I through XX,
inclusive;
17
        Defendants.
18

19         The undersigned hereby consents to service of documents by electronic means through the

20  Court's e-filing program on behalf of the following party or parties:

21         For Plaintiff Optimumedicine, LLC:

22                    MARK H. HUTCHINGS, ESQ.

23                        MHutchings@HutchingsLawGroup.com

24                    JOHN B. LANNING, ESQ.

25                        John@HutchingsLawGroup.com

26                    HELEN PEREZ

27                        Helen@HutchingsLawGroup.com

28

1
**CONSENT TO SERVICE BY ELECTRONIC MEANS**

1  MAKAYLA RODRIGUEZ

2  Assistant@HutchingsLawGroup.com

3  Documents served by electronic means must be transmitted to the following persons at the

4  e-mail addresses listed below:

5  Mark H. Hutchings:       MHutchings@HutchingsLawGroup.com

6  John B. Lanning:        John@HutchingsLawGroup.com

7  Helen Buenrostro:       Helen@HutchingsLawGroup.com

8  Makayla Rodriguez       Assistant@HutchingsLawGroup.com

9  It is my understanding that the attachments may be transmitted to the program in any format

10  and will be converted to a PDF file before service is affected.

11  The undersigned also acknowledges that this consent does not require service by electronic

12  means unless the serving party elects to do so.

13

14  Dated: January 22, 2026                    HUTCHINGS LAW GROUP

15                                   */s/ Mark H. Hutchings*

16                          By:_____
                            Mark H. Hutchings, Esq.

17                          Nevada Bar No. 12783
                            John B. Lanning, Esq.

18                          Nevada Bar No. 15585
                            400 S. 4th St., Ste. 550

19                          Las Vegas, NV 89101
                            Telephone: (702) 660-7700

20                          mhutchings@hutchingslawgroup.com
                            *Attorney for Plaintiff*

21

22

23

24

25

26

27

28

CONSENT TO SERVICE BY ELECTRONIC MEANS

HUTCHINGS LAW GROUP
400 SOUTH 4TH STREET, SUITE 550
LAS VEGAS, NV 89101

Electronically Filed
1/22/2026 4:55 PM
Steven D. Grierson
CLERK OF THE COURT

**DSST**
Mark H Hutchings, Esq.
Nevada Bar No. 12783
John B Lanning, Esq.
Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
Telephone: (702) 660-7700
Facsimile: (702) 552-5202
MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
*Attorney for Plaintiffs*

CASE NO: A-26-937783-W
Department 20

# EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| OPTIMUMEDICINE, LLC, a Nevada limited liability company; | |
|     Plaintiffs, | Case No. |
| v. | Dept. No. |
| HIGHTAIL AIR CHARTER, LLC, a Delaware limited liability company; CHRONOS AIR GROUP, LLC, a Delaware limited liability company, CHRONOS AIR MRO, LLC, a Delaware limited liability company; SCOTT SALDANA, an individual; DOES I through XX; ROE CORPORATIONS I through XX, inclusive; | **NRCP 7.1 DISCLOSURE STATEMENT** |
|     Defendants. | |

COMES NOW, Plaintiff, OPTIMUMEDICINE, LLC ("Plaintiffs") by and through its counsel of record and hereby certifies that there no other entity or publicly held entity owning any stock or interest.

Dated: January 22, 2026          HUTCHINGS LAW GROUP

                                        ***/s/ Mark H. Hutchings***

By:_____
                       Mark H. Hutchings, Esq.
                       Nevada Bar No. 12783
                       John B. Lanning, Esq.
                       Nevada Bar No. 15585
                       400 S. 4th St., Ste. 550
                       Las Vegas, NV 89101
                       Telephone: (702) 660-7700
                       *Attorney for Defendants*

*HUTCHINGS LAW GROUP*
*400 SOUTH 4TH STREET, SUITE 550*
*LAS VEGAS, NV 89101*

Electronically Filed
1/22/2026 4:55 PM
Steven D. Grierson
CLERK OF THE COURT

**IAFD**
Mark H Hutchings, Esq.
Nevada Bar No. 12783
John B Lanning, Esq.
Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
Telephone: (702) 660-7700
Facsimile: (702) 552-5202
MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
*Attorney for Plaintiffs*

CASE NO: A-26-937783-W
Department 20

**EIGHTH JUDICIAL DISTRICT COURT**

**CLARK COUNTY, NEVADA**

OPTIMUMEDICINE, LLC, a Nevada limited
liability company;

      Plaintiffs,

v.

HIGHTAIL AIR CHARTER, LLC, a Delaware
limited liability company; CHRONOS AIR
GROUP, LLC, a Delaware limited liability
company, CHRONOS AIR MRO, LLC, a
Delaware limited liability company; SCOTT
SALDANA, an individual; DOES I through XX;
ROE CORPORATIONS I through XX,
inclusive;

      Defendants.

Case No.

Dept. No.

**INITIAL APPEARANCE FEE DISCLOSURE**

      Pursuant to NRS Chapter 19, as amended by Senate Bill 106, filing fees are submitted for the plaintiff in the above-captioned action in the amount of $270.00 in satisfaction of the fee required.

      TOTAL REMITTED AND PAID: $270.00

Dated: January 22, 2026

HUTCHINGS LAW GROUP

*/s/ Mark H. Hutchings*

By:_____
Mark H. Hutchings, Esq.
Nevada Bar No. 12783
John B. Lanning, Esq.
Nevada Bar No. 15585
400 S. 4th St., Ste. 550
Las Vegas, NV 89101
Telephone: (702) 660-7700
*Attorney for Plaintiff*

Electronically Filed
1/22/2026 4:55 PM
Steven D. Grierson
CLERK OF THE COURT

**COMJD**
Mark H. Hutchings, Esq.
Nevada Bar No. 12783
John B. Lanning, Esq.
Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
Telephone: (702) 660-7700
Facsimile: (702) 552-5202
MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
*Attorney for Plaintiffs*

CASE NO: A-26-937783-W
Department 20

**EIGHTH JUDICIAL DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| OPTIMUMEDICINE, LLC, a Nevada limited liability company;<br><br>Plaintiffs,<br><br>v.<br><br>HIGHTAIL AIR CHARTER, LLC, a Delaware limited liability company; CHRONOS AIR GROUP, LLC, a Delaware limited liability company, CHRONOS AIR MRO, LLC, a Delaware limited liability company; SCOTT SALDANA, an individual; DOES I through XX; ROE CORPORATIONS I through XX, inclusive;<br><br>Defendants. | Case No.:<br><br>Dept. No.:<br><br>**PLAINTIFFS' COMPLAINT AND JURY DEMAND**<br><br>**[EXEMPT FROM ARBITRATION]** |

COMES NOW, Plaintiff OPTIMUMEDICINE, LLC, ("Plaintiff") by and through counsel of record, Mark H. Hutchings, Esq. and John B. Lanning, Esq. of the law firm Hutchings Law Group, and hereby alleges and complains against Defendants HIGHTAIL AIR CHARTER, LLC, CHRONOS AIR GROUP, LLC, CHRONOS AIR MRO, LLC, SCOTT SALDANA DOES I through XX, and ROE CORPORATIONS I through XX as follows:

**I.**

**PARTIES, JURISDICTION, AND VENUE**

1.   Plaintiff, OPTIMUMEDICINE, LLC ("Plaintiff" or "Optimum"), is a Nevada limited liability company doing business in the State of Nevada, County of Clark.

2.   Defendant, HIGHTAIL AIR CHARTER, LLC ("Hightail"), is a Delaware limited liability company doing business in the State of Nevada, County of Clark.

3.   Defendant, CHRONOS AIR GROUP, LLC ("Chronos") is a Delaware limited liability

*Left margin:* HUTCHINGS LAW GROUP — 400 S. 4TH ST., STE. 550 — LAS VEGAS, NV 89101

company doing business in the State of Nevada, County of Clark.

4.     Defendant, CHRONOS AIR MRO, LLC ("Chronos MRO") is a Delaware limited liability upon information and belief doing business in the State of Nevada, County of Clark.

5.     Defendant, SCOTT SALDANA ("Saldana") is an individual residing, upon information and belief, in the State of Illinois, County of Cook, and doing business in the State of Nevada, County of Clark.

6.     The true names and/or capacities, whether individual, corporate or otherwise, of defendants named herein as DOES and ROES, inclusive, are unknown to Plaintiff, who therefore sue said defendants by such fictitious names.  Each of the defendants designated herein by fictitious name is in some manner responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiffs as hereinafter alleged.  Plaintiffs ask leave of the Court to amend this Complaint when the true names and capacities of said defendants have been ascertained.

7.     Whenever it is alleged in this Complaint that a party did any act or thing, it is meant that such party's officers, agents, employees, or representatives did such act or thing and at the time such act or thing was done, it was done with full authorization or ratification of such party or was done in the normal and routine course and scope of business, or with the actual, apparent and/or implied authority of such party's officers, agents, servants, employees, or representatives.  Specifically, parties are liable for the actions of their officers, agents, servants, employees, and representatives.

8.     Whenever it is alleged in this Complaint that a Defendant, person, or entity, including Doe Defendants and Roe Business Entities, did any act or thing, it is meant that person or entity acted as the alter-ego of another, was influenced and governed by the other, that there was such unity of interest and ownership that the corporations, shareholders, members, directors, managers, officers, or individuals are inseparable from each other, and that adherence to the corporate fiction of separate identity would sanction fraud or promote a manifest injustice.

9.     Jurisdiction and Venue are proper in the Eighth Judicial District Court of Clark, County, Nevada, as the acts and events at issue in this Complaint involve and relate to conduct and controversies that occurred in Clark County, Nevada.  The Defendants have participated in, and/or are participating in, activities that are at issue herein, which activities occurred in Clark County, Nevada.  Accordingly,

**PLAINTIFF'S COMPLAINT**

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

jurisdiction and venue are appropriate in Clark County, Nevada.

## II.

## <u>GENERAL ALLEGATIONS</u>

### *Origins of The Parties' Relationship*

10.     Plaintiff is a provider of ambulatory medical services and specializes in providing medical air transport services.

11.     Defendants own and lease airplanes to various individuals.  Defendants also engage in the business of medical transport.

12.     Defendant Saldana is the owner, Chief Executive Officer, and alter ego of the entity Defendants, Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC.

13.     Initially, the parties relationship was confined to the lease of a medial bed from Plaintiff to Defendants.

14.     On or about June 30, 2024, Plaintiff and Defendants entered into an agreement whereby Plaintiff leased a Spectrum Aeromedical Stretcher that it owned to Defendants for use in medical flights.  Pursuant to the terms of this Equipment Lease Agreement, Plaintiff was entitled to 50% of all revenue derived from air ambulance services rendered using the leased medical bed.

15.     Initially, the medical bed lease went without issue.  However, Plaintiff has now learned that Defendants did not fully pay Plaintiff for use of the leased medical bed and concealed revenue using the medical bed.

### *Original Mutual Services Agreement*

16.     On September 11, 2024, Optimum and Hightail Air Charter, LLC d/b/a Chronos Air Group, LLC ("Chronos") entered into a Mutual Services Agreement (the "Original MSA").

17.     Under the terms of the Original MSA, Chronos agreed to provide aviation support and dedicated aircraft to facilitate Optimum's fixed-wing air medical transport operations throughout North and South America.

18.     Section 9 of the MSA established rigorous confidentiality and non-disclosure obligations, strictly prohibiting Chronos from using or disclosing Optimum's "Confidential Information"—defined to include operational methods, marketing strategies, and financial data—for

1    any purpose other than performing its obligations under the agreement.

2        19.    Section 9 of the MSA was essential for Optimum because in order to operate the flight

3    services with Defendants, it necessarily required the extensive sharing of confidential information such

4    as customers, marketing, quoting, costs, insurance information, and client lists in order to schedule

5    flights and appropriately staff them with necessary individuals.

6        20.    Section 10.1 of the MSA explicitly provided that all documents, records, apparatus, and

7    equipment furnished to Chronos "shall be and remain the sole property of Optimum," with an

8    affirmative obligation for Chronos to return such property upon expiration or termination.

9        21.    On September 12, 2024, the parties further reinforced these protections by executing a

10   Business Associate Agreement ("BAA") to ensure the security of protected health information ("PHI")

11   handled during transports.

**The February 2025 Alleged Default and the Security Agreement**

12   22.    On or about February 13, 2025, Chronos issued a Notice of Termination and Notice of

13   Default to Optimum, alleging various acts of default, all of which were disputed by Optimum.

14       23.    Prior to Chronos issuing a Notice of Termination and Notice of Default, Chronos had

15   breached the parties' agreement by failing to maintain confidential information of Optimum or

16   maintain an exclusive relationship.  On the contrary, HighTail and Chronos, under the direction of

17   Saldana, had been providing Optimum's confidential information to at least one third party to create a

18   new business enterprise.

19       24.    At the time of the Notice of Termination and Notice of Default, Optimum and its agents

20   were unaware of the actions of Defendants.

21       25.    Thus, in reliance upon the contractually unsupported Notice of Termination and Default

22   to Optimum, the parties executed a Security Agreement on or about February 21, 2025, whereby

23   Plaintiff promised to pay all outstanding sums due to Defendant Hightail.

24       26.    Under Section 1 of the Security Agreement, Optimum granted Chronos a perfected first

25   priority security interest strictly limited to Optimum's "now existing and hereafter arising accounts

26   receivable" (the "Collateral").  However, Optimum only agreed to entered into this agreement based

27   upon the false pretense that Defendants were not in breach of the parties' agreements.

**PLAINTIFF'S COMPLAINT**

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

Docusign Envelope ID: C7G5F742-E46B-47DB-B717-86D889897D0E

27.  Chronos subsequently perfected this limited interest by filing a UCC-1 Financing Statement with the Nevada Secretary of State on April 10, 2025 (Filing No. 2025-465805-0), covering only "Accounts Receivable."

28.  On March 6, 2025, the parties executed the First Amendment to the Mutual Services Agreement ("First Amendment"), which acknowledged a debt of $396,825.36 and established a schedule for surcharges and repayments.

29.  The First Amendment also strategically gave Defendant Saldana "read only" access to Optimum's bank accounts which contain extremely sensitive financial information of Plaintiff.

30.  The debt acknowledged in the First Amendment to the Mutual Services Agreement was based solely on amounts unpaid from Optimum to Defendants for airplane services.  That amount did not take into account the business Defendants had generated with stolen confidential information, client lists, intellectual property, and proprietary data as Optimum was not fully aware of such activities at that time.  Furthermore, The debt of $396,825.36 did not take into account misuse of Optimum's medical beds.

**Defendants' Material Breaches: Confidentiality and Improper Competition**

31.  Despite the strict prohibitions in Section 9 of the MSA and the BAA, Chronos began utilizing Optimum's proprietary operational data, customer lists, and equipment configurations to benefit themselves and third-party competitors.

32.  Specifically, Chronos leveraged Optimum's confidential pricing policies and operational "know-how" to facilitate medical transports for unapproved third-party providers.  Upon information and belief, Defendant Saldana may have an ownership interest in some of these third-party providers.

**Defendant Saldana's Illegal "Self-Help"**

33.  On or about late 2025, despite having converted hundreds of thousands in property from Plaintiff, Defendants began engaging in "self-help" to recover the $396,825.36 purportedly owed by Plaintiff for unpaid flights, along with usurious interest penalties Defendants claim entitlement to which exceed 58% of the principal sum.

34.  Defendant Saldana now claims that the debt for $396,825.36 in allegedly unpaid flight

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

invoices now exceeds $1,200,000.00 on the basis of a usurious interest rate and other imagined charges.

35.    Starting on or about late 2025, Defendant Saldana began personally engaging in a variety of drastic and illegal "self-help" measures to attempt to collected the amount he believes is owed by Optimum.

36.    Optimum owns two Spectrum Aeromedical medical beds (the "Med Beds"), specifically Serial No. 20-B1AB-121AAB and a secondary unit, which were installed in Chronos aircraft for Optimum's exclusive use.

37.    In late 2025, during a payment dispute, Chronos engaged in an unauthorized "self-help" remedy by refusing to return the Med Beds to Optimum, effectively seizing the equipment as unauthorized collateral despite the Security Agreement being limited to receivables.

38.    Beyond mere retention, Chronos converted the Med Beds for its own profitable use by deploying them on flights for competing companies, as evidenced by ADS-B flight tracking data and third-party advertisements.

39.    Chronos's unauthorized monetization of the Med Beds constitutes a revenue-generating exercise of dominion in direct derogation of Optimum's sole ownership rights under Section 10.1 of the Mutual Services Agreement.

40.    In addition to the use of the Med Beds, on or about November 2025 and January 2026, Chronos utilized Optimum's credit accounts at Fixed Base Operators ("FBOs") to fuel Chronos's aircraft for flights unrelated to Optimum's business.

41.    Invoices from Signature Aviation dated November 27, 2025, and January 4, 2026, confirm that Chronos aircraft (Tail Nos. N90J and N55FJ) were fueled using Optimum's account at times when no Optimum transports were authorized.

42.    Upon information and belief, these fuel charges were incurred for flights which Chronos performed for Diamond Medical, a competitor of Optimum, using Optimum's fuel and Med Beds.

43.    These unauthorized charges represent a direct conversion of Optimum's funds and remain an unliquidated offset against any amounts allegedly owed to Chronos.

44.    On November 10, 2025, Chronos issued a "Final Demand" threatening to trigger direct collection from Optimum's customers under NRS 104.9607.

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

45.     This was despite the fact that it is unclear to what extent any obligation from Plaintiff to Defendant remains unpaid.

46.     On November 18, 2025, Chronos's counsel provided a sample letter intended for Optimum's "account debtors," which falsely characterized the dispute and ignored Chronos's own material breaches.

47.     Because Chronos was in active, uncured material breach of the MSA—including the conversion of the Med Beds and theft of fuel—its attempt to enforce the Security Interest was premature, not commercially reasonable, and constituted tortious interference with Optimum's contractual relations.

48.     Chronos never had any Security Interest in any property other than receivables.  Chronos had no Security Interest in the Med Beds or the fuel.

49.      Optimum formally terminated the MSA on January 5, 2026, due to these pervasive breaches, yet Chronos continues to maintain the now-unauthorized UCC-1 lien on the public record.

50.      Defendant Saldana is as recently as January 16, 2026, threatening to contact all of Optimum's clients with the intent of wrongfully taking possession of funds via the unauthorized UCC-1 lien.

### III.

### CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(Breach of Contract – Aeromedical Equipment Lease; Mutual Services Agreement; Business Associate Agreement)**

***Against all Defendants***

51.     Plaintiff repeats and realleges paragraphs 1 through 50 of the Complaint as though fully set forth herein at length.

52.     Plaintiff and Defendants entered into a valid and enforceable agreement, known as the "Aeromedical Equipment Lease," the terms of which required Plaintiff to provide a "Med Bed" to Defendants Hightail and Chronos.

53.     Plaintiff performed according to the terms of the "Aeromedical Equipment Lease" by

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

Docusign Envelope ID: C7C5F742-E46B-47DB-B717-B6D689897D0E

1    actually providing Defendants with the required Med Bed.

2    54.    Defendants were then required under the terms of the "Aeromedical Equipment Lease" to account for all revenue generated in flights that utilized that bed and pay Plaintiff 50% of all such revenue.

55.    Defendants breached the express terms of the "Aeromedical Equipment Lease" by repeatedly using the Med Beds providing by Plaintiff without paying the 50% of revenue required under the agreement.

56.    Plaintiff and Defendants also entered into a valid and enforceable contract known as the "Mutual Services Agreement" ("MSA").

57.    Plaintiff performed all of its obligations under the MSA.

58.    Defendants breached the MSA at Section 9 by misappropriating Plaintiff's confidential information and using it, in violation of the MSA to steal clients, start businesses with competitors, and do work on the side without Plaintiff's knowledge. These actions constitute a material breach of the MSA.

59.    As a proximate and direct result of Defendants' Breach of Contracts, Plaintiff has suffered damages in excess of Fifteen Thousand Dollars ($15,000.00), the exact amount to be proven at trial.

60.    Plaintiff has been forced to secure the services of an attorney to prosecute this action, and Plaintiff is entitled to reasonable attorney fees and costs incurred.

## SECOND CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

### *Against All Defendants*

61.    Plaintiffs repeat and reallege paragraphs 1 through 60 of the Complaint as though fully set forth herein at length.

62.    The parties entered into two (2) valid and enforceable agreements: the Aeromedical Equipment Lease and the MSA.

63.    There is, implied in every agreement, an implied covenant of good faith and fair dealing that attaches to the performance of the terms of an agreement.

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

64.     Pursuant to the implied covenant of good faith and fair dealing, neither party may defeat the reasonable expectations of the other.

65.     Defendants' violation of the implied covenant of good faith and fair dealing included failure to provide an accounting with respect to Med Bed revenue generated, failure honor the agreements by using Plaintiff's confidential information, including patient lists, client lists, proprietary data, and intellectual property without permission for Defendants' own benefit, including sharing said information with Plaintiff's competitors.  Defendants further violated the justified expectation of Plaintiff by refusing to return Plaintiff's property upon request, and Plaintiff had the justified expectation that property which it owned would be returned.

66.     Said actions constitute a breach of the implied covenant of good faith and fair dealing.

67.     As a direct and proximate result of Defendants' Breach of the Implied Covenant of Good Faith and Fair Dealing, Plaintiff has suffered damages in excess of FIFTEEN THOUSAND DOLLARS ($15,000.00), the exact amount to be proven at trial.

68.     In addition, Plaintiff has been required to retain the services of an attorney and is entitled to its reasonable costs and attorneys' fees as a result of the breach, under contract, rule, or statute, as the case may be.

## THIRD CLAIM FOR RELIEF

### (Alternatively, Unjust Enrichment)

### *Against All Defendants*

69.     Plaintiff repeats and realleges paragraphs 1 through 68 of the Complaint as though fully set forth herein at length.

70.     Defendants received a benefit from Plaintiff in the form of client lists, intellectual property, and proprietary data.

71.     Defendants also received a benefit from Plaintiff in the form of fuel which was not paid for.

72.     Defendants further received a benefit from Plaintiff for the use of the Med Bed pursuant to the 2024 agreement, and again later for the use of two (2) Med Beds that were wrongfully seized by Defendants, including Defendant Saldana from Plaintiff in late 2025.

73. Defendants took these benefits and retained them.

74. It would be inequitable, because of the detriment to Plaintiff, to allow Defendants to retain the benefit and appreciation without payment to Plaintiff.

75. Defendant has been Unjustly Enriched in excess of $15,000.00.

76. As a direct and proximate results of Defendants' actions and conduct, Plaintiff has been forced to retain the services of an attorney and is entitled to reasonable attorney fees as provided by any applicable contract, rule, or statute.

## FOURTH CLAIM FOR RELIEF

### (Fraud in the Inducement)

### *Against All Defendants*

77. Plaintiff repeats, reallege and incorporate by this reference each and all of the allegations contained in Paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78. Defendants falsely induced Plaintiff to execute the First Amendment to Mutual Services Agreement and Security Agreement while knowing of Defendants' breaches of the original Agreements while Plaintiff was unaware.

79. Defendants knew or had reason to believe that Plaintiff was unaware of their theft of intellectual property, client lists, and proprietary information and had reason to believe that had Plaintiff been made aware of these activities, Plaintiff never would have agreed to the First Amendment to Mutual Services Agreement or the Security Agreement.

80. Defendants intended to induce the Plaintiff to act or refrain from acting upon their rights by concealing the true facts to convince Plaintiff that a substantial balance was owing and due to Defendants.

81. Plaintiff justifiably relied upon Defendant's fraudulent or intentional misrepresentations based upon their business relationship and efforts undertaken by Defendant Saldana to convince Plaintiff Defendants were trustworthy.

82. As a result of Defendants' fraudulent conduct, described above, Plaintiff has been damaged in excess of FIFTEEN THOUSAND DOLLARS ($15,000.00), the exact amount to be proven at trial.

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**10**
**PLAINTIFF'S COMPLAINT**

83. As direct and proximate result of Defendants' fraud and/or misrepresentations, Plaintiff has been forced to retain the services of an attorney for which Plaintiff are entitled to an award of reasonable attorneys' fees and costs incurred herein.

84. Defendants engaged in despicable conduct, described above, with a conscious disregard for the rights of Plaintiff. Defendants were otherwise guilty of oppression, fraud, malice and bad faith. Plaintiff is entitled to punitive and/or exemplary damages pursuant to NRS 42.005.

## FIFTH CLAIM FOR RELIEF

### (NRS 225.084; Civil Liability for Fraudulent Filings with Secretary of State)

### *Against All Defendants*

85. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 84 of the Complaint as though set forth at length herein.

86. NRS 225.084 provides civil liability for individuals or entities who file a record with the office of Secretary of State that "contains a false statement of material fact or is being filed in bad faith or to harass or defraud. . ."

87. Defendants filed a UCC-1 lien with the Secretary of State of Nevada, thus this filing falls under the NRS 225.084.

88. Defendants filing contained a false statement of material fact as it was filed without permission and without knowledge of whether any amount was due from Plaintiff given the funds forcibly taken in Defendant Saldana's self-help exercises.

89. Defendants filing of the UCC-1 lien further was filed in bad faith for the purpose of harassing Plaintiff, as evidenced by multiple abrasive and threating communications from Defendant Saldana and the campaign of self-help remedies prior to filing the UCC lien.

90. Per statute, Plaintiff is entitled to $10,000.00 for each violation of the Statute committed by Defendants, or actual damages, whichever is greater. Plaintiff's actual damages are in an amount greater than $15,000.00.

91. Per statute, Plaintiff is entitled to all attorney's fees and costs as well as "any punitive damages that the facts may warrant."

/ / /

**SIXTH CLAIM FOR RELIEF**

**(Negligent Misrepresentation)**

*Against All Defendants*

92.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 91 as though fully set forth herein at length.

93.    Defendants, through the course of an action in which he had a pecuniary interest, failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiff.  Specifically, Defendants did not communicate the actions undertaken in secret which served to offset any amounts owed to Defendants by Plaintiff.

94.    Plaintiff justifiably relied on Defendants' representations when continuing to do business with Defendants and when entering into the Security Agreement and the First Amended Mutual Services Agreement.

95.    Plaintiff has suffered damages as a result of Defendants' negligent misrepresentation of a material term of their agreement.

96.    Plaintiff has suffered damages in excess of FIFTEEN THOUSAND DOLLARS ($15,000.00), the exact amount to be proven at trial.

97.    In addition, Plaintiff has been required to retain the services of an attorney is entitled to its reasonable costs and attorneys' fees as a result of the breach, under contract, rule, or statute, as the case may be.

**SEVENTH CLAIM FOR RELIEF**

**Alter Ego**

*Against All Defendants*

98.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 97 as though fully set forth herein at length.

99.    Plaintiff is informed and believes that there now exists, and at all times relevant hereto has existed, a unity of interest and ownership among Defendant Saldana and the entity Defendants, such that any individuality or separateness of these Defendants is a fiction.  Defendant Saldana and Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

("Defendants") are alter egos of each other, in that:

    a.  Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC, and at all times relevant hereto were, so inadequately capitalized that, compared with the business conducted and the risks of loss attendant thereto, its capitalization was illusory;

    b.  Defendant Saldana has exercised, and continues to exercise, full control and dominance over Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC;

    c.  Defendant Saldana completely disregards the corporate identity of Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC, as a separate legal entities and treats the companies as an extension of himself;

    d.  Defendant Saldana has been commingling his personal funds with the Defendants. This is evidenced by the self help done by Defendant Saldana.

    e.  Defendant Saldana and the Defendants have so intermingled their financial affairs, and there exists among them such a unity of interest and ownership, that any individuality and separateness should be disregarded, Defendant Saldana and Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC should be considered alter egos of each other.

100.    Based on the foregoing, Plaintiff alleges that adherence to the fiction of the separate existence of Defendants and Saldana as individual and distinct entities separate from one another would permit abuse of the corporate privilege and would sanction a fraud upon the Court.

101.    Defendant Saldana used Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC to further his scheme such that the business is an alter ego of himself.

102.    The actions of Saldana and Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC, have caused harm to Plaintiff in an amount in excess of $15,000.00, the exact amount to be proven at trial.

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1    103.    Plaintiff has been forced to retain an attorney to prosecute this action and is entitled to

2    recover reasonable attorney's fees and costs of suit pursuant to Nevada law.

3    ## EIGHTH CLAIM FOR RELIEF

4    **Intentional Interference with Business and Contractual Relations**

5    ***Against All Defendants***

6    104.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 103 of

7    the Complaint as though set forth fully herein at length.

8    105.    Plaintiff provides air medical transport services.  Plaintiff has invested heavily in

9    relationships and other proprietary marking tactics in order to source clients, i.e., people who need

10    medical airplane transport services.

11    106.    As a result of the necessary relationship between Plaintiff and its airplane providers,

12    certain information must be shared with Defendants, who operate the flights and must be aware of

13    numerous aspects of Plaintiff's confidential information.

14    107.    A contract exists between Plaintiff and its clients and an implied or express contract

15    exists between Plaintiff and the organizations and entities who send or refer clients to Plaintiff.

16    108.    Defendants had knowledge of Plaintiff's relationships as evidenced by the

17    confidentiality provisions in the Agreements with Plaintiff.

18    109.    Defendants undertook a series of actions designed to disrupt Plaintiff's relationships.

19    Defendants obtained as much information as possible concerning Plaintiff's lucrative business.  This

20    included confidential and proprietary information.

21    110.    Defendants set up, with others, a rival business to Optimumedicine, LLC providing the

22    same exact air ambulance services.  Defendants used Plaintiff's trade secrets and other information to

23    set up this rival business.

24    111.    Defendants then used their knowledge of Plaintiff's business relationships to steal

25    clients and referral sources and get these individuals and organizations to stop working with Plaintiff.

26    112.    Defendants took these actions with the actual knowledge and hope that they would

27    interfere with Plaintiff's contractual relationships.

28    113.    Defendants' actions resulted actual breach of the implied agreements between Plaintiff

**HUTCHINGS LAW GROUP**
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**14**
**PLAINTIFF'S COMPLAINT**

1   and its patients, a disruption of Plaintiff's relationships with health insurers, and affected Plaintiff's

2   reputation and standing in the community.

3       114.    Plaintiff is entitled to payment of damages as a direct and proximate result of the

4   misconduct of Defendants, according to proof at trial, in excess of $15,000.

5       115.    Defendants' actions were intentional, oppressive, malicious, willful, and wanton and

6   Plaintiff is entitled to compensatory damages, consequential damages, incidental damages, as well as

7   punitive damages to deter future misconduct by Defendants.

8       116.    Plaintiff has been forced to retain the services of an attorney due to the wrongful

9   conduct of Defendants and therefore requests an award of attorney fees and costs of suit as provided

10  by any applicable contract, rule, or statute.

11                          **<u>NINTH CLAIM FOR RELIEF</u>**

12                                  **Conversion**

13                              ***Against All Defendants***

14      117.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 116 as

15  though fully set forth herein at length.

16      118.    Plaintiff owns two Medical Beds which are its property.  Plaintiff only permitted

17  Defendants to have possession of the Medical Beds or use them for trips which Plaintiff and

18  Defendant did together.

19      119.    Plaintiff also has a property interest in its fuel credit account which allows Plaintiff to

20  obtain jet fuel for plane trips on credit.

21      120.    On or about late 2025, Defendant Saldana engaged in self-help, feeling that Plaintiff

22  owed him money.

23      121.    Defendant took possession of Plaintiff's Med Beds, refused to return them despite

24  demand.  Defendant Saldana informed Plaintiff he was taking the Med Beds, which Plaintiff owned,

25  to satisfy his alleged debt.

26      122.    Defendant then used Plaintiff's Med Beds to conduct his own air ambulance business,

27  and even made advertising and social media post showing off the stolen Med Beds.

28      123.    Defendants generated revenue doing air ambulance flights using the stolen Med Beds.

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**15**

124.    Defendant Saldana further engaged in self-help and theft by way of still having access to Plaintiff's jet fuel credit credentials.

125.    During late 2025, before Plaintiff could notice, Defendants began refueling jets for unrelated trips using Plaintiff's fuel credit.

126.    Defendants did this maliciously as a form of self-help.

127.    Defendants have failed to reimburse Plaintiff for the stolen fuel.

128.    These acts were committed in derogation, exclusion, or defiance of Plaintiff's rights to the property.

129.    Plaintiff has been damaged as a direct and proximate result of the conversion of its Med Beds and fuel credit, in an amount in excess of $15,000 and has lost substantial business and experienced significant harm to the fact it cannot provide services.

130.    Plaintiff has been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests and award of attorney fees and costs of suit as provided by any applicable contract, rule, or statue.

<strong><u>TENTH CAUSE OF ACTION</u></strong>

<strong>(Injunctive Relief)</strong>

<strong><em>Against All Defendants</em></strong>

131.    Plaintiff re-alleges the allegations of paragraphs 1 through 130 above as though fully set forth herein.

132.    Pursuant to Nev. R. Civ. Proc. 65 and NRS 33.010, Plaintiff seeks Orders for preliminary injunction, permanent injunction, and specific performance against Defendants as follows:

   a.    Perpetually prohibiting Defendants from using Plaintiff's Med Beds or fuel credit without Plaintiff's express permission;

   b.    Perpetually prohibiting Defendants from asserting wrongful UCC liens against Plaintiff or from contacting Plaintiff's debtors;

   c.    Directing Defendants to provide an accounting of any and all of Plaintiff's property still in Defendants' possession;

HUTCHINGS LAW GROUP<br>400 S. 4TH ST., STE. 550<br>LAS VEGAS, NV 89101

<strong>16</strong><br><strong>PLAINTIFF'S COMPLAINT</strong>

d.    Perpetually prohibiting from possessing or using Plaintiff's intellectual property or confidential information.

133.    Plaintiff has a likelihood of success on the merits as set forth more fully within this Complaint.  Plaintiff merely requests that the Defendants be required to follow already existing law.

134.    The interests and equities favor Plaintiff, particularly given Defendant Saldana's dangerous history of engaging in self-help.

135.    If injunctive relief and specific performance are not awarded, Plaintiff has suffered and will continue to suffer irreparable harm for which economic damages are not a sufficient remedy in the form of harm to professional reputation, harm to the ability to conduct business.

136.    Plaintiff stands ready to post bond as adequate security for costs and damages in the event of wrongful enjoinment.

137.    Plaintiff has been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests an award of reasonable attorney fees and costs of suit as provided by any applicable contract, rule, or statute.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

1.      For general damages in an amount in excess of fifteen thousand dollars ($15,000.00);

2.      For special damages in an amount in excess of fifteen thousand dollars ($15,000.00);

3.      For punitive damages in an amount deemed appropriate to punish Defendants (in their personal capacity for their wrongful and egregious conduct);

4.      For Injunctive Relief/Specific Performance as set forth above;

5.      For reasonable attorney's fees and costs of suit incurred herein;

6.      For an award of pre and post-judgment interest pursuant to NRS 17.130(2), and any other applicable statutory basis; and

7.      For any other relief as this Court deems just and proper.

Respectfully submitted,

Dated: January 22, 2026.                    HUTCHINGS LAW GROUP

*/s/ John B. Lanning*

By: _____
Mark H. Hutchings, Esq.
NV Bar No. 12783
John B. Lanning, Esq.
NV Bar No. 15585
400 S. 4th St., Ste. 550
Las Vegas, NV 89101
Telephone: (702) 660-7700
mhutchings@hutchingslawgroup.com
*Attorney for Plaintiff*

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**VERIFICATION**

I, DEVON EISMA, being first duly sworn under penalty of perjury, deposes and states: That I am the Manager of the Plaintiff in the within cause of action; that I have read the foregoing **PLAINTIFF'S COMPLAINT AND JURY DEMAND** and know the contents thereof; that the same is true of my own knowledge except as to those matters therein stated upon information and belief, and as to those matter, I believe them to be true.

DEVON EISMA
CHIEF EXECUTIVE OFFICER
OPTIMUMEDICINE, LLC

**JURY DEMAND**

Plaintiff, Optimumedicine, LLC, by and through counsel of record, hereby demands a trial of the issues by jury in this matter.

Respectfully submitted,

Dated: January 22, 2026.                    HUTCHINGS LAW GROUP

*/s/ John B. Lanning*
By: _____
Mark H. Hutchings, Esq.
NV Bar No. 12783
John B. Lanning, Esq.
NV Bar No. 15585
400 S. 4th St., Ste. 550
Las Vegas, NV 89101
Telephone: (702) 660-7700
mhutchings@hutchingslawgroup.com
*Attorney for Plaintiff*

Electronically Filed
1/23/2026 3:39 PM
Steven D. Grierson
CLERK OF THE COURT

**APEN**
Mark H. Hutchings, Esq.
Nevada Bar No. 12783
John B. Lanning, Esq.
Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
Telephone: (702) 660-7700
Facsimile: (702) 552-5202
MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
*Attorney for Plaintiff*

**EIGHTH JUDICIAL DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| OPTIMUMEDICINE, LLC, a Nevada limited liability company,<br><br>       Plaintiff,<br><br>     v.<br><br>HIGHTAIL AIR CHARTER, LLC, a Delaware limited liability company; CHRONOS AIR GROUP, LLC, a Delaware limited liability company; CHRONOS AIR MRO, LLC, a Delaware limited liability company; SCOTT SALDANA, an individual; DOES I through XX; ROE CORPORATIONS I through XX, inclusive,<br><br>       Defendants. | Case No.: A-26-937783-C<br><br>Dept. No.: 20 |

**APPENDIX FOR PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

Plaintiff Optimumedicine, LLC (hereinafter "Plaintiff"), by and through their attorneys, Mark H. Hutchings, Esq., and John B. Lanning, Esq. of Hutchings Law Group, and hereby file the Appendix of Exhibits in Support of Plaintiff's Ex Parte application for Temporary Restraining Order and Preliminary Injunction on Order Shortening Time.

/ / /

/ / /

**APPENDIX FOR PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

*(sidebar, rotated text)* HUTCHINGS LAW GROUP — 400 S. 4TH ST. STE. 550 — LAS VEGAS, NV 8901

| EX | DESCRIPTION |
|---|---|
| 1. | Aeromedical Equipment Lease Agreement |
| 2. | Mutual Servies Agreement |
| 3. | Security Agreement (Feb. 21, 2025) |
| 4. | UCC Financing Statement No. 2025465805-0 |
| 5. | First Amendment to Mutual Services Agreement |
| 6. | Notice of Material Default and Demand for Cure |
| 7. | Photographs and ADS-B Flight tracking data |
| 8. | Signature Aviation Invoices dated Nov. 27, 2025 and Jan. 4, 2026 |
| 9. | January 8, 2026 email from Mr. Saldana |

Dated: January 23, 2026                    HUTCHINGS LAW GROUP

*/s/ John B. Lanning*
By: _____
   Mark H. Hutchings, Esq.
   Nevada Bar No. 12783
   John B. Lanning, Esq.
   Nevada Bar No. 15585
   400 South 4th Street, Suite 550
   Las Vegas, Nevada 89101
   Telephone: (702) 660-7700
   *Attorney for plaintiff*

**APPENDIX FOR PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

# EXHIBIT 1

AEROMEDICAL EQUIPMENT LEASE AGREEMENT

This Lease Agreement ("Agreement") is made and entered into as of __6/30/2024__, by and between OptimuMedicine, LLC*, a NEVADA limited liability company with its principal place of business at 175 E RENO AVE, SUITE C-6, LAS VEGAS, NV 89119  ("Lessor"), and Hightail Air Charter LLC, dba Chronos Air Group LLC, a Delaware limited liability company with its principal place of business at 1005 S Wolf Rd, Wheeling, IL 60090 ("Lessee").

WHEREAS, Lessor is the owner of a Spectrum Aeromedical Stretcher (PN: 20-B1AB-121AAB / SN: 058) ("Stretcher");

WHEREAS, Lessee desires to lease the Stretcher from Lessor for installation into their Learjet 35 aircraft (FAA Registration: N90J / AC SN: 485) ("Aircraft") for the express purpose of securing FAA approval for Air-Ambulance operations under the A024 operations specifications;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, the parties hereto agree as follows:

1. Lease of Stretcher.
Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Stretcher for installation into the Aircraft.

2. Term and Renewal.
The term of this Agreement shall commence on the date first written above and shall continue for one (1) year ("Initial Term"). This Agreement shall automatically renew for successive one (1) year terms (each a "Renewal Term") unless terminated by either party providing thirty (30) days' written notice of termination to the other party prior to the end of the Initial Term or any Renewal Term.

3. Rental Payment.
Lessee agrees to pay Lessor a rental fee of One Dollar ($1.00) per year for the duration of this Agreement. The rental fee for each year shall be due and payable on the anniversary date of this Agreement.

4. Use of Stretcher.
Lessee shall use the Stretcher initially for the purpose of securing FAA approval for Air-Ambulance operations under the A024 operations specifications. Lessee is allowed to use the stretcher for Lessees own charters in the air-ambulance configuration.

5. Exclusivity, Priority, and Profit Sharing.

   a. Lessee agrees to give Lessor priority to book the aircraft for air-ambulance charters so long as the aircraft is not previously booked for the proposed charter dates.

   b. Lessee and Lessor shall split fifty percent (50%) of the net profits from such air-ambulance transportation services generated and dispatched by the Lessor. Net profits shall be defined as gross revenue generated from the air-ambulance transportation services less all reasonable and customary expenses directly related to performing such services. The Lessor shall name the lessee as an additional insured for all operations performed for

1

the Lessor. Lessor shall provide Lessee with a certificate of insurance evidencing such coverage. Lessee and Lessor shall execute a services agreement further detailing this arrangement.

   c. Lessor can elect to have exclusive use of the aircraft at any time provided Lessee and Lessor execute or amend a service agreement addressing the new arrangement.

6. Installation, Maintenance and Care.

   a. Lessee, at its own expense, shall install the stretcher. Lessor will provide a qualified mechanic to assist in the installation at its own expense.

   b. Lessee shall, at its own expense, maintain the Stretcher in good working order and condition, reasonable wear and tear excepted. Lessee shall not make any alterations or modifications to the Stretcher without the prior written consent of Lessor.

7. Insurance.
Lessee shall, at its own expense, obtain and maintain insurance coverage for the Stretcher in an amount not less than its full replacement value. Such insurance shall name Lessor as an additional insured and loss payee. Lessee shall provide Lessor with a certificate of insurance evidencing such coverage upon request.

8. Liability and Indemnity.
Lessee shall indemnify, defend, and hold harmless Lessor from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable attorney's fees) arising out of or related to Lessee's use, maintenance, or possession of the Stretcher.

9. Default and Termination.
   a. If Lessee or Lessor breaches any provision of this Agreement, the non-breaching party may terminate this Agreement upon thirty (30) days' written notice to the breaching party, provided that the breaching party fails to cure such breach within such notice period.
   b. Upon termination of this Agreement, Lessee shall immediately return the Stretcher to Lessor in good working order and condition, reasonable wear and tear excepted.

10. Governing Law.
 This Agreement shall be governed by and construed in accordance with the laws of the State of [State], without regard to its conflict of law principles.

11. Entire Agreement.
 This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.

12. Amendment.
 No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by both parties.

13. Notices.

 Any notice required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally, sent by registered or certified mail (return receipt requested), or by a nationally recognized overnight courier service, to the addresses of the parties set forth above.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement as of the day and year first above written.

OptimuMedicine, LLC

By: _____ **Signature:** 30/06/24

**Email:** devon@optimumedicine.com

Name: Devon Eisma _____

Title: CEO _____

Chronos Air Group

By: _____ **Signature:** 30/06/24

Scott (Jun 30, 2024 17:27 EDT)

**Email:** scott@iflychronos.com

Name: Scott Saldana _____

Title: Manager _____

3

Schedule Type equation here.A: Stretcher Details

Spectrum Aeromed – 2800 Series Aeromedical Stretcher
- Part Number (PN): 058
- Serial Number (SN): 20-B1AB-121AAB

# AEROMEDICAL EQUIPMENT LEASE

Final Audit Report                                                     2024-06-30

| | |
|---|---|
| Created: | 2024-06-30 |
| By: | Jon Rosati (jon.rosati@optimumedicine.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAACRaGKxQrWyRB267tJulfMBLntqhFT8vd |

## "AEROMEDICAL EQUIPMENT LEASE" History

📄 Document created by Jon Rosati (jon.rosati@optimumedicine.com)
   2024-06-30 - 6:18:20 PM GMT

📧 Document emailed to Devon Eisma (devon@optimumedicine.com) for signature
   2024-06-30 - 6:18:23 PM GMT

📄 Email viewed by Devon Eisma (devon@optimumedicine.com)
   2024-06-30 - 6:20:18 PM GMT

✍️ Document e-signed by Devon Eisma (devon@optimumedicine.com)
   Signature Date: 2024-06-30 - 6:21:04 PM GMT - Time Source: server

📧 Document emailed to Scott (scott@iflychronos.com) for signature
   2024-06-30 - 6:21:05 PM GMT

📄 Email viewed by Scott (scott@iflychronos.com)
   2024-06-30 - 9:23:05 PM GMT

✍️ Signer Scott (scott@iflychronos.com) entered name at signing as Scott
   2024-06-30 - 9:27:16 PM GMT

✍️ Document e-signed by Scott (scott@iflychronos.com)
   Signature Date: 2024-06-30 - 9:27:18 PM GMT - Time Source: server

✅ Agreement completed.
   2024-06-30 - 9:27:18 PM GMT

Adobe Acrobat Sign

# EXHIBIT 2

## MUTUAL SERVICES AGREEMENT

**THIS MUTUAL SERVICES AGREEMENT** (the "**Agreement**") is made and entered into this 09/11/24, 2024 (the "**Execution Date**") by and between **OptimuMedicine, LLC**, a Nevada limited liability company ("**Optimum**") and **Hightail Air Charter, LLC**, a Delaware limited liability company, d/b/a Chronos Air Group, LLC ("**Chronos**"). Optimum and Chronos may each be referred to as a "**Party**," and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, Chronos owns and operates a fleet of fixed wing aircraft with which it provides flights (each, a "**Flight**") in and around North and South America, including but not limited to Canada, continental United States, and Mexico. (the "**Operating Area**");

**WHEREAS**, Optimum is an ambulatory transport provider that utilizes trained and certified professional medical personnel to provide emergency medical services;

**WHEREAS**, the Parties believe that Chronos has the necessary qualifications, licenses, vehicles and equipment to provide aviation support for air medical transport services that Optimum provides patients throughout the Operating Area (each, a "**Transport**");

**WHEREAS**, Chronos is of the opinion that Optimum has the necessary qualifications, experience and abilities to provide medical support for air medical transport services; and

**WHEREAS**, Both Parties are willing to provide such services in accordance with the terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which consideration is hereby acknowledged, the Parties hereby agree as follows:

1.    **SERVICES**

1.1.    <u>Services Provided by Chronos</u>. Chronos shall provide and operate at least one (1) fixed wing aircraft (each, an "**Aircraft**") to support fixed wing air ambulance services provided pursuant to this Agreement. It is understood by both Parties that Optimum may require an Aircraft to be dispatched anywhere within the Operating Area. It is understood that Chronos shall exert commercially reasonable efforts to begin and complete all flights on the schedule requested by Optimum, but that Chronos shall have exclusive operational control of the Aircraft and remain the sole and exclusive arbiter over navigational, flight safety, and Aircraft crew issues.

1

1.2.    <u>Services Provided by Optimum</u>. Optimum shall provide duly licensed, trained and insured clinicians in support of medivac transportation services provided pursuant to this Agreement. Optimum shall also provide EMS agency licensure, a fully staffed communications center, billing and accounting services, marketing, outreach, and other services as provided herein.

1.3.    <u>Additional Services</u>. Chronos and Optimum may agree to the provision of additional services by either Party, provided such services are evidenced in writing and signed by each Party or an authorized representative of each.

1.4.    <u>Exclusive Provider</u>.

    (a)    Throughout the term of this Agreement, Chronos shall be Optimum's exclusive aviation service provider for aviation services in the Operating Area that commence after the Effective Date, and during the Term of this Agreement, except in those instances where Chronos cannot logistically meet Optimum's needs (as more fully set forth below).

    (b)    Throughout the term of this Agreement, Chronos shall dedicate at least one (1) Aircraft for the exclusive medical requirements of Optimum that commence after the Effective date on the terms and conditions provided herein; additionally, throughout the Term of this Agreement, Chronos further agrees to give Optimum priority to book all Chronos' other aircraft that are fit for air ambulance service so long as such aircraft are not previously booked for the proposed charter dates.

    (c)    Throughout the term of this Agreement, Optimum shall dedicate at least one Medical Crew for the exclusive utilization of the aircraft provided by Chronos pursuant to this agreement.

    (d)    At any point throughout the term of this Agreement, when business demands allow for expanded service, Optimum may elect to have exclusive use of any additional or all aircraft of Chronos that are fit for air ambulance service, provided this Agreement is amended accordingly, to the mutual satisfaction of each Party.

    (e)    Optimum shall notify Chronos of its need for additional services pursuant to <u>Section 1.3</u> within a reasonable amount of time prior to the intended use of such services. Chronos shall be offered a "**Right of First Refusal**" to provide such additional services. Should Chronos be unable to provide such additional services, or should Chronos refuse to provide such additional services, Chronos shall notify Optimum within thirty (30) days of the original request by Optimum that it will not exercise its Right of First

Refusal, at which point Optimum shall have the right to seek such additional services from other third-party providers. Should Chronos not exercise its Right of First Refusal in any given instance, such refusal shall not exempt Optimum from its obligation to offer Chronos further rights of first refusal for similar or additional services.

(f)     Chronos shall notify Optimum of its need for additional services pursuant to <u>Section 1.3</u> within a reasonable amount of time prior to the intended use of such services. Optimum shall be offered a "**Right of First Refusal**" to provide such additional services. Should Optimum be unable to provide such additional services, or should Optimum refuse to provide such additional services, Optimum shall notify Chronos within thirty (30) days of the original request by Chronos that it will not exercise its Right of First Refusal, at which point Chronos shall have the right to seek such additional services from other third-party providers. Should Optimum not exercise its Right of First Refusal in any given instance, such refusal shall not exempt Chronos from its obligation to offer Optimum further rights of first refusal for similar or additional services.

(g)     Should Chronos prove unable to provide enough flight time to fulfill Optimum's needs for at least three (3) consecutive months, or should a mechanical or other issue with the Aircraft or its operation prevent Chronos from rendering services to Optimum, Optimum may seek temporary support from additional third-party providers upon written notice to Chronos and until such time Chronos is able to resume its obligations pursuant to this Agreement and subject to reasonable minimum utilization requirements of such temporary providers.

(h)     When Chronos aircraft are unavailable due to system demand and additional aircraft are needed, Optimum has the right to subcontract flights to other providers and/or charter an aircraft and staff it with Optimum clinicians.

(i)     When Optimum clinicians are unavailable due to system demand and additional clinical personnel are needed, Chronos has the right to subcontract medical personnel from other providers to provide staffing for air ambulance charter flights.

1.5.     <u>Flight Authority</u>. Optimum shall have the authority to designate the medical and ancillary services to be performed pursuant to its air medical operations but Chronos shall have full operational control over the Aircraft for all flights hereunder as stipulated in 14 C.F.R. Section 135.77. Operational control as defined in 14 C.F.R. Section 1.1, means the exercise of authority over initiating, conducting, or terminating a flight, subject to the pilot-in-command's (the "**PIC**") authority for

all safety and flight matters. Chronos' responsibility for operational control supersedes any agreement, contract, understanding or arrangement, either oral or written, expressed or implied, between any persons or Parties. Consequently, Optimum shall not require Chronos to make any flights in situations where flights are deemed unsafe to execute by either the PIC of the Aircraft or management personnel.

1.6.    <u>Chronos Compliance</u>. Chronos represents and warrants that all Aircraft and all Chronos personnel are properly licensed and certified in accordance with all applicable local, state, and federal laws, along with all governmental agencies having jurisdiction over Chronos and the aviation industry. Chronos represents and warrants that it is authorized to use the Aircraft pursuant to the flight services to be performed in accordance with this Agreement. Chronos shall strictly comply with all obligations and conditions of its licenses and certifications and with all of the rules and regulations and directives of such local, state, and federal agencies.

1.7.    <u>Optimum Compliance</u>. Optimum represents and warrants that its ambulance, air medical, and/or non-emergency transport services are licensed and approved in accordance with all applicable local, state, and federal laws, along with all governmental agencies having jurisdiction over Optimum and the emergency medical industry. Optimum represents and warrants that it is authorized to engage in the emergency and non-emergency medical services to be performed in accordance with this Agreement. Optimum shall strictly comply with all obligations and conditions of its licenses and certifications and with all of the rules and regulations and directives of such local, state, and federal agencies.

## 2.    COMPENSATION

2.1.    <u>Consideration</u>. As consideration for the Services mutually provided by the Parties pursuant to this Agreement, the Parties agree that each Party shall receive **Fifty Percent (50%)** of the Distributable Cash Flow resulting from any and all Transports provided pursuant to this Agreement. For the purposes of this Agreement, "**Distributable Cash Flow**" shall mean all money earned via Reimbursement from a Transport after deducting Chronos Expenses and Optimum Expenses.

2.2.    <u>Expenses</u>.

(a)    <u>Chronos Expenses</u>. For the use of its Lear 35A (Serial Number 485; Tail No. N90J), for services provided pursuant to this Agreement, the Parties agree that Chronos shall be reimbursed **One Thousand, Six Hundred Dollars ($1,600)** per flight hour. For the use of its Lear 55 (Serial Number 089; Tail No. N55FJ) for services provided pursuant to this Agreement, the

4

Parties agree that Chronos shall be reimbursed **One Thousand, Eight Hundred Fifty Dollars ($1,850)** per flight hour. The Parties shall agree, in advance, on a compensation rate should Chronos substitute another Aircraft for either of the two Aircraft described above. Flight hours are defined as an Aircraft being in the air servicing a Transport, returning to its home base (with or without medical crew and/or a patient) after a Transport, or repositioning for a Transport or for mutually agreed upon needed maintenance or repair. As an example, but not as a limitation of the foregoing, Chronos shall be reimbursed for the flight hours flown to position the Aircraft in Las Vegas on or immediately after the Effective Date of this Agreement. The Parties further agree that Chronos shall be reimbursed for (i) all Aircraft fuel, landing fees, parking fees, and cleaning costs borne by Chronos; (ii) the out-of-pocket costs borne by Chronos to fly its Aircraft personnel (on commercial airliners) to and from Las Vegas; and (iii) the out-of-pocket costs borne by Chronos if any of its crew is delayed in returning to Las Vegas from a Transport shall be deemed Chronos Expenses. Examples include, but are not limited to accommodations and per diem costs incurred because of a weather delay. (All reimbursable expenses incurred by Chronos shall, hereinafter, be referred to as the "**Chronos Expenses.**")

(b)  Optimum Expenses. The Parties agree that Optimum shall be compensated for its costs for providing ground transportation in Las Vegas, including medical personnel and medical services rendered by them pursuant to this Agreement, at a rate of $500 per Transport. Optimum shall pay and shall be reimbursed, at cost, for its ground transportation expenses required in other locations. The Parties further agree that, where practical, Optimum shall provide payment at the time service is provided or within vendor-assigned payment terms, and shall be reimbursed thereafter, for all Aircraft fuel, landing fees, parking fees, and cleaning costs (All reimbursable expenses incurred by Optimum shall, hereinafter, be referred to as the "**Optimum Expenses.**") (The Chronos Expenses and the Optimum Expenses, in the aggregate shall, hereinafter, be referred to as "**Joint Expenses.**").

2.3.  Invoices. Each Party shall furnish a detailed invoice to the other Party for the services provided pursuant to each Transport, based upon the Joint Expenses as set forth in Section 2.2 (each, an "**Invoice**") in a mutually agreed upon method. Each Party shall submit each Invoice to the other Party within seven (7) days of each Transport. Each Party represents and warrants that each Invoice submitted is accurate, complete, fully documented, and consistent with any invoices submitted to Medicare, Medicaid, and/or any other payor for ambulatory services provided pursuant to this Agreement.

2.4. <u>Accounting</u>.  In addition to those responsibilities delineated in <u>Section 3.2</u>, Optimum shall perform, at its sole cost and expense, all banking, accounting, tax filing, governmental regulatory compliance (if necessary), and billing services for each Transport, including without limitation, all claims, submittals and Reimbursement requests.  Optimum shall maintain a single, separate bank account into which payments for transports conducted under this agreement shall be transferred, which will be accessible by both Parties.

2.5. <u>Payment</u>. Optimum agrees to (a) reimburse Chronos for the Chronos Expenses (b) reimburse itself for the Optimum Expenses and (c) pay each Party its respective share of the Distributable Cash Flow (each, a "**Payment**") within three (3) business days after receiving Reimbursement for any given Transport, or at such other times and/or intervals as the Parties may mutually agree to in writing. If, for any Transport, a Reimbursement (or partial Reimbursement) is less than the sum of the Chronos Expenses and the Optimum Expenses, Optimum, at its discretion, may either delay Payment until sufficient funds are received or pay Chronos and itself on the same proportional basis as the Parties' Invoices, but shall not pay one Party disproportionally to the other Party.  For the purposes of this <u>Section 2</u>, "**Reimbursement**" shall mean payment from Medicare, Medicaid, and/or any other payor for ambulatory services provided pursuant to this Agreement.

## 3.    RESPONSIBILITIES

3.1. <u>Responsibilities of Chronos</u>. Throughout the term of this Agreement, Chronos shall, at its own cost and expense, have the following responsibilities:

(a)    furnish, operate, and maintain at least one (1) Aircraft in order to perform the flight services set forth hereunder;

(b)    provide licensed pilots experienced in the operation of the Aircraft;

(c)    provide proper modifications to the Aircraft to support medical devices, or otherwise cause such modifications to be made;

(d)    if Chronos deems necessary, provide covers for the Aircraft if the Aircraft must remain outside for short periods;

(e)    provide all necessary spare parts, tools and equipment for proper and compliant Aircraft operation and maintenance;

(f)    provide all oil, greases and other supplies incident to the performance of flight services; and

(g)     obtain the services of any licensed, skilled and qualified personnel that may be necessary for the continual operation and maintenance of the Aircraft, who shall not be deemed employees of Optimum.

3.2.    <u>Responsibilities of Optimum</u>. Throughout the term of this Agreement, Optimum shall, at its own cost and expense, have the following responsibilities:

(a)     provide skilled, licensed, and experienced medical personnel to accompany each Transport, to support the provision of Optimum's air medical services, and to generally support the safety and efficiency of flight operations; all such medical personnel shall be in compliance with the flight crew training requirements provided in Section V.23.7 of Chronos' FAR Part 135 Air Ambulance Operations Manual, subsections a, c, e, f, g, and h, a copy of which is attached hereto as <u>Exhibit A</u>.

(b)     provide, staff, and maintain a communications center capable of receiving requests for air medical transport services from anywhere in the Operating Area;

(c)     cover the cost, condition, and upkeep of all medical devices, including any equipment that is affixed to the Aircraft, except that upkeep for any medical device that requires Chronos to track and maintain its condition pursuant to a Supplemental Type Certificate (as defined and set forth in 14 CFR 21.111) shall be paid for by Chronos and invoiced to Optimum;

(d)     cover any and all costs associated with the provision of medical care during each Transport;

(e)     cover costs associated with any additional ground ambulance transportation before, during, and/or after each Transport;

(f)     provide Chronos with read only access to Optimum's Microsoft Lists app, its AdvanceClaims program, and any spreadsheet programs it creates so as to provide Chronos with the names of all patients and their insurance information corresponding with any Transport covered under this agreement, and with copies of all correspondence Optimum has with Medicare, Medicaid, and/or any other payor for ambulatory services provided pursuant to this Agreement and with copies of all correspondence related to any claims or disputes arising from any Transport;

(g)     within ten (10) days of receipt, provide Chronos with copies of all bank statements to which Reimbursements have been deposited or Expenses distributed and with copies of all invoices and receipts, Reimbursement claims, Reimbursement payments, and tax returns related to the Services

7

performed by Chronos and/or Optimum as contemplated by this Agreement;

    (h)    as of the Effective Date, provide Chronos a hangar at a mutually acceptable location at its facility in Las Vegas for the Aircraft; and

    (i)    as of the Effective Date, provide suitable housing in Las Vegas for Aircraft personnel at a mutually acceptable residence.

3.3.    <u>Joint Responsibilities</u>. The Parties shall designate representatives or establish committees who shall discuss the following subjects, whether through meetings, telephone calls, or correspondence, as often and in such a manner as the Parties deem necessary or appropriate:

    (a)    periodic payment and billing reconciliations, including quarterly reviews to determine if costs are being equitably shared;

    (b)    accreditation audits;

    (c)    employee disputes; and

    (d)    such other subjects as the Parties may deem necessary or appropriate.

## 4.    TERM / TERMINATION

4.1.    <u>Term</u>. The term of this Agreement (the "**Term**") will begin on the Effective Date and will remain in full force and effect for a period of one (1) year (the "**Original Term**"). Upon the expiration of the original Term or any renewal term (each, a "**Renewal Term**"), this Agreement shall automatically renew for an additional five (5) year period unless, at least sixty (60) days prior to the renewal date, either Party gives the other Party written notice of its intent not to renew this Agreement.

4.2.    <u>Effective Date</u>.  The Effective Date shall be that date when the Federal Aviation Agency approves Chronos' A024 Air Ambulance Op Specs.

4.3.    <u>Termination</u>.

    (a)    The Parties may terminate this Agreement at any time by mutual written consent.

    (b)    Either Party may terminate this Agreement by giving written notice of termination at least sixty (60) days prior to the termination of the Original Term or any Renewal Term.

(c)     Either Party may terminate this Agreement by giving ten (10) days written notice that Distributable Cash Flow has failed to cover that Party's operating costs for the prior three month period if no acceptable changes/compromise can be reached by mutual agreement of the Parties.

(d)     Either Party may terminate this Agreement upon thirty (30) days written notice that the other Party has materially breached any material term of this Agreement (each a "**Default**") and has failed to cure such breach within thirty (30) days following written notice from the non-breaching Party of such breach.

4.4.    <u>Effect of Default</u>.  In the event of a Default, Optimum and Chronos agree to negotiate, in good faith, a settlement that is mutually acceptable to both Parties. In the event the Parties cannot come to an Agreement regarding damages, the non-defaulting Party shall be entitled to pursue any remedy provided in law or equity.

4.5.    <u>Bankruptcy</u>. Either Party may terminate this Agreement immediately upon the occurrence of any of the following events with regard to the other Party: (i) the making of a general assignment for the benefit of creditors, (ii) the filing of a voluntary petition or the commencement of any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extension, or (iii) the filing of any involuntary petition or the involuntary commencement of any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extension, which such petition or proceeding is not dismissed within ninety (90) days of the date on which it is filed or commenced.

4.6.    <u>Effects of Termination</u>. Upon termination of this Agreement, as provided in this <u>Section 4</u>, no Party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of termination, including payment of the invoices and fees relating to services provided by Chronos or Optimum prior to such termination without offset or credit, and (ii) obligations and covenants set forth herein that are expressly made to extend beyond the termination of this Agreement, including indemnities.

5.      **ARBITRATION.** Any non-personnel controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The losing party in any arbitration award shall pay the reasonable legal fees of the prevailing party.

6.      **PERSONNEL DISPUTES**

9

6.1. <u>Dispute Resolution Process</u>. The Parties acknowledge and agree that the successful cooperation and coordination of Optimum personnel and Chronos personnel is necessary for the safe, efficient, and effective provision of air medical transport services pursuant to this Agreement. Should either Party claim (the "**Disputing Party**") any personnel of the other Party (the "**Party at Issue**") as unsafe, uncooperative, or otherwise unfit, or otherwise claim a dispute with any personnel of the other Party, the Parties shall initially attempt to resolve such claims, disputes or controversies by conducting good faith negotiations ("**Dispute Resolution**").

(a) <u>Dispute Resolution Process</u>. The Disputing Party shall submit to the Party at Issue written notice detailing the claims, controversies, and/or personnel in dispute (the "**Dispute Notice**"). The Parties shall then have thirty (30) days from the date of the Dispute Notice to present any evidence in accordance with Sections 6.1(c) and/or 6.1(d), and to negotiate, in good faith, a resolution to the issues set forth.

(b) <u>Failure of Dispute Resolution</u>. Should the Parties be unable to resolve the matter in thirty (30) days following the Dispute Notice, either Party may hold the other Party in default and the terms and conditions set forth in <u>Section 4</u>, including all applicable grace and cure periods, shall apply.

(c) <u>Disputes with Optimum Personnel</u>. Any disputes by Chronos with Optimum personnel shall be supported by documented evidence of lack of fitness, including but not limited to evidence demonstrating lack of licensure or certification, poor decision making, and/or any recklessness or gross negligence with respect to the responsibilities of such Optimum personnel. Copies of any such evidence shall be provided to Optimum timely during Dispute Resolution.

(d) <u>Disputes with Chronos Personnel</u>. Any disputes by Optimum with Chronos personnel shall be supported by documented evidence of lack of fitness, including but not limited to evidence demonstrating lack of licensure or certification, failure to cooperate with, support, or comply with Optimum's Flight Authority, and/or any recklessness or gross negligence pursuant to the responsibilities of Chronos personnel. Copies of any such evidence shall be provided to Chronos timely during Dispute Resolution.

**7.    INSURANCE**

7.1. <u>Chronos Insurance</u>. Chronos, at its own cost and expense, shall obtain and maintain in full force and throughout the Term of this Agreement, customary insurance policies including but not limited to (i) Worker's Compensation Insurance, (ii) Employer's Liability Insurance, and (iii) Aircraft Liability Insurance covering the Aircraft and passenger liability Insurance.  Prior to the Effective Date, Chronos

shall provide Optimum with a certificate of insurance naming Optimum as an additional insured on a primary non-contributory basis for Aircraft liability in the amount of Twenty-five Million Dollars ($25,000,000.00) for bodily injury or property damage.

7.2.    <u>Optimum Insurance</u>. Optimum, at its own cost and expense, shall obtain and maintain in full force throughout the Term of this Agreement, its own (i) General Liability Policy in a minimum amount of Five Million Dollars ($5,000,000.00) with Company Umbrella Policy, (ii) Employer Liability Policy in a minimum amount of One Million Dollars ($1,000,000.00), (iii) Workman's Compensation Policy in an amount equal to or greater than the amount required by Nevada State law, and (iv) Malpractice Insurance Policy in a minimum amount of Five Million Dollars ($5,000,000.00).  Prior to the Effective Date, Optimum shall name Chronos as an additional insured on its insurance policies and shall provide Chronos with a certificate of insurance evidencing such coverage.

## 8.    INDEMNIFICATION

8.1.    <u>By Optimum</u>. Optimum agrees to protect, defend, indemnify and hold harmless Chronos against loss, damage, or expense by reason of any suits, claims, demands, judgments and causes of action caused by Optimum, its employees, agents or any subcontractor, arising out of or in consequence of the performance of this Agreement, except that in no instance shall Optimum be held responsible for any liability, claim, demand, or cause of action more than 50% attributable to the negligence of Chronos.  This <u>Section 8.1</u> is subject to any restrictions or limitations imposed by law but only to the extent of such restrictions or limitations.

8.2.    <u>By Chronos</u>. Chronos agrees to protect, defend, indemnify and hold harmless Optimum against loss, damage, or expense by reason of any suits, claims, demands, judgments and causes of action caused by Chronos, its employees, agents or any subcontractor, arising out of or in consequence of the performance of this Agreement, except that in no instance shall Chronos be held responsible for any liability, claim, demand, or cause of action more than 50% attributable to the negligence of Optimum.  This <u>Section 8.2</u> is subject to any restrictions or limitations imposed by law but only to the extent of such restrictions or limitations.

8.3.    <u>Survival</u>. The provisions of this <u>Section 8</u> shall survive the termination of this Agreement.

## 9.    CONFIDENTIAL INFORMATION

9.1.    Each Party (the "**Receiving Party**") acknowledges that, in performance of its obligations under this Agreement, it may have access to certain Confidential Information (as defined below) of the other Party (the "**Disclosing Party**") that is

11

critical to the success of the business operations of the Disclosing Party. Accordingly, during and after the Term of this Agreement, except with the written consent of the Disclosing Party or as otherwise required by applicable law, the Receiving Party shall maintain the confidentiality of the Confidential Information of the Disclosing Party, shall not use or disclose the Confidential Information to anyone or for any purpose, except as necessary to perform its obligations hereunder, and shall not make or keep copies or reproduce in any form the Confidential Information.

9.2.    For purposes of this Agreement, "**Confidential Information**" shall mean any and all information, patents, licenses, copyrights, trademarks, trade names, service marks, service names, "know-how," trade secrets, details (including pricing and other key terms), consulting contracts, including the details of this Agreement, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, procurement and sales activities, promotional and pricing techniques, credit and financial data concerning customer and patients, business acquisition plans or any portion or phase of any scientific or technical information, ideas, discoveries, designs, computer programs (including source or object codes), processes, procedures, formulas or improvements of the Disclosing Party, that is not generally known to the general public; provided however, that Confidential Information shall expressly exclude any such information which has been developed by the Receiving Party or its Affiliates.  Confidential Information shall expressly exclude (a) information that was publicly available at the time it was acquired by the Receiving Party, or (b) information that subsequently became public through no act or omission of the Receiving Party.

9.3.    In the event that the Receiving Party is compelled by legal process to disclose Confidential Information, the Receiving Party shall promptly notify the Disclosing Party to allow the Disclosing Party to either waive compliance with this Section 9 or take legal action to prevent the disclosure. If the Receiving Party is nonetheless compelled to disclose the Confidential Information before the Disclosing Party can take any such action, it shall disclose only the minimum amount of Confidential Information required to comply with such legal process. Without limiting other possible remedies for breach of this Section 9, the Parties agree that injunctive or other equitable relief shall be available to enforce the provisions of this Section 9, such relief to be without the necessity of posting a bond, cash or otherwise. The provisions of this Section 9 shall survive the expiration or other termination of this Agreement, regardless of the cause of such termination.

## 10.    RETURN OF PROPERTY

10.1.    Return of Optimum Property. All documents, records, apparatus, equipment and other physical property or Confidential Information which is furnished to or obtained by Chronos in the course of this Agreement shall be and remain the sole

property of Optimum. Chronos agrees that, upon the expiration or termination of this Agreement, Chronos shall return all such property and agrees not to make or retain copies, reproductions, or summaries of such property.

10.2. <u>Return of Chronos Property</u>. All documents, records, apparatus, equipment and other physical property or Confidential Information which is furnished to or obtained by Optimum in the course of this Agreement shall be and remain the sole property of Chronos. Optimum agrees that, upon the expiration or termination of this Agreement, Optimum shall return all such property and agrees not to make or retain copies, reproductions, or summaries of such property.

## 11. MISCELLANEOUS

11.1. <u>Regulatory Compliance</u>. The Parties recognize and acknowledge that this Agreement and any underlying arrangements shall be subject to applicable state and federal laws, regulations and policies, including, but not limited to, those laws, regulations, and policies pertaining to Medicare and Medicaid reimbursement. In performing their respective duties and obligations hereunder, the Parties shall comply with all codes, ordinances, rules, regulations and requirements of all applicable federal, state and municipal authorities now in force, or which may hereafter be in force. Without limiting the generality of the foregoing, each Party agrees to perform its respective duties and obligations in a non-discriminatory manner without regard to race, gender, color, national origin, sexual orientation or disability and to operate in compliance with any compliance plans and programs in place for the operation of Optimum.

11.2. <u>Assignability</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto (whether by operation of law or otherwise) without the prior written consent of the other Parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

11.3. <u>Notice</u>. Any notices to be given hereunder by a Party to any other Party shall be deemed to be received by the intended recipient (i) when delivered personally, (ii) the day following delivery to a nationally recognized overnight courier service with proof of delivery, (iii) if sent by facsimile or electronic mail, upon confirmed transmission, or (iv) three (3) days after mailing by certified mail, postage prepaid with return receipt requested to the address for such Party as outlined in this Agreement. Any Party may change such Party's address for notice under this Agreement by giving prior written notice to the other Party of such change in the manner provided in this <u>Section 11.3</u>.

**Chronos**                                    **Optimum**

13

Hightail Air Charter, LLC                OptimuMedicine, LLC
1011 South Wolf Rd                       175 E Reno Ave Suite C-#
Wheeling, IL 60090                       Las Vegas, NV 89119
d/b/a Chronos Air Group LLC              d/b/a Optimum AIR
Attn: Scott Saldana                      Attn : Devon Eisma, CEO
Email: scott@iflychronos.com             Email : devon@optimumedicine.com
Phone: 312-505-5931                      Phone: (702) 286-6490

Copies of all notices shall be sent to each Party's respective attorneys.  If to Chronos' attorney, to:

Jonathan Strauss
20 N. Clark Street; Suite 3300
Chicago, Illinois 60602
Email: Jonathan@JonathanStraussLaw.com
Phone: 312-578-0562

If to Optimum's attorney, to:

Glenn Truitt
Private Wealth Law, Inc.
400 S. 4th St, Suite 540
Las Vegas, NV 89101
Email: gtruitt@privatewealthlawinc.com
Phone: 702-852-6601

11.4.  <u>Contractor Status</u>. In the performance of this Agreement, each Party shall at all times be considered an independent contractor and neither it or its agents, servants, nor employees shall be considered employees of the other Party.  Each Party's agents, servants and employees shall be under the exclusive supervision and control of that Party.

11.5.  <u>Waiver</u>. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that Party of the right thereafter to that term or any other term of this Agreement.

11.6.  <u>Construction</u>. Each Party has reviewed this Agreement and the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof.

11.7.  <u>Modification</u>. Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be

binding if evidenced in writing signed by each Party or an authorized representative of each Party.

11.8.  <u>Counterpart</u>. This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered (including delivery by facsimile transmission or email scan) shall be deemed an original, and all of which together shall constitute one and the same instrument.

11.9.  <u>Governing Law</u>. This Agreement shall be governed by and shall be construed, interpreted, and enforced in accordance with the laws of the State of Nevada. In the event that Nevada law is held inapplicable, the law of the state in which the work is performed shall apply.

11.10.  <u>Severability</u>. In the event any provision of this Agreement is held to be invalid, illegal, or unenforceable for any reason and in any respect, and if the extent of such invalidity, illegality or unenforceability does not destroy the basis of the bargain herein, such invalidity, illegality or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall remain in full force and effect, enforceable in accordance with its terms as if such provisions had not been included, or had been modified as provided below, as the case may be. To carry out the intent of the Parties hereto as fully as possible, the invalid, illegal or unenforceable provisions, if possible, shall be deemed modified to the extent necessary and possible to render such provisions valid and enforceable. In the event this Agreement cannot be modified to the satisfaction of both Parties, then either Party may terminate this Agreement upon ten (10) days' written notice to the other Party.

11.11.  <u>Entire Agreement</u>. This Agreement constitutes the full and complete understanding between the Parties hereto with respect to the subject matter of this Agreement.  No modification or amendment hereof shall be valid or binding on either Party hereto unless made in writing or signed on behalf of such Party by its proper officers or representatives' thereunto duly authorized.

*[Signatures on following page]*

      **IN WITNESS WHEREOF,** and intending to be legally bound, the Parties hereto affix their signatures below and execute this Agreement as of the Effective Date.

**Hightail Air Charter, LLC,**             **OptimuMedicine, LLC,**
a Delaware limited liability company     a Nevada limited liability company


**By:** _Scott Saldana (Sep 11, 2024 22:05 EDT)_        **By:** _Devon Eisma (Sep 11, 2024 13:52 PDT)_
**Name: Scott Saldana, Manager**      **Name: Devon Eisma, CEO**

<u>EXHIBIT A</u>

**Chronos' FAR Part 135 General Operations Manual – Air Ambulance Operations**

*See attached.*

## Chronos Air Group

| | |
|---|---|
| Section V | FAR Part 135 General |
| Flight Operations | Operations Manual |

Note: After the last deplaning passenger has entered the terminal building, the crewmember should return to the aircraft to complete post-flight duties.

**V.23.7 Air Ambulance Operations.**

Flight Crews will be trained on their Initial Operating Experience on all airplanes that are used for Air Ambulance Operations Specific Areas that will be accomplished during the IOE are:

   a. Aircraft medical systems variations:
   b. Passenger restraining methods in flight;
   c. Flightcrew functions and responsibilities, including Crew Resource Management ( CRM) as it pe1tains to interface between medical personnel and flightcrew members;
   d. Aircraft systems variations, such as special electrical systems, navigational radios, and instrumentation and their performance characteristics;
   e. Handling of special medical equipment to include loading/unloading of stretchers, isolettes, balloon pumps, and ventilators;
   f. Appropriate restraint of infants, pediatric patients, and problem passengers to include prisoners.
   g. International operations (if appropriate); and
   h. Bloodbome pathogens (BBP) and biohazard and infection control, including prevention and control of infectious diseases.

**V.23.8    Ramp Entry**.

Given the congestion of some of the small ramp areas into which Chronos Air Group operates, it is imperative pilots follow directions of ramp personnel. Their ground directions must be followed unless the Pilot-in-Command feels the ground guidance will jeopardize his ability to taxi safely. It is imperative for both crewmembers to be aware of wing tip clearance. If not, STOP and VISUALLY observe.

In order to minimize confusion, standard hand signals should be used to insure proper response from the Flight Crew in positioning the aircraft:

These should be used whenever the aircraft is:

   • Arriving
   • Departing; and/or
   • Moving anywhere on the ramp
   • Give signals in a clear and concise manner. Remember, the Flight Crew cannot hear or see facial expressions.

HT-101

# [REDLINE] Saldana.Optimum Mutual Services Agreement.8.29.24 v2 [PWL]DEVON

Final Audit Report                                                         2024-09-12

| | |
|---|---|
| Created: | 2024-09-11 |
| By: | Devon Eisma (devon@optimumedicine.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA3Oabc2_YENy2HCV6BsVCs3qMkj8BICt2 |

## "[REDLINE] Saldana.Optimum Mutual Services Agreement.8.29. 24 v2 [PWL]DEVON" History

📄 Document created by Devon Eisma (devon@optimumedicine.com)
2024-09-11 - 8:48:16 PM GMT

📧 Document emailed to Scott Saldana (scott@iflychronos.com) for signature
2024-09-11 - 8:48:26 PM GMT

📧 Document emailed to Devon Eisma (devon@optimumedicine.com) for signature
2024-09-11 - 8:48:26 PM GMT

✍️ Document e-signed by Devon Eisma (devon@optimumedicine.com)
E-signature hosted by Devon Eisma (devon@optimumedicine.com)
Signature Date: 2024-09-11 - 8:52:04 PM GMT - Time Source: server

📄 Email viewed by Scott Saldana (scott@iflychronos.com)
2024-09-12 - 1:51:42 AM GMT

✍️ Document e-signed by Scott Saldana (scott@iflychronos.com)
Signature Date: 2024-09-12 - 2:05:49 AM GMT - Time Source: server

✅ Agreement completed.
2024-09-12 - 2:05:49 AM GMT

**Adobe Acrobat Sign**

# EXHIBIT 3

# SECURITY AGREEMENT

This Security Agreement ("Agreement") is made and entered into as of February 21, 2025 by and between:

BORROWER:

OptimuMedicine, LLC

175 E Reno Ave , Suite C

Las Vegas, Nevada 89119

d/b/a Optimum AIR

LENDER:

Hightail Air Charter, LLC

1011 S Wolf Rd

Wheeling, IL 60090

d/b/a Chronos Air Group LLC

The Borrower and Lender shall, hereafter, be referred to as the Parties.

RECITALS:

Whereas, Borrower and Lender entered into a Mutual Services Agreement on September 11, 2024 ('MSA");

Whereas, on February 13, 2025, Lender issued to Borrower a Notice of Termination and Notice of Default; and

Whereas, the Parties now desire to reinstate the MSA on terms mutually satisfactory to each of them, including, but not limited to the terms set forth herein.

1

AGREEMENT:

NOW THEREFORE, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which consideration is hereby acknowledged, the Parties hereby agree as follow:

## 1. Grant of Security Interest

Borrower hereby grants and conveys to Lender a perfected first priority security interest in all of Borrower's now existing and hereafter arising accounts receivable and those of its subsidiaries, affiliates, and assigns. (collectively referred to as "Collateral"). Borrower shall maintain and pay for bank control accounts for Borrower's accounts receivables.

## 2. Representations and Warranties:

Borrower represents and warrants that:

(a) Exhibit 1, attached hereto and made a part hereof, is a full and complete schedule of all its now existing accounts receivable as of February 26, 2025 (the "Accounts Receivable").

(b) The Accounts Receivable are valid and enforceable obligations.

(c) There are no other liens or encumbrances on the Collateral, except as disclosed in this Agreement.

(d) Borrower has full authority to grant this security interest.

## 3. Obligations of Borrower:

Borrower agrees to:

(a) Notify Lender promptly of any changes in the Collateral.

(b) Maintain accurate records of the Accounts Receivable and the Collateral.

(c) Use the proceeds from the Collateral for business purposes only.

## 4. Filing of UCC Financing Statement:

The Borrower agrees that concomitantly with the execution of this Agreement, it shall complete and execute a UCC Filing Statement in form substantially similar to that attached hereto as

Exhibit 2 and that the Lender may file the UCC Financing Statement with the appropriate state filing office in Nevada to perfect the security interest granted under this Agreement. The Borrower authorizes the Lender to take any necessary action to effectuate the perfection of the security interest in accordance with applicable laws.

**6. Notice of Filing:**

The Lender shall provide the Borrower with a copy of the filed UCC Financing Statement or any amendments thereto promptly after such filing, ensuring the Borrower is informed of the secured interests recorded against its assets

**7. Duration of Filing:**

(a) The UCC Financing Statement shall remain in effect throughout the duration of the term of the MSA or until all monies owed Lender by Borrower have been paid in full, whichever is later.

(b) Until all monies due Borrower from Lender under the MSA (the "Debt") have been satisfied in full, Lender shall maintain a first security lien on the Collateral. If Borrower secures financing that allows it to pay Lender the Debt,   Lender shall file such financing statements as required by law to reduce its security interest from a first lien to that of a second lien.

(c) To effectuate such payment, Borrower shall notify any finance company willing to collateralize the Collateral that the finance company must pay Lender the balance of all monies due Lender under the MSA from the proceeds of said loan.  The parties agree that the services of an independent escrow company may be necessary.  The Parties shall share equally in the costs of such escrow service provider.

**8 Specific Performance:**

(a) Obligation to Cooperate.  The Borrower acknowledges that its prompt cooperation is essential for the Lender to perfect its security interest in accordance with this Agreement, including the filing of the UCC Financing Statement.

(b) Covenant to Perform.  The Borrower covenants and agrees to take all necessary actions, execute all required documents, and provide any necessary information promptly upon the Lender's request to facilitate the perfection of the security interest.

(c) Right to Seek Specific Performance.  In the event the Borrower fails or refuses to cooperate as required under this Agreement, the Lender shall have the right to seek an order of specific performance from a court of competent jurisdiction, compelling the Borrower to fulfill their obligations under this Agreement. The Borrower acknowledges that monetary damages may not be a sufficient remedy for such non-compliance, and therefore, the Lender shall not be limited to seeking damages alone.

(d) Costs and Fees.  If the Lender is required to take legal action to enforce this provision, the Borrower agrees to pay all reasonable costs and attorney fees incurred by the Lender in connection with such action, including but not limited to any action seeking specific performance.

**9. Default:**

In the event of default by the Borrower, the Lender shall have all rights and remedies available under applicable law, including the right to take possession of the Collateral.

**10. Governing Law:**

This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

**11. Assignability:**

Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto (whether by operation of law or otherwise) without the prior written consent of the other Parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

**12. Notice:**

Any notices to be given hereunder by a Party to any other Party shall be deemed to be received by the intended recipient (i) when delivered personally, (ii) the day following delivery to a nationally recognized overnight courier service with proof of delivery, (iii) if sent by facsimile or electronic mail, upon confirmed transmission, or (iv) three (3) days after mailing by certified mail, postage prepaid with return receipt requested to the address for such Party as outlined in this Agreement. Any Party may change such Party's address for notice under this Agreement by giving prior written notice to the other Party of such change.  Notices to the Parties shall be provided to the following addresses:

**If to Lender**

Hightail Air Charter, LLC
1011 S. Wolf Road
Wheeling, IL 60090
d/b/a Chronos Air Group LLC
Attn: Scott Saldana
Email: scott@iflychronos.com
Phone: 312-505-5931

**If to Borrower**

OptimuMedicine, LLC
175 E Reno Ave Suite C-#
Las Vegas, NV 89119
d/b/a Optimum AIR
Attn: Devon Eisma, CEO
Email: devon@optimumedicine.com
Phone: (702) 286-6490

Copies of all notices shall be sent to each Party's respective attorneys.  If to Lender's attorney, to:

Jonathan Strauss
20 N. Clark Street; Suite 3300
Chicago, Illinois 60602
Email: Jonathan@JonathanStraussLaw.com
Phone: 312-578-0562

If to Borrower's attorney, to:
Glenn Truitt
Private Wealth Law, Inc.
400 S. 4th St., Suite 540
Las Vegas, NV 89101

**13.  Waiver:** The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that Party of the right thereafter to that term or any other term of this Agreement.

**14. Construction:** Each Party has reviewed this Agreement and the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof.

**15. Modification:** Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be binding if evidenced in writing signed by each Party or an authorized representative of each Party.

**16. Electronic Signatures:**

This Agreement may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.

**17. Counterparts:**

This Agreement may be executed in one or more counterparts and, if executed in more than one counterpart, the executed counterparts shall each be deemed to be an original but all such counterparts shall together constitute one and the same instrument.

[The remainder of this page is intentionally left blank]

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first above written.

**OptimuMedicine, LLC**

By: _____

    Devon Eisma, CEO

Title: _____

**Hightail Air Charter, LLC**

By: _____

    Scott J. Saldana

Title: Manager

7

# EXHIBIT A

# OptimuMedicine

## A/R Aging Summary

As of February 26, 2025

| | CURRENT | 1 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 AND OVER | TOTAL |
|---|---|---|---|---|---|---|---|---|
| AARP Supplemental | | 88,182.87 | | | | | | $88,182.87 |
| Aetna - Commercial | | 3,927.89 | 59,640.76 | | | | | $63,568.65 |
| Aetna - Mgd Medicare | 109.43 | | | | | | | $109.43 |
| Aetna TX- Mgd Medicare | 2,557.50 | | | | | | | $2,557.50 |
| Anthem BCBS of CA COMMERCIAL | | | | | | 38,495.00 | | $38,495.00 |
| Anthem BCBS of NV COMMERCIAL ID#SB765 | | | | 16,236.00 | | | 24,736.00 | $40,972.00 |
| Anthem BCBS of NV FEP Blue | 213.69 | | | | | | | $213.69 |
| Anthem BCBS of NV MEDICAID ID#SB765 | | | | 21,906.00 | | | 23,840.00 | $45,746.00 |
| BCBS of Arizona | | | | | | | 181,450.00 | $181,450.00 |
| California Medicaid - Medi-Cal | | | | | | | 831.60 | $831.60 |
| CIGNA - Advisory Health | | | | -1,426.35 | 2,365.00 | | | $938.65 |
| CNMI Medicaid | 203,250.00 | | | | | | | $203,250.00 |
| Culinary Health Fund | | | 446.87 | | | | | $446.87 |
| Emergency AirLift | | | | | | | 3,309.48 | $3,309.48 |
| EMS Events | | | | | | | 1,759.88 | $1,759.88 |
| Geha United HealthCare Shared Services | | | | | 382.04 | | 2,170.00 | $2,552.04 |
| Health Plan of Nevada (HPN) - Commercial | 26,840.50 | 3,615.00 | | | 52,120.00 | 25,788.00 | | $108,363.50 |
| Health Plan of Nevada (HPN) - Mgd Medicaid | 5,842.50 | 23,670.00 | 32,103.25 | | 612.00 | 22,914.00 | | $85,141.75 |
| HMSA | | 172,084.44 | 122,654.00 | | | | 107,600.00 | $402,338.44 |
| HMSA Quest (HI Medicaid) | | | 35,002.86 | | | | | $35,002.86 |
| Hometown Health NV - MC | | | | 26,064.00 | | | | $26,064.00 |
| Humana - Mgd Medicare | 1,888.75 | 1,888.75 | | 2,801.25 | 431.06 | | | $7,009.81 |
| Intermountain HC - Mgd MC | 6,700.00 | 1,881.25 | | | 176.40 | 147.00 | 1,137.47 | $10,042.12 |
| Kaiser Ambulance Claims | | 15.00 | | | | | | $15.00 |
| Kaiser So Cal | | 39,575.00 | | | | | | $39,575.00 |
| Medescort International | | 28,000.00 | | | | | | $28,000.00 |
| Medway Air Ambulance | 137,300.00 | | | | | | | $137,300.00 |
| Meritain Health Aetna | 1,770.00 | | | | | | | $1,770.00 |
| Molina | | 20,500.00 | | 20,500.00 | 1,747.50 | | | $42,747.50 |
| Mountain View Hospital | | | | | | | 1,653.40 | $1,653.40 |
| Nevada Medicaid - First Health Services Corp | | 77,641.15 | -944.45 | 1,961.66 | | -0.30 | 111,461.41 | $190,119.47 |
| Nevada State Immunization Program | 49,433.73 | 42,982.69 | 31,348.87 | 21,496.67 | | | | $145,261.96 |
| NV Medicare Part B (J1 - PGBA) | 7,772.24 | 5,415.34 | -1,621.78 | -653.10 | 2,640.24 | 4,542.79 | -1,446.69 | $16,649.04 |
| One Call Medical Transports | 4,700.00 | 550.00 | | | 1,200.00 | | -60.00 | $6,390.00 |
| OptumCare SLC - Mgd MC | 1,881.25 | | 550.00 | | | | | $2,431.25 |
| P3 Health Partners Nevada | | | | 265.00 | | | 17,606.87 | $17,871.87 |
| Quest AlohaCare Mgd Medicaid | | 77,500.00 | | | | | | $77,500.00 |
| Railroad Medicare (PGBA) | | | | 550.00 | | | | $550.00 |
| SELF PAY CUSTOMERS | 3,156.32 | 13,273.96 | 4,328.31 | 4,750.17 | 8,783.47 | 10,032.68 | 78,991.41 | $123,316.32 |
| Sierra Health and Life - Commercial | | 70,347.00 | | | 3,969.00 | | | $74,316.00 |
| Sierra Health and Life - Mgd Medicaid | 48,182.75 | | | | | | | $48,182.75 |
| Silver Summit HP - Mgd MCD | | | | 20,500.00 | | | | $20,500.00 |
| Tricare East Region | | | | | 1,747.50 | | | $1,747.50 |
| Tricare for Life | | 294.39 | 200.83 | 292.17 | | 396.73 | 256.73 | $1,440.85 |
| Tricare West | 13,800.00 | 8,725.00 | | | | 1,268.73 | 722.41 | $24,516.14 |

# OptimuMedicine

## A/R Aging Summary

As of February 26, 2025

| | CURRENT | 1 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 AND OVER | TOTAL |
|---|---|---|---|---|---|---|---|---|
| UMR | | 86,868.75 | 4,476.25 | 5,863.75 | 4,746.25 | | 17,689.20 | $119,644.20 |
| United Healthcare-PPO | | | 83.29 | | | | | $83.29 |
| UnitedHealthcare - COMMERCIAL | 4,076.25 | 275.00 | -815.00 | | 2,352.87 | | | $5,889.12 |
| UnitedHealthcare - Mgd MC | | | 275.00 | | | | 8,408.48 | $8,683.48 |
| UnitedHealthcare AARP MC | | 3,986.25 | | 1,100.00 | 1,000.00 | | | $6,086.25 |
| UnitedHealthcare Community Plan / Dual Complete Mgd MC | 2,372.50 | 250.00 | | | | 275.00 | | $2,897.50 |
| UnitedHealthcare MC | 3,416.25 | | | | | | | $3,416.25 |
| VA Fee Basis Programs | 3,962.50 | 3,750.00 | 150.00 | 5,612.50 | 9,437.50 | 12,480.96 | 3,757.50 | $39,150.96 |
| VA Pacific Islands Health Care Systems | | | | 23,981.23 | | | | $23,981.23 |
| Wakefield & Associates | | | | | | | 11,476.10 | $11,476.10 |
| Wellcare by Allwell | | | | | | 463.03 | | $463.03 |
| Zurich | | | 2,126.25 | | | | | $2,126.25 |
| TOTAL | $529,226.16 | $775,199.73 | $290,005.31 | $171,800.95 | $93,710.83 | $116,803.62 | $597,351.25 | $2,574,097.85 |

# EXHIBIT B

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)

B. E-MAIL CONTACT AT SUBMITTER (optional)

C. SEND ACKNOWLEDGMENT TO:    (Name and Address)

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OptimuMedicine, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 175 East Reno Ave, Suite C-# | Las Vegas | | NV | 89119 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| HIghtail Air Charter, LLC | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1011 South Wolf Rd | Wheeling | | IL | 60090 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

Accounts Recievable, now existing or hereafter arising.

5. Check only if applicable and check only one box:    Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:    
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):    ☐ Lessee/Lessor    ☐ Consignee/Consignor    ☐ Seller/Buyer    ☐ Bailee/Bailor    ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

# EXHIBIT 4

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional)<br>JONATHAN STRAUSS | |
| **B. E-MAIL CONTACT AT FILER** (optional)<br>Jonathan@JonathanStraussLaw.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address)<br><br>Jonathan Strauss<br>20 N. Clark Street<br>Suite 3300<br>Chicago, IL 60602 | |

| Filed in the Office of | Initial Filing Number<br>**2025465805-0** |
|---|---|
| F.V. Aguilan<br><br>Secretary of State<br>State Of Nevada | **Filed On**<br>**April 10, 2025 03:25 PM** |
| | Number of Pages<br>**1** |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME<br>**OptimuMedicine, LLC** | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS<br>**175 East Reno Ave., Suite C-#** | CITY<br>**Las Vegas** | STATE<br>**NV** | POSTAL CODE<br>**89119** | COUNTRY<br>**USA** |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME<br>**Hightail Air Charter, LLC** | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS<br>**200 S. Wacker Drive; Suite 2450** | CITY<br>**Chicago** | STATE<br>**IL** | POSTAL CODE<br>**60606** | COUNTRY<br>**USA** |

4. **COLLATERAL:** This financing statement covers the following collateral:

**All accounts receivable, now existing or hereafter arising.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. **ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# EXHIBIT 5

**FIRST AMENDMENT TO THE**

**MUTUAL SERVICES AGREEMENT**

**THIS FIRST AMENDMENT TO THE MUTUAL SERVICES AGREEMENT** (the "**First Amendment**") is made and entered into this March 6th, 2025 (the "**Execution Date**") by and between **OptimuMedicine, LLC**, a Nevada limited liability company (the "**Optimum**") and **Hightail Air Charter, LLC**, a Delaware limited liability company, d/b/a Chronos Air Group, LLC (the "**Chronos**"). Optimum and Chronos may each be referred to as a "**Party**," and collectively as the "**Parties**."

**RECITALS**

**WHEREAS**, Optimum and Chronos executed a Mutual Services Agreement on September 11, 2024 (the "MSA"). The First Amendment and the MSA, taken together, shall hereinafter be referred to as the "Amended Agreement.";

**WHEREAS**, on February 13, 2025 Chronos issued to Optimum a Notice of Termination and Notice of Default, whereby Chronos alleged that Optimum committed various acts of default under the MSA and provided notice of the termination of the MSA;

**WHEREAS**, Optimum acknowledges that as of the Execution Date, Optimum owes Chronos monies under the MSA for unpaid Chronos Expenses and Chronos' share of the Distributable Cash Flow in an amount as reflected in Exhibit 1, attached hereto and by this reference made a part hereof (the "Debt").

**WHEREAS**, Optimum and Chronos executed a Security Agreement as of February 21, 2025 whereby Optimum granted Chronos a first security interest in its accounts receivable ("Security Agreement"); and

**WHEREAS**, Optimum and Chronos have negotiated a settlement of their differences and have agreed to reinstate the MSA by amending the MSA under the terms and conditions set forth below:

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which consideration is hereby acknowledged, the Parties hereby agree as follows:

1.    **LLC MEMBERSHIP**

a.    On or prior to March 25, 2025, Optimum shall arrange to assign to Chronos (or a designated affiliate of Chronos owned more than 50% by Scott Saldana or owned by a trust for which Scott Saldana is a beneficiary with more than a 50% beneficial interest) a 3% membership interest in OptimuMedicine, LLC.

1

b.    On or before March 11, 2025, Optimum shall provide Chronos with otherwise unlimited, read-only electronic access to all bank accounts of Optimum.

## 2.    ACCOUNTS RECEIVABLE

a.    On or before May 1, 2025, Optimum shall pay Chronos a one-time 13% surcharge on the Debt. Said surcharge shall increase to 18% if not paid in full by May 1, 2025, to 23% if not paid in full by June 1, 2025, to 28% if not paid in full by July 1, 2025, and increasing by 5% each month thereafter until the Debt is paid in full.

b.    Optimum shall pay Chronos a 5% surcharge on all monies owed Chronos under the Amended Agreement that accrue after the Execution Date and are not paid to Chronos within five business days of Reimbursement. Said surcharge shall increase to 10% on that balance remaining on unpaid obligations more than 30 days old, to 15% on that balance remaining on unpaid obligations more than 60 days old, and increasing by 5% each month thereafter.

c.    Optimum is currently paying $19,000 per week to Credit Line Capital Group, $12,500 to BridgeCap Advance LLC, and $12,500 to Kingdom Kapital in accordance with terms set forth in various merchant credit agreements Optimum has entered into (each one a "Merchant Credit Agreement" and collectively the "Merchant Credit Agreements.") As each Merchant Credit Agreements expires or is paid in full, Optimum shall commence paying Chronos, in identical weekly installments, an amount equal to that which it was paying on the expiring Merchant Credit Agreement. That means that Optimum will be paying Chronos $44,000 per week once the Merchant Credit Agreements are paid in full with weekly payments continuing until the Debt and all monies owed Chronos under the Amended Agreement that accrue after the Execution Date are paid in full.

d.    As provided in the Security Agreement, if Optimum secures additional financing beyond its current obligations, Optimum shall immediately pay Chronos all monies Optimum owes Chronos under the Amended Agreement before paying Optimum any funds from the loan.

e.    All partial payments made by Optimum to Chronos shall be applied first to the surcharge on the Debt as set forth in Paragraph 2a above; secondly to the surcharge on late payments accruing after the Execution Date as set forth in Paragraph 2b above; thirdly, to newly accruing obligations under the Amended Agreement; and fourthly, to the Debt (oldest to newest).

f.    Concomitantly with the execution of this First Amendment, Optimum shall execute an ACH authorization to effectuate automatic payments to Chronos from its Account No. ----2718 at Bank of Nevada to be applied consistent with the terms

2

and conditions of this First Amendment and continuing until the Debt and all monies owed Chronos under the Amended Agreement that accrue after the Execution Date are paid in full.  Until such time as the ACH authorization is in place, Optimum shall wire funds to Chronos.

g.   Chronos may, at its discretion, waive all surcharges imposed on Optimum as set forth in Sections 2(a) and 2(b) above, if Chronos is satisfied that Optimum is performing in good faith.

## 3.   REPRESENTATIONS

a.   Optimum represents and warrants that the schedule of monies owed Chronos attached hereto as Exhibit 1 is a true and complete schedule of all monies owed Chronos under the MSA as of the Execution Date.

b.   Optimum represents and warrants that the Operating Agreement attached hereto as Exhibit 2 is a true and correct copy of its current operating agreement of Optimum and that the Operating Agreement has not been amended or modified since its execution.

## 4.   TERMINATION

a.   Paragraph 4.1 of the MSA is hereby amended by modifying the Original Term to two (2) years from the Execution Date.

b.   Paragraph 4.3 (d) of the MSA is hereby amended by allowing termination of the Amended Agreement by modifying the thirty-day cure period to a ten (10) day cure period for failure to make timely Reimbursements or other monetary payments either Party is obligated to make under the Amended Agreement.

c.   Paragraph 11.3 of the MSA is hereby amended to reflect Chronos' new address of 200 S. Wacker Drive, Suite 2450, Chicago, IL 60606.

d.   Chronos may, upon twenty-four hour written notice to Optimum, suspend service (i.e. those obligations and responsibilities as are set forth in paragraph 3.1 of the MSA) if, in Chronos' reasonable belief, Optimum is not honoring its obligations under the Amended Agreement.

e.   Chronos may, upon ten-day written notice to Optimum, suspend service (i.e. those obligations and responsibilities as are set forth in paragraph 3.1 of the MSA) if its Payments (i.e. the sum of Chronos' reimbursement of Chronos' Expenses, Chronos' share of Distributable Cash Flow, and any surcharges imposed on late payments) are less than $125,000 in any rolling thirty-day period.

f.    In the event of an act of default by Optimum under the Amended Agreement, Chronos may, at its option, declare that all obligations shall be accelerated and become due and payable immediately, including but not limited to reimbursement of Chonos' Expenses and Chronos' share of the Distributable Cash Flow, notwithstanding as to whether Optimum has been reimbursed by insurance vendors for the services rendered.

## 5.    MISCELLANEOUS

a.    If there is any discrepancy between the terms and provisions contained in this First Amendment and the MSA, those terms and conditions contained herein shall prevail.

b.    Terms and phrases used in this First Amendment shall have the same meaning as used or defined in the MSA.

c.    Upon execution of this First Amendment, the MSA shall be deemed reinstated and in full force and effect, except as amended herein.  Such reinstatement shall not be deemed a waiver by Chronos of any breach of any term, covenant, or condition of the Amended Agreement, whether now existing or arising after the Execution Date.  Chronos retains all remedies available to it by law or by the terms and provisions of the Amended Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound, the Parties hereto affix their signatures below and execute this First Amendment as of the Effective Date.

**Hightail Air Charter, LLC,**
A Delaware limited liability company

**OptimuMedicine, LLC,**
a Nevada limited liability company

By: _Scott Saldana_ _____
**Name: Scott Saldana, Manager**

By: _____
**Name: Devon Eisma, CEO**

| trip number | DOS | amt due to Chronos |
|---|---|---|
| 24-001289 | 10/8/2024 | $27,148.51 |
| 24-001296 | 10/9/2024 | $39,053.19 |
| 24-1322 | 10/12/2024 | $10,020.40 |
| 24-1328 | 10/13/2024 | $14,473.09 |
| 24-1332 | 10/14/2024 | $1,569.55 |
| 24-1334 | 10/14/2024 | $8,690.98 |
| 24-1363 | 10/21/2024 | $26,612.22 |
| 24-1392 | 10/26/2024 | $5,078.51 |
| 24-1429 | 11/2/2024 | $5,351.58 |
| 24-1443 | 11/5/2024 | $13,420.31 |
| 24-1470 | 11/10/2024 | $10,233.62 |
| 24-1509 | 11/18/2024 | $10,802.59 |
| 24-1511 | 11/19/2024 | $9,813.86 |
| 24-1512 | 11/20/2024 | $16,219.99 |
| 24-1531 | 11/25/2024 | $11,914.19 |
| 24-1534 | 11/26/2024 | $12,449.70 |
| 24-1539 | 11/27/2024 | $30,355.50 |
| 24-1548 | 11/28/2024 | $10,847.33 |
| 24-1560 | 12/1/2024 | $12,035.08 |
| 24-1578 | 12/6/2024 | $28,091.83 |
| 24-1582 | 12/7/2024 | $16,230.57 |
| 24-1631 | 12/17/2024 | $27,692.06 |
| 25-004 | 1/2/2025 | $10,239.51 |
| 25-008 | 1/3/2025 | $11,348.46 |
| 25-0079 | 1/16/2025 | $13,965.23 |
| 25-00127 | 1/27/2025 | $13,167.50 |

Exhibit 1

| TOTAL | | $396,825.36 |
|---|---|---|

# Chronos.Optimum MSA Amendment final

Final Audit Report                                                              2025-03-07

| | |
|---|---|
| Created: | 2025-03-07 |
| By: | Scott Saldana (scott@iflychronos.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbitSgJlcC5ksnJQyptancYKvcvONOi2p |

## "Chronos.Optimum MSA Amendment final" History

📄 Document created by Scott Saldana (scott@iflychronos.com)
2025-03-07 - 3:13:06 AM GMT

📧 Document emailed to Devon Eisma (devon@optimumedicine.com) for signature
2025-03-07 - 3:14:27 AM GMT

📄 Email viewed by Devon Eisma (devon@optimumedicine.com)
2025-03-07 - 3:25:22 AM GMT

🖋️ Document e-signed by Devon Eisma (devon@optimumedicine.com)
Signature Date: 2025-03-07 - 3:27:12 AM GMT - Time Source: server

📧 Document emailed to Scott Saldana (scott@iflychronos.com) for signature
2025-03-07 - 3:27:15 AM GMT

📄 Email viewed by Scott Saldana (scott@iflychronos.com)
2025-03-07 - 12:15:55 PM GMT

🖋️ Document e-signed by Scott Saldana (scott@iflychronos.com)
Signature Date: 2025-03-07 - 12:16:33 PM GMT - Time Source: server

✅ Agreement completed.
2025-03-07 - 12:16:33 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT 6



**November 19, 2025**

**SENT VIA EMAIL AND FEDEX OVERNIGHT DELIVERY**

Hightail Air Charter, LLC
d/b/a Chronos Air Group LLC
Attn: Scott Saldana
Email: scott@iflychronos.com
200 S. Wacker Drive, Suite 2450
Chicago, IL 60606 2

Natalie L. Winslow, Esq.
Atlas | Solomon LLC
7674 W. Lake Mead Blvd., Suite 220
Las Vegas, NV 89128
Email: nwinslow@atlas-solomon.com

RE:    **NOTICE OF MATERIAL DEFAULT AND DEMAND FOR CURE**
        **Amended Mutual Services, as amended (the "*Amended MSA*")**

Mr. Saldana,

OptimuMedicine, LLC ("***Optimum***") hereby delivers this formal Notice of Default pursuant to Section 4.3(d) of the Amended MSA. Chronos Air Charter, LLC ("***Chronos***") is in material breach of the Amended MSA and must cure the following default within **thirty (30) days** of receipt of this Notice, or Optimum will be entitled to terminate the Amended MSA.

**Chronos's Material Breach: Unauthorized Conversion of Optimum's Property**

Chronos is in breach for the unauthorized seizure and retention of Optimum's equipment and for exercising an unauthorized self-help remedy:

1.   **Retention of Sole Property:** Optimum owns two (2) medical beds (the "***Med Beds***") currently installed in Chronos aircraft. Pursuant to <u>Section 10.1</u> of the MSA, this Equipment "*shall be and remain the sole property of Optimum*".

2.   **Unauthorized Retention:** Chronos has explicitly refused to return Optimum's Equipment, citing monies allegedly owed to Chronos. The Amended MSA does not grant Chronos the right to retain, seize, or place a lien on Optimum's property for security or collection purposes. This action is an unauthorized exercise of an equitable lien and a breach of Chronos's duty to honor Optimum's ownership rights.

**DEMAND FOR CURE:** Chronos must cure this material default by *immediately* returning and making available the two Med Beds to Optimum at a mutually acceptable location. Failure to cure this breach within thirty (30) days will entitle Optimum to pursue all available remedies in law and equity, including termination of the Amended MSA.



**Warning Regarding UCC Enforcement**

Optimum is in receipt of a letter from your counsel dated November 18, 2025, threatening to enforce collection rights against Optimum's account debtors pursuant to NRS 104.9607.

**Chronos's current material default of the Amended MSA (the contract underlying the accounts receivable) renders Chronos's attempt to enforce the security interest premature and wrongful.**

- The remedy under NRS 104.9607 is available only "after default" by the debtor. Chronos's uncured material breach of the Amended MSA vitiates its claim that Optimum is in an excusable default and exposes Chronos to defenses arising from the transaction.

- Any attempt by Chronos to enforce the security interest in accounts receivable while in its own uncured material breach will be deemed to be undertaken in a manner that is **not commercially reasonable** pursuant to NRS 104.9607(3) and will subject Chronos to immediate claims for damages, including for tortious interference with contractual relations.

Optimum demands that Chronos refrain from sending any notice of payment demand to Optimum's account debtors until this material default is cured.

Sincerely,

OPTIMUMEDICINE, LLC

DEVON EISMA, CEO

# EXHIBIT 7



# EXHIBIT 8

| | | |
|---|---|---|
| **Reservation #** | RES-9727948 | |
| **Invoice #** | LIT-C-B-90-7948007 | |
| **Invoice Date** | 01/04/2026 17:39 | |
| **Customer** | OptimuMedicine LLC | |
| | 175 East Reno Avenue | |
| | Suite C-6 | |
| | Las Vegas, NV  89119 | |
| | United States | |

**SIGNATURE AVIATION**

| | | |
|---|---|---|
| **Registration** | N55FJ | |
| **Account Number** | 188034 | |
| **Trip/Reference#** | | |
| **Loyalty Status** | Gold | |
| **Operator ID** | Dana  A | |

2401 Crisp Drive
Little Rock, AR 72202
Phone 501.374.6582

---

Services provided by Signature Aviation - LIT On 27 Nov 2025 13:38 local

---

| Description | Fuel Program | Quantity | List price | Unit Discount | Unit Price | Tax | Total price |
|---|---|---|---|---|---|---|---|
| **Handling Fee**<br>Tenant | | 1 | 560.00 | $(560) | 0.00 | 0.00 | 0.00 |
| **Infrastructure Fee**<br>Tenant | | 1 | 27.00 | $(27) | 0.00 | 0.00 | 0.00 |
| **Ground Power Unit**<br>Tenant | | 1 | 110.00 | $(110) | 0.00 | 0.00 | 0.00 |
| **Jet A (with additive)**<br>ASR Number - 227117038 | BRAVO by Signature | 440 | 4.78560 | $(0) | 4.78560 | 180.88 | 2286.54 |
| **Ground Power Unit** | | 1 | 110.00 | $(110) | 0.00 | 0.00 | 0.00 |

| | |
|---|---|
| Total Amount (USD): | $2286.54 |
| Total Amt includes Fuel Tax of | $0.00 |
| Total Amt includes Sales Tax of | $180.88 |
| Paid with AvCard-2933(USD): (3195462-01742515) | $2286.54 |

I agree to the statement of services and charges as shown and have provided
payment to Signature in the amount outlined above.

_____

**Customer Signature**

| | |
|---|---|
| **Reservation #** | RES-9930702 |
| **Invoice #** | LIT-C-B-90-0702080 |
| **Invoice Date** | 01/04/2026 11:35 |
| **Customer** | OptimuMedicine LLC |
| | 175 East Reno Avenue |
| | Suite C-6 |
| | Las Vegas, NV 89119 |
| | United States |



| | |
|---|---|
| **Registration** | N90J |
| **Account Number** | 188034 |
| **Trip/Reference#** | |
| **Loyalty Status** | Gold |
| **Operator ID** | Verver Charles (SFS-LIT090) V |

2401 Crisp Drive
Little Rock, AR 72202
Phone 501.374.6582

---

Services provided by Signature Aviation - LIT On 04 Jan 2026 09:57 local

| Description | Fuel Program | Quantity | List price | Unit Discount | Unit Price | Tax | Total price |
|---|---|---|---|---|---|---|---|
| **Handling Fee** | | 1 | 360.00 | $(360) | 0.00 | 0.00 | 0.00 |
| **Infrastructure Fee**<br>Tenant | | 1 | 27.00 | $(27) | 0.00 | 0.00 | 0.00 |
| **Ground Power Unit**<br>Tenant | | 1 | 110.00 | $(110) | 0.00 | 0.00 | 0.00 |
| **Jet A (with additive)**<br>ASR Number -<br>153122596,153204964 | BRAVO by Signature | 220 | 4.65909 | $(0.00001) | 4.65908 | 88.04 | 1113.04 |

| | |
|---|---|
| Total Amount (USD): | $1113.04 |
| Total Amt includes Fuel Tax of | $0.00 |
| Total Amt includes Sales Tax of | $88.04 |
| Paid with AvCard-2941(USD): (3194007-01741208) | $1113.04 |

I agree to the statement of services and charges as shown and have provided
payment to Signature in the amount outlined above.

_____

**Customer Signature**



**We'd love feedback on your experience at Signature today.**
**Please scan this QR code to fill out a brief survey.**

1 of 1                                                                                            01/04/2026 11:35

# EXHIBIT 9

**From:** Scott <Scott@iflychronos.com>
**Date:** Thursday, January 8, 2026 at 08:36
**To:** Devon Eisma <devon@optimumedicine.com>, Owen McKeany
<Owen.McKeany@optimumedicine.com>, Jon Rosati <jon.rosati@optimumedicine.com>
**Subject:** Payment Plan

[EXTERNAL]:

Gentlemen,

It's time to figure out how we are going to handle the monies Optimum owes Chronos.

I'm open to a reasonable payment plan.  Optimums default on payment for our services has put Chronos in a financial bind.

Absent any payment from Optimum we have no choice to go directly to Optimums payers.

I suggest we have a group meeting to discuss our options.

I'm free later today and tomorrow.

See Optimums balance due below,

Scott

| Due to Chronos | Source |
|---:|---|
| 415,446.11 | Nina, 11/13/25 email |
| 28,250.00 | Surch 25 09; Sep |
| 24,639.96 | Surch 25 10; Oct |
| 23,238.96 | Surch 25 11; Nov |
| 23,150.91 | Surch 25 12; Dec |
| 2,357.64 | WFS bill, 25-001081 |
| 238.58 | Landing Fees |
| 731,164.69 | OM unpaid trips due now |
| **$   1,248,486.85** | **Total Due to Chronos 12/31/25** |

CAUTION: This email originated from outside of OptimuMedicine. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Electronically Filed
01/26/2026 4:19 PM

CLERK OF THE COURT

1 **EXPT**
Mark H. Hutchings, Esq.
2 Nevada Bar No. 12783
John B. Lanning, Esq.
3 Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
4 400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
5 Telephone: (702) 660-7700
Facsimile: (702) 552-5202
6 MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
7 *Attorneys for Plaintiff*

**EIGHTH JUDICIAL DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| OPTIMUMEDICINE, LLC, a Nevada limited liability company, | Case No.: A-26-937783-C |
| Plaintiff, | Dept. No.: 20 |
| v. | |
| HIGHTAIL AIR CHARTER, LLC, a Delaware limited liability company; CHRONOS AIR GROUP, LLC, a Delaware limited liability company; CHRONOS AIR MRO, LLC, a Delaware limited liability company; SCOTT SALDANA, an individual; DOES I through XX; ROE CORPORATIONS I through XX, inclusive, | **PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME** |
| Defendants. | **[HEARING REQUESTED]** |

Plaintiff OPTIMUMEDICINE, LLC, ("Plaintiff") by and through counsel, Mark H. Hutchings, Esq. and John B. Lanning, Esq. of the law firm Hutchings Law Group and moves this Court *ex parte* and on Order Shortening Time for a Temporary Restraining Order and Preliminary Injunction against Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, Chronos Air MRO, LLC, and Scott Saldana ("Defendants"). Injunctive relief is necessary given the illegal "self-help" measures currently being employed by Defendants in relation to this dispute. Injunctive relief is therefore necessary to preserve the status quo while the dispute is adjudicated.

Specifically, Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction prohibiting Defendants from the following:

1. Taking any actions in furtherance of any UCC lien and from contacting any of Optimum's

*(left margin, vertical)* **HUTCHINGS LAW GROUP** 400 S. 4TH ST., STE. 550 LAS VEGAS, NV 89101

account debtors, clients, or customers.

2. Unauthorized use of any of Plaintiff's medical equipment currently in Defendants possession including but not limited to the Spectrum Aeromedical Stretcher bearing SN No. 20-B1AB-121AAB.

3. Continuing to fuel their airplanes for operations unrelated to Optimum using Optimum's fuel credit account.

4. Engaging in any further "self-help;" meaning attempts to recoup amounts allegedly owed that involve conversion or otherwise fall outside the realm of the judicial process.

This Motion is made and based upon the attached Memorandum of Points and Authorities, the Declaration of John B. Lanning, Esq., the Declaration of Devon Eisma, all attached exhibits, the Verified Complaint of Plaintiff, and such argument and evidence as may be presented at the hearing on this Motion.

Dated: January 23, 2026.                          **HUTCHINGS LAW GROUP**

                                                  */s/ John B. Lanning*
                                        By:_____
                                           Mark H. Hutchings, Esq.
                                           Nevada Bar No. 12783
                                           John B. Lanning, Esq.
                                           Nevada Bar No. 15585
                                           400 South 4th Street, Suite 550
                                           Las Vegas, Nevada 89101
                                           Telephone: (702) 660-7700
                                           Mhutchings@HutchingsLawGroup.com
                                           John@HutchingsLawGroup.com
                                           *Attorneys for Plaintiff*

**ORDER SHORTENING TIME**

Upon declaration of John B. Lanning, Esq., and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the time for hearing on this Motion for a ~~Temporary Restraining Order and~~ Preliminary Injunction shall be shortened and will be heard on the 28th day of _____January_____, 2026, at the hour of __11:00__ __a__.m., or as soon thereafter as counsel may be heard, in Department __XX__ of the Eighth Judicial District Court.

Deadline to file Opposition: End of business day January 27, 2026. **Dated this 26th day of January, 2026**

Dated:_____

_____
DISTRICT COURT JUDGE

**431 3B9 486A 9044**
**Eric Johnson**
**District Court Judge**

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**TEMPORARY RESTRAINING ORDER**

Upon the review of the Plaintiff's Verified Complaint, as well as the Plaintiff's *Ex Parte* Application for Temporary Restraining Order, and the Declarations and Exhibits submitted in support thereof, and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Defendants and all their directors, management, attorneys, staff, agents, investigators, and employees shall maintain the status quo and be restrained from:

5. Taking any actions in furtherance of any UCC lien and from contacting any of Optimum's account debtors, clients, or customers.

6. Unauthorized use of any of Plaintiff's medical equipment currently in Defendants possession including but not limited to the Spectrum Aeromedical Stretcher bearing SN No. 20-B1AB-121AAB.

7. Continuing to fuel their airplanes for operations unrelated to Optimum using Optimum's fuel credit account.

8. Engaging in any further "self-help;" meaning attempts to recoup amounts allegedly owed that involve conversion or otherwise fall outside the realm of the judicial process.

This Temporary Restraining Order shall be in effect until after a hearing on Plaintiffs' Motion for a Preliminary Injunction is heard by the Court. This Temporary Restraining Order shall remain in effect until Notice of Entry of Order is served on Plaintiffs' Motion for a Preliminary Injunction.

The Plaintiff must serve all pleadings, briefs, and supporting documents on Defendants by:

The Defendants' time for filing any Opposition to Plaintiff's Application or Motion shall be:

Plaintiff's request for Temporary Restraining Order is DENIED.

Dated:_____

_____
DISTRICT COURT JUDGE

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**DECLARATION OF JOHN B. LANNING, ESQ. IN SUPPORT OF
PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

I, John B. Lanning, Esq., hereby declare as follows:

1.    I am over the age of 18, an attorney licensed to practice before all of the courts of the State of Nevada, and an attorney with Hutchings Law Group.

2.    I represent the Plaintiff in the above-captioned matter, OPTIMUMEDICINE, LLC.

3.    I have personal knowledge of the facts set forth below based upon my review of the documents in this matter, except for those factual statements expressly made upon information and belief, and as to those facts, I believe them to be true, and I am competent to testify.

4.    I make this declaration in support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order and Preliminary Injunction on Order Shortening Time.

5.    There is good cause for the *ex parte* motion to shorten time for the Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction.

6.    This Motion seeks to enjoin Defendants from their ongoing self-help activities to illegally attempt to collect upon a debt.  Specifically, although Defendants have a secured interest in accounts receivable, Defendants have converted property of Plaintiff instead of relying upon the accounts receivable interest.

7.    As set forth herein and in Plaintiff's verified Complaint, Defendants have taken actions which constitute conversion in an attempt to collect debt owed by Plaintiff.  These actions include the following:

a.   Retaining possession of Med Beds which are owned by Plaintiff and refusing to return them including the Spectrum Aeromedical Stretcher bearing SN No. 20-B1AB-121AAB;

b.   Using the Med Beds to operate air ambulance services for Plaintiff's direct competitors and keeping all proceeds;

c.   Converting fuel on Plaintiff's account by using Plaintiff's fuel credentials to fill planes with fuel for use in trips unrelated to Optimumedicine.

d.   Using self-help to attempt to recoup amounts Defendants feel they are owed by

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1    Plaintiff outside of the judicial process and not commercially reasonable within the
2    meaning of the Uniform Commercial Code.

3    8.    After taking the above actions,  Defendants have collected against property which is not
4    allowed under the applicable Security Agreement.  Despite doing this and acting in a commercially
5    unreasonable manner, Defendants are now threatening to contact and harass Plaintiff's clients who
6    have accounts receivable balances.

7    9.    As set forth more fully in Plaintiffs' Verified Complaint, an Order Shortening Time is
8    necessary in this circumstance because Defendants are actively engaging in self-help including the
9    conversion of fuel and use of Med Beds and these actions will continue to occur and cause untold harm
10    to Plaintiff absent an order prohibiting Defendants from taking any further self help actions.

11    10.    The Defendants are posing an immediate and existential threat to Plaintiffs' operations,
12    primarily by converting property and by threatening to disrupt crucial relationships.  A review of the
13    Plaintiffs Verified Complaint reveals a history of improper conduct by the Defendants, which has
14    recently escalated.  Defendants have created the crisis that mandates an Order Shortening Time, TRO,
15    and Preliminary Injunction.

16    11.    Declarant makes this request in good faith and without intent to delay.  Further, there is
17    no risk of material prejudice to Defendants as, based on my knowledge, there is no risk of harm from
18    simply requiring Defendants to follow the law and preserve the status quo.

19    I declare under penalties of perjury under the laws of the State of Nevada that the foregoing is
20    true and correct.

21    Dated: January 23, 2026.

22

23    /s/ John B. Lanning
24    JOHN B. LANNING, ESQ.

25

26

27

28

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**DECLARATION OF DEVON EISMA IN SUPPORT OF
PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

I, Devon Eisma, hereby declare as follows:

1.      I am over the age of 18, and I am the authorized Manager of OPTIMUMEDICINE, LLC ("Optimum").

2.      I have personal knowledge of the facts set forth below based upon my review of the documents in this matter, except for those factual statements expressly made upon information and belief, and as to those facts, I believe them to be true, and I am competent to testify.

3.      I make this declaration in support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order and Preliminary Injunction on Order Shortening Time.

4.      Optimum is a company which provides acute medical transportation services.  The services provided by Optimum include regular ground transportation services, as well as air ambulance services to global destinations provided on flights staffed by Optimum medical professionals.

5.      On or about May of 2024, Optimum began looking for airplane operators to provide the flights for Optimum's air ambulance services.  Specifically, Optimum was looking for companies to work with that owned properly licensed airplanes and could provide pilots.

6.      On or about June of 2024, Optimum was introduced to Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC ("Chronos" or "Defendants").  Chronos was willing to provide flight services to Optimum, but would first need to obtain the necessary Federal Aviation Administration ("FAA") approval to provide air ambulance flights.

7.      On or about June 30, 2024, Optimum and Chronos entered into an Aeromedical Equipment Lease Agreement.  The purpose of this agreement was to lease a "Med Bed" owned by Optimum to Chronos so that Chronos could install the Med Bed and obtain FAA approval for air ambulance flights.  One FAA approval was obtained, the lease agreement contemplated that the parties would enter a subsequent agreement regarding the provision of services using the Med Bed.  A true and correct copy of the "Aeromedical Equipment Lease Agreement" between Optimumedicine and Defendant Hightail Air Charter, LLC dated June 30, 2024 is attached hereto as **Exhibit 1**.

/ / /

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

8.    After the Aeromedical Equipment Lease Agreement was executed, Optimum provided Chronos with the required Med Bed which was then installed in a Chronos aircraft.  Sometime thereafter in or around August of 2024, Chronos was able to secure the necessary FAA approval to begin running air ambulance flights.

9.    After the FAA approval was obtained, the Optimum and Chronos entered into a Mutual Services Agreement.  Attached as **Exhibit 2** is a true and correct copy of the "Mutual Services Agreement" (the "MSA") between Optimum and Defendants Hightail Air Charter, LLC and Chronos Air Group, LLC (September 11, 2024).

10.    The MSA established the core of our operational partnership, specifically mandating in Section 10.1 that all equipment furnished by Optimum, including any medical beds, remains the sole property of Optimum and must be returned immediately upon termination of the agreement.

11.    In early 2025, following a dispute regarding the timing of certain payments, Chronos demanded additional security to continue operations. On February 21, 2025, I executed a Security Agreement on behalf of Optimum. A true and correct copy of the February 21, 2025 Security Agreement is attached hereto as **Exhibit 3**.

12.    At the time the Security Agreement was signed, I was unaware that Chronos was in breach of the MSA.

13.    It was my specific understanding in signing **Exhibit 3** that the security interest was strictly limited to Optimum's accounts receivable, as is reflected in the Agreement. At no point did I authorize, nor does the document provide for, a security interest in Optimum's physical equipment, fuel credit account, or medical beds.

14.    To my knowledge, Chronos acted upon this agreement by filing a financing statement. Attached hereto as **Exhibit 4** is a true and correct copy of UCC Financing Statement No. 2025465805-0, filed with the Nevada Secretary of State on or about April 10, 2025.

15.    On March 6, 2025, the parties executed the First Amendment to the Mutual Services Agreement, which reinstated our working relationship. A true and correct copy of the First Amendment is attached hereto as **Exhibit 5**.

/ / /

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

16.     In November 2025, despite the reinstatement, a new dispute arose. Defendants began engaging in "self-help" by refusing to return our Med Beds. On November 19, 2025, I sent a formal Notice of Material Default and Demand for Cure to Defendants. A true and correct copy of this notice is attached hereto as **Exhibit 6**.

17.     Following this notice, I discovered that Defendants were not merely retaining the Med Beds, but were actively using them to perform medical transports for a competitor, Diamond Flight Medical.  Attached hereto as **Exhibit 7** are true and correct copies of photographs and ADS-B flight tracking data demonstrating Chronos's unauthorized commercial use of Optimum's Med Beds for third parties.

18.     I further discovered that Defendants were misappropriating Optimum's funds by charging fuel for non-Optimum flights to our corporate credit accounts. Attached hereto as **Exhibit 8** are true and correct copies of Signature Aviation Invoices dated November 27, 2025, and January 4, 2026, showing fueling for aircraft N55FJ and N90J which are owned by Defendants and were not authorized by Optimum.

19.     On or about January of 2026, I reached out to Defendant Saldana and requested that he stop engaging in self-help via the conversion of fuel and Med Beds and provide me an accounting of the funds obtained via these means.  Defendant Saldana sent me an email on or about January 8, 2026 informing me that despite Chronos' commercially unreasonable actions which were not permitted by the Security Agreement, Defendants would be directly contacting Optimum's payers.  A true and correct copy of the January 8, 2026 email from Mr. Saldana is attached hereto as **Exhibit 9**.

20.     Despite the termination of the MSA and the ongoing dispute regarding the "Net Balance," Scott Saldana has issued imminent threats to contact Optimum's insurance payers and brokers to demand direct payment. Based on my experience in this industry, if Defendants are permitted to contact our payers, it will cause irreparable harm to our reputation and likely result in the permanent loss of these critical business relationships.

/ / /

/ / /

/ / /

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

21.     Furthermore, because Chronos has already engaged in unauthorized self-help by stealing fuel and converting our Med Beds for profit, it is no longer possible to ascertain what amount, if any, is actually owed to Chronos without a full accounting and judicial offset.

22.     Declarant makes this request in good faith and without intent to delay.

I declare under penalties of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Dated: January 23, 2026

/s/ Devon Eisma

DEVON EISMA

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## INTRODUCTION

3    This is an action for emergency injunctive relief to restrain Defendants from continuing a

4 campaign of unauthorized "self-help," conversion, and commercial sabotage. Plaintiff

5 OptimuMedicine, LLC ("Optimum" or "Plaintiff") provides critical, life-saving air medical

6 transportation services globally. Defendants Hightail Air Charter, LLC d/b/a Chronos Air Group

7 ("Chronos" or "Defendants") and its principal, Scott Saldana, were engaged to provide aviation support

8 for these missions. However, over the past several months, Defendants have abandoned the parties'

9 contractual framework in favor of a lawless exercise of dominion over Optimum's property.

10    Specifically, Defendants have: (1) converted Optimum's specialized medical equipment (the

11 "Med Beds") for their own profit by servicing Optimum's competitors; (2) misappropriated Optimum's

12 corporate fuel accounts to steal fuel for non-Optimum flights; and (3) maintained a now-invalid UCC-

13 1 lien on the public record as a tool for extortion. Despite the termination of the parties' agreements

14 and the fact that Defendants' own tortious conduct has created a debt offset that likely exceeds any

15 amounts allegedly owed, Defendants are now threatening the "nuclear option": contacting Optimum's

16 insurance payers and account debtors to divert all incoming revenue to Chronos.  This is despite the

17 fact that given the unauthorized seizure of non-secured collateral and commercially unreasonable

18 behavior, Chronos no longer has a valid security interest in Optimum's receivables.

19    If Defendants are not immediately enjoined, Optimum will suffer catastrophic and irreparable

20 harm to its business reputation, its payer relationships, and its ability to continue its life-saving

21 operations. Optimum has a strong likelihood of prevailing on all of its claims, particularly its statutory

22 and contract based claims.  Finally, the balance of equities and public interest strongly favor injunctive

23 relief.  A Temporary Restraining Order and Preliminary Injunction is thus necessary to preserve the

24 status quo, compel the return of converted property, and prevent Defendants from executing a

25 commercially unreasonable collection scheme based on a legally infirm lien.

26 / / /

27 / / /

28 / / /

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**FACTS**[1]

**I.      The Parties.**

Plaintiff Optimumedicine ("Plaintiff" or "Optimum") is a highly specialized medical transportation services provider based in Southern Nevada.  Despite being based in Southern Nevada, Plaintiff provides high acuity air transportation services for patients worldwide.  Defendants Hightail Air Charter, LLC, Chronos Air Group, LLC, and Chronos Air MRO, LLC ("Defendants" or "Chronos") operate a private aviation company that provides on-demand air travel solutions, meaning commercial non-scheduled flights.  Defendant Scott Saldana ("Saldana") is the founder and Chief Operating Officer of Chronos.

**II.      The Original Med Bed Lease Agreement.**

The parties' relationship commenced on or about June 30, 2024 when the parties' entered into the Aeromedical Equipment Lease Agreement.  *See* **Exhibit 1**.  Under that lease agreement, Optimum provided a Spectrum Aeromedical Stretcher (the "Primary Med Bed") (SN: 20-B1AB-121AAB) to Chronos for installation into aircraft N90J.  *Id.*  The purpose of this lease agreement was to allow Defendants to install the Primary Med Bed for the purpose of securing FAA approval for Air-Ambulance operations under the A024 operations specifications, a certification that Defendants lacked at the time of the agreement.  *Id.* at Section 4.  The lease agreement further provided that after FAA approval was obtained, Optimum would have priority to book the plane and Optimum could, in its discretion, elect to have exclusive use of the aircraft, which would be governed by a subsequent services agreement between the parties.  *Id.* at Section 5.

**III.      The Mutual Services Agreement.**

After installing the Med Bed pursuant to the Aeromedical Equipment Lease Agreement, on or about August of 2024 Defendants completed installation of the Med Bed and obtained the necessary FAA approval to begin running air ambulance flights.  Decl. Eisma at ¶8.  Next, the parties executed the original "Mutual Services Agreement" on or about September 11, 2024. **Exhibit 2.** Pursuant to that Agreement, the parties agreed that Chronos would dedicate one aircraft exclusively for use by Optimum.  *Id.* at Section 1.4.  The Agreement further provided that Optimum would be responsible for

---

[1] Plaintiffs' Statement of Facts is supported by the Verified Complaint filed in this action, as well as all attached Exhibits.

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1  clinical staffing and all medical services on the air ambulance flights, but that Chronos would have full

2  authority and operational control over all aspects of the actual flight, in accordance with federal

3  regulations. *Id.* at Section 1.5. The Agreement further provided that after deducting certain expenses,

4  Chronos would be paid fifty percent (50%) if distributable cash flow derived from each air ambulance

5  flight conducted pursuant to the Agreement. *Id.* at Section 2.

6        Necessarily, given the close nature of the parties relationship under the Mutual Services

7  Agreement, the exchange and disclosure of confidential information was necessary. This includes

8  Optimum's intellectual property, trade secrets, customers, vendors, and other highly sensitive

9  information. Accordingly, the Mutual Services Agreement specifically contained detailed provisions

10  restricting the use of all confidential information, and prohibiting Chronos from using any confidential

11  information obtained from Optimum for any commercial purpose. *Id.* at Section 9. Critically, the

12  Mutual Services Agreement also provided that ***all equipment furnished to Chronos, including the***

13  ***Med Beds***, must be returned to Optimum upon termination of the Agreement. *Id.* at Section 10.1.

14  **IV.    The Security Agreement and the First Amendment to the Mutual Services Agreement.**

15        On or about February 2025, Optimum had allegedly fallen slightly behind on payments owed

16  to Chronos under the Mutual Services Agreement. As a result, Chronos suspended all service for

17  Optimum flights. On order to remedy this, on or about February 21, 2025 the parties executed a

18  Security Agreement, which is attached hereto as **Exhibit 3**. Pursuant to that Security Agreement,

19  Chronos was granted a first priority security interest in Optimum's accounts receivable. *Id.* However,

20  this Security Interest was only permitted to remain in effect for "the duration of the term of the MSA

21  [Mutual Services Agreement] or until all monies owed Lender [Chronos] by Borrower [Optimum] have

22  been paid in full . . ." *Id.* at Section 7. The Security Agreement was highly specific in scope: Section

23  1 grants Chronos a security interest only in Optimum's "now existing and hereafter arising accounts

24  receivable" (Exhibit 3, § 1). 8. On April 10, 2025, Chronos perfected this limited interest by filing

25  UCC-1 Financing Statement No. 2025465805-0 with the Nevada Secretary of State. **Exhibit 4**.

26        After executing the Security Agreement, the parties negotiated a reinstatement of the Mutual

27  Services Agreement known as the First Amendment to the Mutual Services Agreement on or about

28  March 6, 2025. **Exhibit 5**. That agreement reinstated the relationship between the parties. Importantly,

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1  per both the Security Agreement and the First Amendment to the Mutual Services Agreement, Chronos

2  was never authorized to take possession of any physical property of Optimum. **Exhibit 3**; **Exhibit 5**.

3  No physical equipment, aircraft, or medical beds were ever authorized as collateral.

4  **V.    Chronos' Self Help and Material Breaches: Conversion of Property and Theft of Fuel.**

5        In late 2025, a dispute arose regarding accelerated surcharges and payments due.  Rather than

6  seeking judicial relief, Defendants engaged in unauthorized "self-help."   Specifically, Chronos

7  converted the Med Beds which are Optimum's property by refusing to return them after termination

8  of the Mutual Services Agreement and then using those Med Beds to provide services for other

9  companies.  Optimum sent notice on November 19, 2025 informing Chronos that contractually the

10  Med Beds were Optimum's property and must be returned. *See* **Exhibit 6**.  Despite this, Chronos

11  refused to return the Med Beds, despite Optimum's ownership under MSA Section 10.1. Beyond

12  mere retention, Optimum discovered that Chronos was actively deploying the Med Beds on aircraft

13  servicing Optimum's direct competitors for profit. *See* **Exhibit 7** (photographs showing that Chronos

14  used the Med Beds and did actually run air ambulance flights for Diamond Flight Medical).  This

15  monetization of Optimum's property was done without consent and in direct violation of the MSA

16  confidentiality provisions.  Chronos took these actions because Optimum owed it money, and Scott

17  Saldana decided unilaterally that conversion was therefore appropriate.

18        Even more egregious than the conversion of the Med Beds was the discovery of fuel theft.

19  Invoices from Signature Aviation dated November 27, 2025, and January 4, 2026, prove that Chronos

20  utilized Optimum's credit accounts to fuel its aircraft (Tail Nos. N55FJ and N90J) for flights that

21  were not performed for or authorized by Optimum. **Exhibit 8**.  These fuelings were not just for

22  Chronos' planes, but appear to line up with the flight logs of the flights that Chronos ran for the

23  competitor, Diamond Flight Medical. **Exhibit 7**; **Exhibit 8**. Thus, Chronos, using the fuel credentials

24  (confidential information) it had obtained from Optimum, used that information to steal fuel to run

25  flights for a competitor.  Again, these actions were taken by Chronos and Scott Saldana on the basis

26  that because they felt they were owed money, they could take any of Optimum's property they

27  wanted.  However, the Security Agreement did not authorize theft of fuel or Med Beds. **Exhibit 3**.

28  Instead, that Security Agreement and all other agreements explicitly only contemplated a security

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1  interest in Optimum's accounts receivable.

2   Since the termination and Chronos' self-help conversion, Chronos is now threatening to

3  enforce its UCC lien and contact Optimum's clients with accounts receivable balances.  This

4  however, is invalid as due the conversion, Chronos has behaved in a commercially unreasonable

5  manner.  Further, any alleged debt is subject to a total offset based on (i) the unauthorized fuel

6  charges, (ii) a 50% revenue share for the unauthorized use of the Med Beds, and (iii) damages for the

7  misappropriation of PHI and trade secrets. Despite the termination of the MSA and the disputed

8  nature of the debt, Defendants have refused to file a UCC-3 Termination Statement. Instead, they

9  have threatened to contact Optimum's "account debtors"—the insurance payers and brokers—to

10  demand they divert all payments directly to Chronos.  This is despite the fact that given the self-help

11  and conversion, it is no longer ascertainable what amount, if any, Optimum currently owes to

12  Chronos.  Chronos is now threatening as of January 8, 2026, through Scott Saldana, via coercive

13  email communications to contact Optimum's payers directly.  **Exhibit 9**.

14   Based on the foregoing, Plaintiff brings this Application for a Temporary Restraining Order.

15  Defendants are engaging in self-help, i.e., the conversion of property not covered by the UCC

16  financing statement.  Despite benefiting from the conversion in a yet to be determined amount,

17  Chronos is steal threatening to interfere with the relationship between Optimum and its payers.

18  Accordingly, a Temporary Restraining Order and Injunction are necessary to prevent Chronos from

19  engaging in further unauthorized self-help and to preserve the status quo between the parties.

20  Optimum has suffered cognizable harm because of Defendants' illegal misconduct and will continue

21  to suffer harm if Defendants are not immediately Enjoined from their illegal conduct.

22                                            **POINTS AND AUTHORITIES**

23   A.  **A Temporary Restraining Order and Injunction is an Appropriate Remedy**

24   NRCP 65(b), involving Temporary Restraining Orders provides in part:

25    (b) Temporary Restraining Order.

26    (1) Issuing Without Notice. The court may issue a temporary restraining
27    order without written or oral notice to the adverse party or its attorney only
     if:

28    (A) specific facts in an affidavit or a verified complaint clearly show that
     immediate and irreparable injury, loss, or damage will result to the movant

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

(2) Contents; Expiration. Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.

(3) Expediting the Preliminary-Injunction Hearing. If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.

(4) Motion to Dissolve. On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

NRS 33.010 provides in part:

Cases in which injunction may be granted. An injunction may be granted in the following cases:

1.      When it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually.

2.      When it shall appear by the complaint or affidavit that the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the plaintiff.

3.      When it shall appear, during the litigation, that the defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

A preliminary injunction is available upon a showing that the party seeking it enjoys a reasonable probability of success on the merits, and that the defendant's conduct, if allowed to continue, will result in irreparable harm for which compensatory damages is an inadequate remedy. *S.O.C., Inc. v. Mirage Casino-Hotel*, 117 Nev. 403; 23 P.3d 243 (2001); *Dangberg Holdings v. Douglas Co.*, 115 Nev. 129, 978 P.2d 311(1999); *Pickett v. Comanche Construction, Inc.*, 108 Nev. 422, 426, 836 P.2d 42, 44 (1992); *Dixon v. Thatcher*, 103 Nev. 414, 742 P.2d 1029 (1987); *Sobol v. Capital Management*, 102

HUTCHINGS LAW GROUP

400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1  Nev. 444, 446, 726 P.2d 335 (1986); *citing Number One Rent-A-Car v. Ramada Inns*, 94 Nev. 779,

2  780, 587 P.2d 1329,1330 (1978). The balance of hardships between the parties is also a factor to be

3  considered. *Ottenheimer v. Real Estate Division*, 91 Nev. 338, 535 P .2d 1284 (1975). The Supreme

4  Court has ruled that improper deprivation of a real property interest rises to the level of irreparable

5  harm for which money damages would be inadequate. *See*, *Pickett v. Comanche Construction*, 108

6  Nev. 422, 836 P.2d 42 (1992). Real property is considered unique, and loss of property rights generally

7  results in irreparable harm. *Dixon v. Thatcher*, 103 Nev. 414, 742 P.2d 1029 (1987) as such, an

8  injunction is proper to prohibit foreclosures when the plaintiff has shown that it is entitled to relief. The

9  district court enjoys discretionary review from the appeals court with respect to its decision to grant,

10  deny, or dissolve temporary restraining orders and injunctions. *Coronet Homes, Inc. v. Mylan*, 84 Nev.

11  435, 437 (1968).

12       In addition to the general authorities permitting Temporary Restraining Orders and Preliminary

13  Injunctions in NRCP 65 and NRS 33.010, Nevada's codification of the Uniform Commercial Code

14  provides a further mechanism for injunctive relief. Specifically, NRS 104.9625 provides

15  "Remedies for secured party's failure to comply with article [the Uniform Commercial Code]" which

16  include the following:

17       If it is established that a secured party is not proceeding in accordance with this

18       article, a court may order or restrain collection, enforcement or disposition of

19       collateral on appropriate terms and conditions.

20  NRS 104.9625(1).  Not proceeding in accordance with the article includes failing to proceed in a

21  commercially reasonable manner or provide an accounting of the amount due to the secured

22  creditor.  NRS 104.9210; NRS 104.9607(3).  If a party fails to comply with the Uniform Commercial

23  Code, the injunction authorized by NRS 104.9625(1) provides that the Court "may order or ***restrain***

24  ***collection, enforcement or disposition of collateral*** on appropriate terms and conditions."  NRS

25  104.9625(1) (emphasis added).

26     **B.  Plaintiff Has a Reasonable Probability of Success on the Merits**

27       Optimum is likely to succeed on the merits of its claims for Breach of Contract, Conversion,

28  and statutory violations of the UCC.

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1

<u>Conversion and Breach of Contract (Med Beds and Fuel)</u>

2   Optimum has an extremely strong likelihood of success on its claims against Defendants for

3   Conversion and Breach of Contract. In Nevada, a claim for Conversion "is a distinct act of dominion

4   wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights

5   therein or in derogation, exclusion, or defiance of such title or rights." *Evans v. Dean Witter Reynolds,*

6   *Inc.*, 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000) (internal quotation marks omitted).

7   "Further, conversion is an act of general intent, which does not require wrongful intent and is not

8   excused by care, good faith, or lack of knowledge." *Id.*

9   The evidence is uncontroverted that Optimum owns the Med Beds. Section 10.1 of the MSA

10  **Exhibit 2**. The Aeromedical Equipment Lease (**Exhibit 1**) and the MSA explicitly state that the

11  equipment remains the "sole property of Optimum." **Exhibit 2**, § 10.1; Decl. Eisma ¶¶7, 10.

12  Defendants' refusal to return the beds and their affirmative use of said beds to service a competitor,

13  Diamond Flight Medical, constitutes a classic conversion—a "distinct act of dominion wrongfully

14  exerted over another's personal property." There is also no question that the UCC Financing Statement

15  (**Exhibit 4**) nor the Security Agreement (**Exhibit 3**) authorized the collection of Optimum's medical

16  equipment as collateral. Instead, those agreements were solely limited to accounts receivable and

17  nothing else. *Id.*

18  Furthermore, in Nevada, a claim for Breach of Contract exists where there is "(1) the existence

19  of a valid contract; (2) a breach by the defendant; and, (3) damages as a result of the

20  breach." *Richardson* v. *Jones*, 1 Nev. 405, 408 (1865); *Rivera* v. *Peri & Sons Farms, Inc.*, 735 F.3d

21  892, 899 (9th Cir. 2013). Here, the theft of fuel by Chronos using Optimum's confidential information

22  (the fuel credit account credentials necessary to obtain the fuel), constitute both conversion and breach

23  of contract (the Confidentiality Section of the Management Services Agreement). The Signature

24  Aviation invoices provide documentary proof of fuel theft. **Exhibit 7**. Defendants utilized Optimum's

25  confidential credit credentials to fuel aircraft N55FJ and N90J for flights unrelated to Optimum's

26  business. Decl. Eisma ¶17. This constitutes a material breach of the MSA's confidentiality provisions

27  and a conversion of Optimum's funds.

28  Accordingly, based on the evidence submitted herewith, there is a strong likelihood of success

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 8901

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

on the merits of Plaintiff's claims for Conversion and Breach of Contract. Optimum has evidence of unauthorized use of the Med Beds by a direct competitor. Optimum has further submitted proof that it was billed for fuel which went into Defendants' aircraft for flights that Optimum was not involved in nor authorized. Accordingly, Optimum will prevail on its claims for Breach of Contract and Conversion against Defendants. Given the strong likelihood of success on the merits of these claims, injunctive relief is warranted.

Wrongful Maintenance of UCC Lien (NRS 104.9513 and NRS 225.084)

Defendants' UCC-1 lien is now invalid. Under the Security Agreement, the lien was only authorized for the duration of the MSA or until the debt was paid. **Exhibit 3** at §7. The MSA is now terminated. **Exhibit 9**; Decl. Eisma ¶18. Moreover, any alleged debt is subject to a total offset due to the converted fuel and the revenue share Optimum is entitled to from Chronos's unauthorized third-party use of the Med Beds. Decl. Eisma ¶¶19, 22. Under NRS 104.9513, Defendants are required to file a termination statement when there is no longer an authorized obligation. Their bad-faith refusal to do so, while using the lien to threaten account debtors, violates NRS 225.084. Defendants' threat to contact account debtors is a violation of NRS 104.9607(3), which requires a secured party to proceed in a "commercially reasonable manner." *See* **Exhibit 8**. It is per se commercially unreasonable to attempt to collect on a lien while the secured party is in active, material breach of the underlying contract and in possession of converted property belonging to the debtor. Verified Complaint ¶¶101-105.

Accordingly, Optimum has a strong likelihood of success on its statutory claims. The Security Agreement unambiguously only gives Defendants an interest in receivables, and not in fuel or medical equipment. **Exhibit 3**. Defendants therefore engaged in commercially unreasonable behavior and violated the express statutory provisions of the Uniform Commercial Code when engaging in the unauthorized "self-help" collection activities detailed herein and in the Verified Complaint. Accordingly, Plaintiff has a strong likelihood of prevailing on the statutory NRS 225.084 claim against Defendants.

**C. Plaintiff Will Suffer Immediate and Irreparable Harm**

Without Injunctive Relief, Optimum faces the imminent destruction of its business. Defendants

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

19

1    have explicitly threatened to contact Optimum's insurance payers and brokers to demand direct

2    payment. *See* **Exhibit 8**; Decl. Eisma ¶ 21.

3         In the medical transport industry, payer relationships are built on trust and administrative

4    stability. "[A]cts committed without just cause which unreasonably interfere with a business or destroy

5    its credit or profits, may do an irreparable injury and thus authorize issuance of an injunction." *Sobol*

6    *v. Capital Management Consultants*, 102 Nev. 444, 446 (1986) *citing Guion v. Terra Marketing of*

7    *Nev., Inc.*, 90 Nev. 237, 240, 523 P.2d 847, 848 (1974). Interference "with the operation of a legitimate

8    business" is an activity that "may result in irreparable damage." *Id*. If payers receive conflicting

9    demands from a third-party aviation company alleging a million-dollar default, they will likely freeze

10   all payments to Optimum indefinitely. This will therefore result in harm that far exceeds simply the

11   loss of funds owed to Optimum. This "chilling effect" on cash flow, coupled with the irreparable blow

12   to Optimum's commercial reputation, cannot be adequately compensated by money damages after the

13   fact.

14        The type of business interference threatened by Defendants, notably Saldana is exactly the type

15   of malicious harm to business reputation and goodwill which warrants injunctive relief. *See Sobol v.*

16   *Capital Mgmt. Consultants*, 102 Nev. 444, 446 726 P.2d 335, 337 (1986) (determining that where a

17   person has "interfere[ed] with the operation of a legitimate business by creating public confusion,

18   infringing on goodwill, and damaging reputation in the eyes of creditors," it may result

19   in irreparable harm). Further, Defendants are in possession of Plaintiff's confidential trade secret

20   information and have a contractual duty to keep it confidential. Despite this, Plaintiff has found proof

21   that Defendants are using Plaintiff's Med Bed to work with a direct competitor, Diamond. **Exhibit 7**.

22   This further indicates the irreparable nature of the harm as the threats of confidential information

23   disclosure cannot be addressed by monetary damages. *See Saini v. International Game Technology*,

24   434 F. Supp. 2d 913, 919 (D. Nev. 2006) ("[D]isclosure of confidential information or trade secrets"

25   creates serious harms, "which are not readily addressed through payment of economic damages, [and]

26   are sufficient to meet the irreparable injury requirement for a preliminary injunction").

27        Accordingly, The threat of harm is "immediate," as required by NRCP 65(b) and Plaintiff has

28   suffered, continues to suffer, and will suffer significant harm if Defendants are not immediately

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

1    Ordered to Cease and Desist from their illegal conduct.

2        D.  **The Balance of Hardships Tips Sharply in Plaintiff's Favor**

3        The balance of hardships between the parties weighs strongly in Plaintiff's favor. For Optimum,

4    the denial of this motion means a total cessation of its business operations and the loss of global payer

5    relationships.  Further, it means that Defendants will be able to continue converting property and using

6    confidential information in ways that Optimum cannot predict.  Defendants have already demonstrated

7    they are willing to engage in self-help far beyond what is authorized under the Security Agreement.

8        Conversely, the Defendants suffer no cognizable hardship by being compelled to follow the

9    law.  Defendants have no legal right to retain converted medical beds or stolen fuel funds.  Furthermore,

10    enjoining them from contacting account debtors simply maintains the status quo while the court

11    determines the "True Net Balance" through the litigation process. Defendants' interest is purely

12    monetary; Optimum's interest is its very existence. Decl. Eisma ¶ 21-22.  Defendants no longer have a

13    valid security interest, thus, there is no harm to Defendants.  Any imagined harm to Defendants is

14    simply the result of Defendants' own actions in violation of the Uniform Commercial Code.

15        E.  **The Public Interest Strongly Favors Injunctive Relief**

16        The public interest is served by upholding the integrity of the Nevada Secretary of State's filing

17    system and ensuring that secured creditors do not utilize "self-help" conversion as a substitute for

18    judicial process.

19        More importantly, Optimum provides life-saving air ambulance services. Decl. Eisma ¶ 4. The

20    public has a significant interest in ensuring that medical transport providers are not grounded by the

21    tortious conduct of aviation subcontractors who prioritize unauthorized revenue generation over

22    contractual and fiduciary obligations. Enjoining Defendants ensures that Optimum can continue to

23    provide essential medical care to the public without interference from an invalid and commercially

24    unreasonable lien.

25        F.  **No Bond Should Be Required**

26        The express purpose of posting a security bond is to protect a party from damages incurred as

27    a result of a wrongful injunction.  *See* NRCP 65; *Glenn Falls Ins. v. First Nat'l Bank*, 83 Nev. 196, 427

28    P.2d 1 (1967).  Here, Plaintiff should not be required to post any bond because Defendants can

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

1  articulate no monetary harm that would accrue from this Court granting a TRO or injunctive relief.

2  **CONCLUSION**

3  Plaintiffs have demonstrated a high probability of success on the merits, irreparable harm to

4  themselves, and the public, and that the balance of hardships weighs entirely in their favor.

5  Furthermore, no bond should be required because there is no threat of monetary harm to Defendants

6  posed by enjoining their conduct.

7  Plaintiffs therefore respectfully request a temporary restraining order, a hearing for a

8  preliminary injunction, and seek a Temporary Restraining Order and Preliminary Injunction as follows:

9   1. Compelling Defendants to immediately file a UCC-3 Termination Statement to remove the

10     invalid lien currently asserted against Optimum's accounts receivables.

11  2. Prohibiting Defendants and all their directors, management, attorneys, staff, agents,

12     investigators, and employees from contacting any of Optimum's account debtors or

13     customers.

14  3. Prohibiting Defendants from any further unauthorized use of any of Plaintiff's medical

15     equipment in their possession, including but not limited to the Spectrum Aeromedical

16     Stretcher bearing SN No. 20-B1AB-121AAB.

17  4. Prohibiting Defendants from continuing to fuel their airplanes for operations unrelated to

18     Optimum using Optimum's fuel credit account.

19  5. Prohibiting Defendants and all their directors, management, attorneys, staff, agents,

20     investigators, and employees from engaging in any further "self-help;" meaning attempts to

21     recoup amounts allegedly owed that involve conversion or otherwise fall outside the realm

22     of the judicial process.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

HUTCHINGS LAW GROUP
400 S. 4TH ST., STE. 550
LAS VEGAS, NV 89101

Respectfully submitted,

Dated: January 23, 2026.

HUTCHINGS LAW GROUP

*/s/ John B. Lanning*

By: _____

Mark H. Hutchings, Esq.
NV Bar No. 12783
John B. Lanning, Esq.
NV Bar No. 15585
400 S. 4th St., Ste. 550
Las Vegas, NV 89101
Telephone: (702) 660-7700
mhutchings@hutchingslawgroup.com
*Attorney for Plaintiff*

**PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ON ORDER SHORTENING TIME**

# EXHIBIT 1

AEROMEDICAL EQUIPMENT LEASE AGREEMENT

This Lease Agreement ("Agreement") is made and entered into as of ___6/30/2024_____, by and between OptimuMedicine, LLC*, a NEVADA limited liability company with its principal place of business at 175 E RENO AVE, SUITE C-6, LAS VEGAS, NV 89119 ("Lessor"), and Hightail Air Charter LLC, dba Chronos Air Group LLC, a Delaware limited liability company with its principal place of business at 1005 S Wolf Rd, Wheeling, IL 60090 ("Lessee").

WHEREAS, Lessor is the owner of a Spectrum Aeromedical Stretcher (PN: 20-B1AB-121AAB / SN: 058) ("Stretcher");

WHEREAS, Lessee desires to lease the Stretcher from Lessor for installation into their Learjet 35 aircraft (FAA Registration: N90J / AC SN: 485) ("Aircraft") for the express purpose of securing FAA approval for Air-Ambulance operations under the A024 operations specifications;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, the parties hereto agree as follows:

1. Lease of Stretcher.
Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Stretcher for installation into the Aircraft.

2. Term and Renewal.
The term of this Agreement shall commence on the date first written above and shall continue for one (1) year ("Initial Term"). This Agreement shall automatically renew for successive one (1) year terms (each a "Renewal Term") unless terminated by either party providing thirty (30) days' written notice of termination to the other party prior to the end of the Initial Term or any Renewal Term.

3. Rental Payment.
Lessee agrees to pay Lessor a rental fee of One Dollar ($1.00) per year for the duration of this Agreement. The rental fee for each year shall be due and payable on the anniversary date of this Agreement.

4. Use of Stretcher.
Lessee shall use the Stretcher initially for the purpose of securing FAA approval for Air-Ambulance operations under the A024 operations specifications. Lessee is allowed to use the stretcher for Lessees own charters in the air-ambulance configuration.

5. Exclusivity, Priority, and Profit Sharing.

   a. Lessee agrees to give Lessor priority to book the aircraft for air-ambulance charters so long as the aircraft is not previously booked for the proposed charter dates.

   b. Lessee and Lessor shall split fifty percent (50%) of the net profits from such air-ambulance transportation services generated and dispatched by the Lessor. Net profits shall be defined as gross revenue generated from the air-ambulance transportation services less all reasonable and customary expenses directly related to performing such services. The Lessor shall name the lessee as an additional insured for all operations performed for

1

the Lessor.  Lessor shall provide Lessee with a certificate of insurance evidencing such coverage.  Lessee and Lessor shall execute a services agreement further detailing this arrangement.

   c. Lessor can elect to have exclusive use of the aircraft at any time provided Lessee and Lessor execute or amend a service agreement addressing the new arrangement.

6. Installation, Maintenance and Care.

   a.  Lessee, at its own expense, shall install the stretcher.  Lessor will provide a qualified mechanic to assist in the installation at its own expense.

   b.  Lessee shall, at its own expense, maintain the Stretcher in good working order and condition, reasonable wear and tear excepted. Lessee shall not make any alterations or modifications to the Stretcher without the prior written consent of Lessor.

7. Insurance.
Lessee shall, at its own expense, obtain and maintain insurance coverage for the Stretcher in an amount not less than its full replacement value. Such insurance shall name Lessor as an additional insured and loss payee. Lessee shall provide Lessor with a certificate of insurance evidencing such coverage upon request.

8. Liability and Indemnity.
Lessee shall indemnify, defend, and hold harmless Lessor from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable attorney's fees) arising out of or related to Lessee's use, maintenance, or possession of the Stretcher.

9. Default and Termination.
   a. If Lessee or Lessor breaches any provision of this Agreement, the non-breaching party may terminate this Agreement upon thirty (30) days' written notice to the breaching party, provided that the breaching party fails to cure such breach within such notice period.
   b. Upon termination of this Agreement, Lessee shall immediately return the Stretcher to Lessor in good working order and condition, reasonable wear and tear excepted.

10. Governing Law.
 This Agreement shall be governed by and construed in accordance with the laws of the State of [State], without regard to its conflict of law principles.

11. Entire Agreement.
 This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.

12. Amendment.
 No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by both parties.

2

13. Notices.

Any notice required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally, sent by registered or certified mail (return receipt requested), or by a nationally recognized overnight courier service, to the addresses of the parties set forth above.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement as of the day and year first above written.

OptimuMedicine, LLC

By: _____  **Signature:** _____   30/06/24

Name: _Devon Eisma_____   **Email:** devon@optimumedicine.com

Title: _CEO_____

Chronos Air Group

By: _____  **Signature:** _____30/06/24
                                         Scott (Jun 30, 2024 17:27 EDT)

Name: _Scott Saldana_____   **Email:** scott@iflychronos.com

Title: _Manager_____

3

Schedule Type equation here.A: Stretcher Details

Spectrum Aeromed – 2800 Series Aeromedical Stretcher
- Part Number (PN): 058
- Serial Number (SN): 20-B1AB-121AAB

# AEROMEDICAL EQUIPMENT LEASE

Final Audit Report                                              2024-06-30

| | |
|---|---|
| Created: | 2024-06-30 |
| By: | Jon Rosati (jon.rosati@optimumedicine.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAACRaGKxQrWyRB267tJulfMBLntqhFT8vd |

## "AEROMEDICAL EQUIPMENT LEASE" History

📄 Document created by Jon Rosati (jon.rosati@optimumedicine.com)
2024-06-30 - 6:18:20 PM GMT

📧 Document emailed to Devon Eisma (devon@optimumedicine.com) for signature
2024-06-30 - 6:18:23 PM GMT

📄 Email viewed by Devon Eisma (devon@optimumedicine.com)
2024-06-30 - 6:20:18 PM GMT

🖊 Document e-signed by Devon Eisma (devon@optimumedicine.com)
Signature Date: 2024-06-30 - 6:21:04 PM GMT - Time Source: server

📧 Document emailed to Scott (scott@iflychronos.com) for signature
2024-06-30 - 6:21:05 PM GMT

📄 Email viewed by Scott (scott@iflychronos.com)
2024-06-30 - 9:23:05 PM GMT

🖊 Signer Scott (scott@iflychronos.com) entered name at signing as Scott
2024-06-30 - 9:27:16 PM GMT

🖊 Document e-signed by Scott (scott@iflychronos.com)
Signature Date: 2024-06-30 - 9:27:18 PM GMT - Time Source: server

✅ Agreement completed.
2024-06-30 - 9:27:18 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT 2

# MUTUAL SERVICES AGREEMENT

**THIS MUTUAL SERVICES AGREEMENT** (the "**Agreement**") is made and entered into this <u>09/11/24</u>, 2024 (the "**Execution Date**") by and between **OptimuMedicine, LLC**, a Nevada limited liability company ("**Optimum**") and **Hightail Air Charter, LLC**, a Delaware limited liability company, d/b/a Chronos Air Group, LLC ("**Chronos**"). Optimum and Chronos may each be referred to as a "**Party**," and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, Chronos owns and operates a fleet of fixed wing aircraft with which it provides flights (each, a "**Flight**") in and around North and South America, including but not limited to Canada, continental United States, and Mexico. (the "**Operating Area**");

**WHEREAS**, Optimum is an ambulatory transport provider that utilizes trained and certified professional medical personnel to provide emergency medical services;

**WHEREAS**, the Parties believe that Chronos has the necessary qualifications, licenses, vehicles and equipment to provide aviation support for air medical transport services that Optimum provides patients throughout the Operating Area (each, a "**Transport**");

**WHEREAS**, Chronos is of the opinion that Optimum has the necessary qualifications, experience and abilities to provide medical support for air medical transport services; and

**WHEREAS**, Both Parties are willing to provide such services in accordance with the terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which consideration is hereby acknowledged, the Parties hereby agree as follows:

1. **SERVICES**

    1.1. <u>Services Provided by Chronos</u>. Chronos shall provide and operate at least one (1) fixed wing aircraft (each, an "**Aircraft**") to support fixed wing air ambulance services provided pursuant to this Agreement. It is understood by both Parties that Optimum may require an Aircraft to be dispatched anywhere within the Operating Area. It is understood that Chronos shall exert commercially reasonable efforts to begin and complete all flights on the schedule requested by Optimum, but that Chronos shall have exclusive operational control of the Aircraft and remain the sole and exclusive arbiter over navigational, flight safety, and Aircraft crew issues.

1.2.    <u>Services Provided by Optimum</u>. Optimum shall provide duly licensed, trained and insured clinicians in support of medivac transportation services provided pursuant to this Agreement. Optimum shall also provide EMS agency licensure, a fully staffed communications center, billing and accounting services, marketing, outreach, and other services as provided herein.

1.3.    <u>Additional Services</u>. Chronos and Optimum may agree to the provision of additional services by either Party, provided such services are evidenced in writing and signed by each Party or an authorized representative of each.

1.4.    <u>Exclusive Provider</u>.

(a)    Throughout the term of this Agreement, Chronos shall be Optimum's exclusive aviation service provider for aviation services in the Operating Area that commence after the Effective Date, and during the Term of this Agreement, except in those instances where Chronos cannot logistically meet Optimum's needs (as more fully set forth below).

(b)    Throughout the term of this Agreement, Chronos shall dedicate at least one (1) Aircraft for the exclusive medical requirements of Optimum that commence after the Effective date on the terms and conditions provided herein; additionally, throughout the Term of this Agreement, Chronos further agrees to give Optimum priority to book all Chronos' other aircraft that are fit for air ambulance service so long as such aircraft are not previously booked for the proposed charter dates.

(c)    Throughout the term of this Agreement, Optimum shall dedicate at least one Medical Crew for the exclusive utilization of the aircraft provided by Chronos pursuant to this agreement.

(d)    At any point throughout the term of this Agreement, when business demands allow for expanded service, Optimum may elect to have exclusive use of any additional or all aircraft of Chronos that are fit for air ambulance service, provided this Agreement is amended accordingly, to the mutual satisfaction of each Party.

(e)    Optimum shall notify Chronos of its need for additional services pursuant to <u>Section 1.3</u> within a reasonable amount of time prior to the intended use of such services. Chronos shall be offered a "**Right of First Refusal**" to provide such additional services. Should Chronos be unable to provide such additional services, or should Chronos refuse to provide such additional services, Chronos shall notify Optimum within thirty (30) days of the original request by Optimum that it will not exercise its Right of First

2

Refusal, at which point Optimum shall have the right to seek such additional services from other third-party providers.  Should Chronos not exercise its Right of First Refusal in any given instance, such refusal shall not exempt Optimum from its obligation to offer Chronos further rights of first refusal for similar or additional services.

(f)     Chronos shall notify Optimum of its need for additional services pursuant to <u>Section 1.3</u> within a reasonable amount of time prior to the intended use of such services. Optimum shall be offered a "**Right of First Refusal**" to provide such additional services. Should Optimum be unable to provide such additional services, or should Optimum refuse to provide such additional services, Optimum shall notify Chronos within thirty (30) days of the original request by Chronos that it will not exercise its Right of First Refusal, at which point Chronos shall have the right to seek such additional services from other third-party providers.  Should Optimum not exercise its Right of First Refusal in any given instance, such refusal shall not exempt Chronos from its obligation to offer Optimum further rights of first refusal for similar or additional services.

(g)     Should Chronos prove unable to provide enough flight time to fulfill Optimum's needs for at least three (3) consecutive months, or should a mechanical or other issue with the Aircraft or its operation prevent Chronos from rendering services to Optimum, Optimum may seek temporary support from additional third-party providers upon written notice to Chronos and until such time Chronos is able to resume its obligations pursuant to this Agreement and subject to reasonable minimum utilization requirements of such temporary providers.

(h)     When Chronos aircraft are unavailable due to system demand and additional aircraft are needed, Optimum has the right to subcontract flights to other providers and/or charter an aircraft and staff it with Optimum clinicians.

(i)     When Optimum clinicians are unavailable due to system demand and additional clinical personnel are needed, Chronos has the right to subcontract medical personnel from other providers to provide staffing for air ambulance charter flights.

1.5.     <u>Flight Authority</u>. Optimum shall have the authority to designate the medical and ancillary services to be performed pursuant to its air medical operations but Chronos shall have full operational control over the Aircraft for all flights hereunder as stipulated in 14 C.F.R. Section 135.77.  Operational control as defined in 14 C.F.R. Section 1.1, means the exercise of authority over initiating, conducting, or terminating a flight, subject to the pilot-in-command's (the "**PIC**") authority for

all safety and flight matters. Chronos' responsibility for operational control supersedes any agreement, contract, understanding or arrangement, either oral or written, expressed or implied, between any persons or Parties. Consequently, Optimum shall not require Chronos to make any flights in situations where flights are deemed unsafe to execute by either the PIC of the Aircraft or management personnel.

1.6.  <u>Chronos Compliance</u>. Chronos represents and warrants that all Aircraft and all Chronos personnel are properly licensed and certified in accordance with all applicable local, state, and federal laws, along with all governmental agencies having jurisdiction over Chronos and the aviation industry. Chronos represents and warrants that it is authorized to use the Aircraft pursuant to the flight services to be performed in accordance with this Agreement. Chronos shall strictly comply with all obligations and conditions of its licenses and certifications and with all of the rules and regulations and directives of such local, state, and federal agencies.

1.7.  <u>Optimum Compliance</u>. Optimum represents and warrants that its ambulance, air medical, and/or non-emergency transport services are licensed and approved in accordance with all applicable local, state, and federal laws, along with all governmental agencies having jurisdiction over Optimum and the emergency medical industry. Optimum represents and warrants that it is authorized to engage in the emergency and non-emergency medical services to be performed in accordance with this Agreement. Optimum shall strictly comply with all obligations and conditions of its licenses and certifications and with all of the rules and regulations and directives of such local, state, and federal agencies.

2.  **COMPENSATION**

2.1.  <u>Consideration</u>. As consideration for the Services mutually provided by the Parties pursuant to this Agreement, the Parties agree that each Party shall receive **Fifty Percent (50%)** of the Distributable Cash Flow resulting from any and all Transports provided pursuant to this Agreement. For the purposes of this Agreement, "**Distributable Cash Flow**" shall mean all money earned via Reimbursement from a Transport after deducting Chronos Expenses and Optimum Expenses.

2.2.  <u>Expenses</u>.

(a)  <u>Chronos Expenses</u>. For the use of its Lear 35A (Serial Number 485; Tail No. N90J), for services provided pursuant to this Agreement, the Parties agree that Chronos shall be reimbursed **One Thousand, Six Hundred Dollars ($1,600)** per flight hour. For the use of its Lear 55 (Serial Number 089; Tail No. N55FJ) for services provided pursuant to this Agreement, the

Parties agree that Chronos shall be reimbursed **One Thousand, Eight Hundred Fifty Dollars ($1,850)** per flight hour. The Parties shall agree, in advance, on a compensation rate should Chronos substitute another Aircraft for either of the two Aircraft described above. Flight hours are defined as an Aircraft being in the air servicing a Transport, returning to its home base (with or without medical crew and/or a patient) after a Transport, or repositioning for a Transport or for mutually agreed upon needed maintenance or repair. As an example, but not as a limitation of the foregoing, Chronos shall be reimbursed for the flight hours flown to position the Aircraft in Las Vegas on or immediately after the Effective Date of this Agreement. The Parties further agree that Chronos shall be reimbursed for (i) all Aircraft fuel, landing fees, parking fees, and cleaning costs borne by Chronos; (ii) the out-of-pocket costs borne by Chronos to fly its Aircraft personnel (on commercial airliners) to and from Las Vegas; and (iii) the out-of-pocket costs borne by Chronos if any of its crew is delayed in returning to Las Vegas from a Transport shall be deemed Chronos Expenses. Examples include, but are not limited to accommodations and per diem costs incurred because of a weather delay. (All reimbursable expenses incurred by Chronos shall, hereinafter, be referred to as the "**Chronos Expenses.**")

(b)    <u>Optimum Expenses</u>. The Parties agree that Optimum shall be compensated for its costs for providing ground transportation in Las Vegas, including medical personnel and medical services rendered by them pursuant to this Agreement, at a rate of $500 per Transport. Optimum shall pay and shall be reimbursed, at cost, for its ground transportation expenses required in other locations. The Parties further agree that, where practical, Optimum shall provide payment at the time service is provided or within vendor-assigned payment terms, and shall be reimbursed thereafter, for all Aircraft fuel, landing fees, parking fees, and cleaning costs (All reimbursable expenses incurred by Optimum shall, hereinafter, be referred to as the "**Optimum Expenses.**") (The Chronos Expenses and the Optimum Expenses, in the aggregate shall, hereinafter, be referred to as "**Joint Expenses.**").

2.3.    <u>Invoices</u>. Each Party shall furnish a detailed invoice to the other Party for the services provided pursuant to each Transport, based upon the Joint Expenses as set forth in <u>Section 2.2</u> (each, an "**Invoice**") in a mutually agreed upon method. Each Party shall submit each Invoice to the other Party within seven (7) days of each Transport. Each Party represents and warrants that each Invoice submitted is accurate, complete, fully documented, and consistent with any invoices submitted to Medicare, Medicaid, and/or any other payor for ambulatory services provided pursuant to this Agreement.

2.4.    <u>Accounting</u>.   In addition to those responsibilities delineated in <u>Section 3.2</u>, Optimum shall perform, at its sole cost and expense, all banking, accounting, tax filing, governmental regulatory compliance (if necessary), and billing services for each Transport, including without limitation, all claims, submittals and Reimbursement requests.  Optimum shall maintain a single, separate bank account into which payments for transports conducted under this agreement shall be transferred, which will be accessible by both Parties.

2.5.    <u>Payment</u>. Optimum agrees to (a) reimburse Chronos for the Chronos Expenses (b) reimburse itself for the Optimum Expenses and (c) pay each Party its respective share of the Distributable Cash Flow (each, a "**Payment**") within three (3) business days after receiving Reimbursement for any given Transport, or at such other times and/or intervals as the Parties may mutually agree to in writing. If, for any Transport, a Reimbursement (or partial Reimbursement) is less than the sum of the Chronos Expenses and the Optimum Expenses, Optimum, at its discretion, may either delay Payment until sufficient funds are received or pay Chronos and itself on the same proportional basis as the Parties' Invoices, but shall not pay one Party disproportionally to the other Party.   For the purposes of this <u>Section 2</u>, "**Reimbursement**" shall mean payment from Medicare, Medicaid, and/or any other payor for ambulatory services provided pursuant to this Agreement.

3.    **RESPONSIBILITIES**

3.1.    <u>Responsibilities of Chronos</u>. Throughout the term of this Agreement, Chronos shall, at its own cost and expense, have the following responsibilities:

(a)    furnish, operate, and maintain at least one (1) Aircraft in order to perform the flight services set forth hereunder;

(b)    provide licensed pilots experienced in the operation of the Aircraft;

(c)    provide proper modifications to the Aircraft to support medical devices, or otherwise cause such modifications to be made;

(d)    if Chronos deems necessary, provide covers for the Aircraft if the Aircraft must remain outside for short periods;

(e)    provide all necessary spare parts, tools and equipment for proper and compliant Aircraft operation and maintenance;

(f)    provide all oil, greases and other supplies incident to the performance of flight services; and

6

(g)    obtain the services of any licensed, skilled and qualified personnel that may be necessary for the continual operation and maintenance of the Aircraft, who shall not be deemed employees of Optimum.

3.2.    <u>Responsibilities of Optimum</u>. Throughout the term of this Agreement, Optimum shall, at its own cost and expense, have the following responsibilities:

(a)    provide skilled, licensed, and experienced medical personnel to accompany each Transport, to support the provision of Optimum's air medical services, and to generally support the safety and efficiency of flight operations; all such medical personnel shall be in compliance with the flight crew training requirements provided in Section V.23.7 of Chronos' FAR Part 135 Air Ambulance  Operations Manual, subsections a, c, e, f, g, and h, a copy of which is attached hereto as <u>Exhibit A</u>.

(b)    provide, staff, and maintain a communications center capable of receiving requests for air medical transport services from anywhere in the Operating Area;

(c)    cover the cost, condition, and upkeep of all medical devices, including any equipment that is affixed to the Aircraft, except that upkeep for any medical device that requires Chronos to track and maintain its condition pursuant to a Supplemental Type Certificate (as defined and set forth in 14 CFR 21.111) shall be paid for by Chronos and invoiced to Optimum;

(d)    cover any and all costs associated with the provision of medical care during each Transport;

(e)    cover costs associated with any additional ground ambulance transportation before, during, and/or after each Transport;

(f)    provide Chronos with read only access to Optimum's Microsoft Lists app, its AdvanceClaims program, and any spreadsheet programs it creates so as to provide Chronos with the names of all patients and their insurance information corresponding with any Transport covered under this agreement, and with copies of all correspondence Optimum has with Medicare, Medicaid, and/or any other payor for ambulatory services provided pursuant to this Agreement and with copies of all correspondence related to any claims or disputes arising from any Transport;

(g)    within ten (10) days of receipt, provide Chronos with copies of all bank statements to which Reimbursements have been deposited or Expenses distributed and with copies of all invoices and receipts, Reimbursement claims, Reimbursement payments, and tax returns related to the Services

performed by Chronos and/or Optimum as contemplated by this Agreement;

(h)     as of the Effective Date, provide Chronos a hangar at a mutually acceptable location at its facility in Las Vegas for the Aircraft; and

(i)     as of the Effective Date, provide suitable housing in Las Vegas for Aircraft personnel at a mutually acceptable residence.

3.3.    <u>Joint Responsibilities</u>. The Parties shall designate representatives or establish committees who shall discuss the following subjects, whether through meetings, telephone calls, or correspondence, as often and in such a manner as the Parties deem necessary or appropriate:

(a)     periodic payment and billing reconciliations, including quarterly reviews to determine if costs are being equitably shared;

(b)     accreditation audits;

(c)     employee disputes; and

(d)     such other subjects as the Parties may deem necessary or appropriate.

## 4.    TERM / TERMINATION

4.1.    <u>Term</u>. The term of this Agreement (the "**Term**") will begin on the Effective Date and will remain in full force and effect for a period of one (1) year (the "**Original Term**"). Upon the expiration of the original Term or any renewal term (each, a "**Renewal Term**"), this Agreement shall automatically renew for an additional five (5) year period unless, at least sixty (60) days prior to the renewal date, either Party gives the other Party written notice of its intent not to renew this Agreement.

4.2.    <u>Effective Date</u>.  The Effective Date shall be that date when the Federal Aviation Agency approves Chronos' A024 Air Ambulance Op Specs.

4.3.    <u>Termination</u>.

(a)     The Parties may terminate this Agreement at any time by mutual written consent.

(b)     Either Party may terminate this Agreement by giving written notice of termination at least sixty (60) days prior to the termination of the Original Term or any Renewal Term.

(c)    Either Party may terminate this Agreement by giving ten (10) days written notice that Distributable Cash Flow has failed to cover that Party's operating costs for the prior three month period if no acceptable changes/compromise can be reached by mutual agreement of the Parties.

(d)    Either Party may terminate this Agreement upon thirty (30) days written notice that the other Party has materially breached any material term of this Agreement (each a "**Default**") and has failed to cure such breach within thirty (30) days following written notice from the non-breaching Party of such breach.

4.4.    <u>Effect of Default</u>. In the event of a Default, Optimum and Chronos agree to negotiate, in good faith, a settlement that is mutually acceptable to both Parties. In the event the Parties cannot come to an Agreement regarding damages, the non-defaulting Party shall be entitled to pursue any remedy provided in law or equity.

4.5.    <u>Bankruptcy</u>. Either Party may terminate this Agreement immediately upon the occurrence of any of the following events with regard to the other Party: (i) the making of a general assignment for the benefit of creditors, (ii) the filing of a voluntary petition or the commencement of any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extension, or (iii) the filing of any involuntary petition or the involuntary commencement of any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganization, composition or extension, which such petition or proceeding is not dismissed within ninety (90) days of the date on which it is filed or commenced.

4.6.    <u>Effects of Termination</u>. Upon termination of this Agreement, as provided in this <u>Section 4</u>, no Party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of termination, including payment of the invoices and fees relating to services provided by Chronos or Optimum prior to such termination without offset or credit, and (ii) obligations and covenants set forth herein that are expressly made to extend beyond the termination of this Agreement, including indemnities.

5.    **ARBITRATION.** Any non-personnel controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The losing party in any arbitration award shall pay the reasonable legal fees of the prevailing party.

6.    **PERSONNEL DISPUTES**

6.1.   <u>Dispute Resolution Process</u>. The Parties acknowledge and agree that the successful cooperation and coordination of Optimum personnel and Chronos personnel is necessary for the safe, efficient, and effective provision of air medical transport services pursuant to this Agreement. Should either Party claim (the "**Disputing Party**") any personnel of the other Party (the "**Party at Issue**") as unsafe, uncooperative, or otherwise unfit, or otherwise claim a dispute with any personnel of the other Party, the Parties shall initially attempt to resolve such claims, disputes or controversies by conducting good faith negotiations ("**Dispute Resolution**").

(a)   <u>Dispute Resolution Process</u>. The Disputing Party shall submit to the Party at Issue written notice detailing the claims, controversies, and/or personnel in dispute (the "**Dispute Notice**"). The Parties shall then have thirty (30) days from the date of the Dispute Notice to present any evidence in accordance with <u>Sections 6.1(c)</u> and/or <u>6.1(d)</u>, and to negotiate, in good faith, a resolution to the issues set forth.

(b)   <u>Failure of Dispute Resolution</u>. Should the Parties be unable to resolve the matter in thirty (30) days following the Dispute Notice, either Party may hold the other Party in default and the terms and conditions set forth in <u>Section 4</u>, including all applicable grace and cure periods, shall apply.

(c)   <u>Disputes with Optimum Personnel</u>. Any disputes by Chronos with Optimum personnel shall be supported by documented evidence of lack of fitness, including but not limited to evidence demonstrating lack of licensure or certification, poor decision making, and/or any recklessness or gross negligence with respect to the responsibilities of such Optimum personnel. Copies of any such evidence shall be provided to Optimum timely during Dispute Resolution.

(d)   <u>Disputes with Chronos Personnel</u>. Any disputes by Optimum with Chronos personnel shall be supported by documented evidence of lack of fitness, including but not limited to evidence demonstrating lack of licensure or certification, failure to cooperate with, support, or comply with Optimum's Flight Authority, and/or any recklessness or gross negligence pursuant to the responsibilities of Chronos personnel. Copies of any such evidence shall be provided to Chronos timely during Dispute Resolution.

**7.    INSURANCE**

7.1.   <u>Chronos Insurance</u>. Chronos, at its own cost and expense, shall obtain and maintain in full force and throughout the Term of this Agreement, customary insurance policies including but not limited to (i) Worker's Compensation Insurance, (ii) Employer's Liability Insurance, and (iii) Aircraft Liability Insurance covering the Aircraft and passenger liability Insurance.  Prior to the Effective Date, Chronos

shall provide Optimum with a certificate of insurance naming Optimum as an additional insured on a primary non-contributory basis for Aircraft liability in the amount of Twenty-five Million Dollars ($25,000,000.00) for bodily injury or property damage.

7.2. <u>Optimum Insurance</u>. Optimum, at its own cost and expense, shall obtain and maintain in full force throughout the Term of this Agreement, its own (i) General Liability Policy in a minimum amount of Five Million Dollars ($5,000,000.00) with Company Umbrella Policy, (ii) Employer Liability Policy in a minimum amount of One Million Dollars ($1,000,000.00), (iii) Workman's Compensation Policy in an amount equal to or greater than the amount required by Nevada State law, and (iv) Malpractice Insurance Policy in a minimum amount of Five Million Dollars ($5,000,000.00). Prior to the Effective Date, Optimum shall name Chronos as an additional insured on its insurance policies and shall provide Chronos with a certificate of insurance evidencing such coverage.

## 8. INDEMNIFICATION

8.1. <u>By Optimum</u>. Optimum agrees to protect, defend, indemnify and hold harmless Chronos against loss, damage, or expense by reason of any suits, claims, demands, judgments and causes of action caused by Optimum, its employees, agents or any subcontractor, arising out of or in consequence of the performance of this Agreement, except that in no instance shall Optimum be held responsible for any liability, claim, demand, or cause of action more than 50% attributable to the negligence of Chronos. This <u>Section 8.1</u> is subject to any restrictions or limitations imposed by law but only to the extent of such restrictions or limitations.

8.2. <u>By Chronos</u>. Chronos agrees to protect, defend, indemnify and hold harmless Optimum against loss, damage, or expense by reason of any suits, claims, demands, judgments and causes of action caused by Chronos, its employees, agents or any subcontractor, arising out of or in consequence of the performance of this Agreement, except that in no instance shall Chronos be held responsible for any liability, claim, demand, or cause of action more than 50% attributable to the negligence of Optimum. This <u>Section 8.2</u> is subject to any restrictions or limitations imposed by law but only to the extent of such restrictions or limitations.

8.3. <u>Survival</u>. The provisions of this <u>Section 8</u> shall survive the termination of this Agreement.

## 9. CONFIDENTIAL INFORMATION

9.1. Each Party (the "**Receiving Party**") acknowledges that, in performance of its obligations under this Agreement, it may have access to certain Confidential Information (as defined below) of the other Party (the "**Disclosing Party**") that is

critical to the success of the business operations of the Disclosing Party. Accordingly, during and after the Term of this Agreement, except with the written consent of the Disclosing Party or as otherwise required by applicable law, the Receiving Party shall maintain the confidentiality of the Confidential Information of the Disclosing Party, shall not use or disclose the Confidential Information to anyone or for any purpose, except as necessary to perform its obligations hereunder, and shall not make or keep copies or reproduce in any form the Confidential Information.

9.2.    For purposes of this Agreement, "**Confidential Information**" shall mean any and all information, patents, licenses, copyrights, trademarks, trade names, service marks, service names, "know-how," trade secrets, details (including pricing and other key terms), consulting contracts, including the details of this Agreement, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, procurement and sales activities, promotional and pricing techniques, credit and financial data concerning customer and patients, business acquisition plans or any portion or phase of any scientific or technical information, ideas, discoveries, designs, computer programs (including source or object codes), processes, procedures, formulas or improvements of the Disclosing Party, that is not generally known to the general public; provided however, that Confidential Information shall expressly exclude any such information which has been developed by the Receiving Party or its Affiliates.  Confidential Information shall expressly exclude (a) information that was publicly available at the time it was acquired by the Receiving Party, or (b) information that subsequently became public through no act or omission of the Receiving Party.

9.3.    In the event that the Receiving Party is compelled by legal process to disclose Confidential Information, the Receiving Party shall promptly notify the Disclosing Party to allow the Disclosing Party to either waive compliance with this <u>Section 9</u> or take legal action to prevent the disclosure. If the Receiving Party is nonetheless compelled to disclose the Confidential Information before the Disclosing Party can take any such action, it shall disclose only the minimum amount of Confidential Information required to comply with such legal process. Without limiting other possible remedies for breach of this <u>Section 9</u>, the Parties agree that injunctive or other equitable relief shall be available to either enforce the provisions of this <u>Section 9</u>, such relief to be without the necessity of posting a bond, cash or otherwise. The provisions of this <u>Section 9</u> shall survive the expiration or other termination of this Agreement, regardless of the cause of such termination.

## 10.    RETURN OF PROPERTY

10.1.    <u>Return of Optimum Property</u>. All documents, records, apparatus, equipment and other physical property or Confidential Information which is furnished to or obtained by Chronos in the course of this Agreement shall be and remain the sole

property of Optimum. Chronos agrees that, upon the expiration or termination of this Agreement, Chronos shall return all such property and agrees not to make or retain copies, reproductions, or summaries of such property.

10.2.    <u>Return of Chronos Property</u>. All documents, records, apparatus, equipment and other physical property or Confidential Information which is furnished to or obtained by Optimum in the course of this Agreement shall be and remain the sole property of Chronos. Optimum agrees that, upon the expiration or termination of this Agreement, Optimum shall return all such property and agrees not to make or retain copies, reproductions, or summaries of such property.

## 11.    MISCELLANEOUS

11.1.    <u>Regulatory Compliance</u>. The Parties recognize and acknowledge that this Agreement and any underlying arrangements shall be subject to applicable state and federal laws, regulations and policies, including, but not limited to, those laws, regulations, and policies pertaining to Medicare and Medicaid reimbursement. In performing their respective duties and obligations hereunder, the Parties shall comply with all codes, ordinances, rules, regulations and requirements of all applicable federal, state and municipal authorities now in force, or which may hereafter be in force. Without limiting the generality of the foregoing, each Party agrees to perform its respective duties and obligations in a non-discriminatory manner without regard to race, gender, color, national origin, sexual orientation or disability and to operate in compliance with any compliance plans and programs in place for the operation of Optimum.

11.2.    <u>Assignability</u>. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto (whether by operation of law or otherwise) without the prior written consent of the other Parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

11.3.    <u>Notice</u>. Any notices to be given hereunder by a Party to any other Party shall be deemed to be received by the intended recipient (i) when delivered personally, (ii) the day following delivery to a nationally recognized overnight courier service with proof of delivery, (iii) if sent by facsimile or electronic mail, upon confirmed transmission, or (iv) three (3) days after mailing by certified mail, postage prepaid with return receipt requested to the address for such Party as outlined in this Agreement. Any Party may change such Party's address for notice under this Agreement by giving prior written notice to the other Party of such change in the manner provided in this <u>Section 11.3</u>.

**Chronos**                                    **Optimum**

13

Hightail Air Charter, LLC                OptimuMedicine, LLC
1011 South Wolf Rd                       175 E Reno Ave Suite C-#
Wheeling, IL 60090                       Las Vegas, NV 89119
d/b/a Chronos Air Group LLC              d/b/a Optimum AIR
Attn: Scott Saldana                      Attn : Devon Eisma, CEO
Email: scott@iflychronos.com             Email : devon@optimumedicine.com
Phone: 312-505-5931                      Phone: (702) 286-6490


Copies of all notices shall be sent to each Party's respective attorneys.  If to Chronos' attorney, to:

Jonathan Strauss
20 N. Clark Street; Suite 3300
Chicago, Illinois 60602
Email: Jonathan@JonathanStraussLaw.com
Phone: 312-578-0562

If to Optimum's attorney, to:

Glenn Truitt
Private Wealth Law, Inc.
400 S. 4th St, Suite 540
Las Vegas, NV 89101
Email: gtruitt@privatewealthlawinc.com
Phone: 702-852-6601


11.4.   Contractor Status. In the performance of this Agreement, each Party shall at all times be considered an independent contractor and neither it or its agents, servants, nor employees shall be considered employees of the other Party.  Each Party's agents, servants and employees shall be under the exclusive supervision and control of that Party.

11.5.   Waiver. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that Party of the right thereafter to that term or any other term of this Agreement.

11.6.   Construction. Each Party has reviewed this Agreement and the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof.

11.7.   Modification. Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be

14

binding if evidenced in writing signed by each Party or an authorized representative of each Party.

11.8. <u>Counterpart</u>. This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered (including delivery by facsimile transmission or email scan) shall be deemed an original, and all of which together shall constitute one and the same instrument.

11.9. <u>Governing Law</u>. This Agreement shall be governed by and shall be construed, interpreted, and enforced in accordance with the laws of the State of Nevada. In the event that Nevada law is held inapplicable, the law of the state in which the work is performed shall apply.

11.10. <u>Severability</u>. In the event any provision of this Agreement is held to be invalid, illegal, or unenforceable for any reason and in any respect, and if the extent of such invalidity, illegality or unenforceability does not destroy the basis of the bargain herein, such invalidity, illegality or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall remain in full force and effect, enforceable in accordance with its terms as if such provisions had not been included, or had been modified as provided below, as the case may be. To carry out the intent of the Parties hereto as fully as possible, the invalid, illegal or unenforceable provisions, if possible, shall be deemed modified to the extent necessary and possible to render such provisions valid and enforceable. In the event this Agreement cannot be modified to the satisfaction of both Parties, then either Party may terminate this Agreement upon ten (10) days' written notice to the other Party.

11.11. <u>Entire Agreement</u>. This Agreement constitutes the full and complete understanding between the Parties hereto with respect to the subject matter of this Agreement.  No modification or amendment hereof shall be valid or binding on either Party hereto unless made in writing or signed on behalf of such Party by its proper officers or representatives' thereunto duly authorized.

*[Signatures on following page]*

**IN WITNESS WHEREOF,** and intending to be legally bound, the Parties hereto affix their signatures below and execute this Agreement as of the Effective Date.

**Hightail Air Charter, LLC,**
a Delaware limited liability company

**OptimuMedicine, LLC,**
a Nevada limited liability company

By: _Scott Saldana (Sep 11, 2024 22:05 EDT)_
**Name: Scott Saldana, Manager**

By: _Devon Eisma (Sep 11, 2024 13:52 PDT)_
**Name: Devon Eisma, CEO**

16

<u>EXHIBIT A</u>

**Chronos' FAR Part 135 General Operations Manual – Air Ambulance Operations**

*See attached.*

## Chronos Air Group

| Section V | FAR Part 135 General |
|---|---|
| Flight Operations | Operations Manual |

Note: After the last deplaning passenger has entered the terminal building, the crewmember should return to the aircraft to complete post-flight duties.

**V.23.7 Air Ambulance Operations.**

Flight Crews will be trained on their Initial Operating Experience on all airplanes that are used for Air Ambulance Operations Specific Areas that will be accomplished during the IOE are:

   a. Aircraft medical systems variations:
   b. Passenger restraining methods in flight;
   c. Flightcrew functions and responsibilities, including Crew Resource Management ( CRM) as it pe1tains to interface between medical personnel and flightcrew members;
   d. Aircraft systems variations, such as special electrical systems, navigational radios, and instrumentation and their performance characteristics;
   e. Handling of special medical equipment to include loading/unloading of stretchers, isolettes, balloon pumps, and ventilators;
   f. Appropriate restraint of infants, pediatric patients, and problem passengers to include prisoners.
   g. International operations (if appropriate); and
   h. Bloodbome pathogens (BBP) and biohazard and infection control, including prevention and control of infectious diseases.

**V.23.8    Ramp Entry**.

Given the congestion of some of the small ramp areas into which Chronos Air Group operates, it is imperative pilots follow directions of ramp personnel. Their ground directions must be followed unless the Pilot-in-Command feels the ground guidance will jeopardize his ability to taxi safely. It is imperative for both crewmembers to be aware of wing tip clearance. If not, STOP and VISUALLY observe.

In order to minimize confusion, standard hand signals should be used to insure proper response from the Flight Crew in positioning the aircraft:

These should be used whenever the aircraft is:
   •    Arriving
   •    Departing; and/or
   •    Moving anywhere on the ramp
   •    Give signals in a clear and concise manner. Remember, the Flight Crew cannot hear or see facial expressions.

HT-101

# [REDLINE] Saldana.Optimum Mutual Services Agreement.8.29.24 v2 [PWL]DEVON

Final Audit Report                                      2024-09-12

| | |
|---|---|
| Created: | 2024-09-11 |
| By: | Devon Eisma (devon@optimumedicine.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA3Oabc2_YENy2HCV6BsVCs3qMkj8BICt2 |

## "[REDLINE] Saldana.Optimum Mutual Services Agreement.8.29.24 v2 [PWL]DEVON" History

📄 Document created by Devon Eisma (devon@optimumedicine.com)
2024-09-11 - 8:48:16 PM GMT

📧 Document emailed to Scott Saldana (scott@iflychronos.com) for signature
2024-09-11 - 8:48:26 PM GMT

📧 Document emailed to Devon Eisma (devon@optimumedicine.com) for signature
2024-09-11 - 8:48:26 PM GMT

✍️ Document e-signed by Devon Eisma (devon@optimumedicine.com)
E-signature hosted by Devon Eisma (devon@optimumedicine.com)
Signature Date: 2024-09-11 - 8:52:04 PM GMT - Time Source: server

📄 Email viewed by Scott Saldana (scott@iflychronos.com)
2024-09-12 - 1:51:42 AM GMT

✍️ Document e-signed by Scott Saldana (scott@iflychronos.com)
Signature Date: 2024-09-12 - 2:05:49 AM GMT - Time Source: server

✅ Agreement completed.
2024-09-12 - 2:05:49 AM GMT

# EXHIBIT 3

# SECURITY AGREEMENT

This Security Agreement ("Agreement") is made and entered into as of February 21, 2025 by and between:

BORROWER:

OptimuMedicine, LLC

175 E Reno Ave , Suite C

Las Vegas, Nevada 89119

d/b/a Optimum AIR

LENDER:

Hightail Air Charter, LLC

1011 S Wolf Rd

Wheeling, IL 60090

d/b/a Chronos Air Group LLC

The Borrower and Lender shall, hereafter, be referred to as the Parties.

RECITALS:

Whereas, Borrower and Lender entered into a Mutual Services Agreement on September 11, 2024 ('MSA");

Whereas, on February 13, 2025, Lender issued to Borrower a Notice of Termination and Notice of Default; and

Whereas, the Parties now desire to reinstate the MSA on terms mutually satisfactory to each of them, including, but not limited to the terms set forth herein.

AGREEMENT:

NOW THEREFORE, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which consideration is hereby acknowledged, the Parties hereby agree as follow:

**1. Grant of Security Interest**

Borrower hereby grants and conveys to Lender a perfected first priority security interest in all of Borrower's now existing and hereafter arising accounts receivable and those of its subsidiaries, affiliates, and assigns. (collectively referred to as "Collateral"). Borrower shall maintain and pay for bank control accounts for Borrower's accounts receivables.

**2. Representations and Warranties:**

Borrower represents and warrants that:

(a) Exhibit 1, attached hereto and made a part hereof, is a full and complete schedule of all its now existing accounts receivable as of February 26, 2025  (the "Accounts Receivable").

(b) The Accounts Receivable are valid and enforceable obligations.

(c) There are no other liens or encumbrances on the Collateral, except as disclosed in this Agreement.

(d) Borrower has full authority to grant this security interest.

**3. Obligations of Borrower:**

Borrower agrees to:

(a) Notify Lender promptly of any changes in the Collateral.

(b) Maintain accurate records of the Accounts Receivable and the Collateral.

(c) Use the proceeds from the Collateral for business purposes only.

**4. Filing of UCC Financing Statement:**

The Borrower agrees that concomitantly with the execution of this Agreement, it shall complete and execute a UCC Filing Statement in form substantially similar to that attached hereto as

Exhibit 2 and that the Lender may file the UCC Financing Statement with the appropriate state filing office in Nevada to perfect the security interest granted under this Agreement. The Borrower authorizes the Lender to take any necessary action to effectuate the perfection of the security interest in accordance with applicable laws.

**6. Notice of Filing:**

The Lender shall provide the Borrower with a copy of the filed UCC Financing Statement or any amendments thereto promptly after such filing, ensuring the Borrower is informed of the secured interests recorded against its assets

**7. Duration of Filing:**

(a) The UCC Financing Statement shall remain in effect throughout the duration of the term of the MSA or until all monies owed Lender by Borrower have been paid in full, whichever is later.

(b) Until all monies due Borrower from Lender under the MSA (the "Debt") have been satisfied in full, Lender shall maintain a first security lien on the Collateral. If Borrower secures financing that allows it to pay Lender the Debt,   Lender shall file such financing statements as required by law to reduce its security interest from a first lien to that of a second lien.

(c) To effectuate such payment, Borrower shall notify any finance company willing to collateralize the Collateral that the finance company must pay Lender the balance of all monies due Lender under the MSA from the proceeds of said loan.  The parties agree that the services of an independent escrow company may be necessary.  The Parties shall share equally in the costs of such escrow service provider.

**8 Specific Performance:**

(a) Obligation to Cooperate.  The Borrower acknowledges that its prompt cooperation is essential for the Lender to perfect its security interest in accordance with this Agreement, including the filing of the UCC Financing Statement.

(b) Covenant to Perform.  The Borrower covenants and agrees to take all necessary actions, execute all required documents, and provide any necessary information promptly upon the Lender's request to facilitate the perfection of the security interest.

(c) Right to Seek Specific Performance.  In the event the Borrower fails or refuses to cooperate as required under this Agreement, the Lender shall have the right to seek an order of specific performance from a court of competent jurisdiction, compelling the Borrower to fulfill their obligations under this Agreement. The Borrower acknowledges that monetary damages may not be a sufficient remedy for such non-compliance, and therefore, the Lender shall not be limited to seeking damages alone.

(d) Costs and Fees.  If the Lender is required to take legal action to enforce this provision, the Borrower agrees to pay all reasonable costs and attorney fees incurred by the Lender in connection with such action, including but not limited to any action seeking specific performance.

**9. Default:**

In the event of default by the Borrower, the Lender shall have all rights and remedies available under applicable law, including the right to take possession of the Collateral.

**10. Governing Law:**

This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

**11. Assignability:**

Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties hereto (whether by operation of law or otherwise) without the prior written consent of the other Parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

**12. Notice:**

Any notices to be given hereunder by a Party to any other Party shall be deemed to be received by the intended recipient (i) when delivered personally, (ii) the day following delivery to a nationally recognized overnight courier service with proof of delivery, (iii) if sent by facsimile or electronic mail, upon confirmed transmission, or (iv) three (3) days after mailing by certified mail, postage prepaid with return receipt requested to the address for such Party as outlined in this Agreement. Any Party may change such Party's address for notice under this Agreement by giving prior written notice to the other Party of such change.  Notices to the Parties shall be provided to the following addresses:

**If to Lender**

Hightail Air Charter, LLC
1011 S. Wolf Road
Wheeling, IL 60090
d/b/a Chronos Air Group LLC
Attn: Scott Saldana
Email: scott@iflychronos.com
Phone: 312-505-5931

**If to Borrower**

OptimuMedicine, LLC
175 E Reno Ave Suite C-#
Las Vegas, NV 89119
d/b/a Optimum AIR
Attn: Devon Eisma, CEO
Email: devon@optimumedicine.com
Phone: (702) 286-6490

Copies of all notices shall be sent to each Party's respective attorneys.  If to Lender's attorney, to:

Jonathan Strauss
20 N. Clark Street; Suite 3300
Chicago, Illinois 60602
Email: Jonathan@JonathanStraussLaw.com
Phone: 312-578-0562

If to Borrower's attorney, to:
Glenn Truitt
Private Wealth Law, Inc.
400 S. 4th St., Suite 540
Las Vegas, NV 89101

**13.  Waiver:** The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that Party of the right thereafter to that term or any other term of this Agreement.

**14. Construction:** Each Party has reviewed this Agreement and the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof.

**15. Modification:** Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be binding if evidenced in writing signed by each Party or an authorized representative of each Party.

**16. Electronic Signatures:**

This Agreement may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.

**17. Counterparts:**

This Agreement may be executed in one or more counterparts and, if executed in more than one counterpart, the executed counterparts shall each be deemed to be an original but all such counterparts shall together constitute one and the same instrument.

[The remainder of this page is intentionally left blank]

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first above written.

**OptimuMedicine, LLC**

By: _____

    Devon Eisma, CEO

Title: _____

**Hightail Air Charter, LLC**

By: _____

    Scott J. Saldana

Title: Manager

7

# EXHIBIT A

# OptimuMedicine

## A/R Aging Summary

As of February 26, 2025

| | CURRENT | 1 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 AND OVER | TOTAL |
|---|---|---|---|---|---|---|---|---|
| AARP Supplemental | | 88,182.87 | | | | | | $88,182.87 |
| Aetna - Commercial | | 3,927.89 | 59,640.76 | | | | | $63,568.65 |
| Aetna - Mgd Medicare | 109.43 | | | | | | | $109.43 |
| Aetna TX- Mgd Medicare | 2,557.50 | | | | | | | $2,557.50 |
| Anthem BCBS of CA COMMERCIAL | | | | | | 38,495.00 | | $38,495.00 |
| Anthem BCBS of NV COMMERCIAL ID#SB765 | | | | 16,236.00 | | | 24,736.00 | $40,972.00 |
| Anthem BCBS of NV FEP Blue | 213.69 | | | | | | | $213.69 |
| Anthem BCBS of NV MEDICAID ID#SB765 | | | | 21,906.00 | | | 23,840.00 | $45,746.00 |
| BCBS of Arizona | | | | | | | 181,450.00 | $181,450.00 |
| California Medicaid - Medi-Cal | | | | | | | 831.60 | $831.60 |
| CIGNA - Advisory Health | | | | -1,426.35 | 2,365.00 | | | $938.65 |
| CNMI Medicaid | 203,250.00 | | | | | | | $203,250.00 |
| Culinary Health Fund | | | 446.87 | | | | | $446.87 |
| Emergency AirLift | | | | | | | 3,309.48 | $3,309.48 |
| EMS Events | | | | | | | 1,759.88 | $1,759.88 |
| Geha United HealthCare Shared Services | | | | | 382.04 | | 2,170.00 | $2,552.04 |
| Health Plan of Nevada (HPN) - Commercial | 26,840.50 | 3,615.00 | | | 52,120.00 | 25,788.00 | | $108,363.50 |
| Health Plan of Nevada (HPN) - Mgd Medicaid | 5,842.50 | 23,670.00 | 32,103.25 | | 612.00 | 22,914.00 | | $85,141.75 |
| HMSA | | 172,084.44 | 122,654.00 | | | | 107,600.00 | $402,338.44 |
| HMSA Quest (HI Medicaid) | | | 35,002.86 | | | | | $35,002.86 |
| Hometown Health NV - MC | | | | 26,064.00 | | | | $26,064.00 |
| Humana - Mgd Medicare | 1,888.75 | 1,888.75 | | 2,801.25 | 431.06 | | | $7,009.81 |
| Intermountain HC - Mgd MC | 6,700.00 | 1,881.25 | | | 176.40 | 147.00 | 1,137.47 | $10,042.12 |
| Kaiser Ambulance Claims | | 15.00 | | | | | | $15.00 |
| Kaiser So Cal | | 39,575.00 | | | | | | $39,575.00 |
| Medescort International | | 28,000.00 | | | | | | $28,000.00 |
| Medway Air Ambulance | 137,300.00 | | | | | | | $137,300.00 |
| Meritain Health Aetna | 1,770.00 | | | | | | | $1,770.00 |
| Molina | | 20,500.00 | | 20,500.00 | 1,747.50 | | | $42,747.50 |
| Mountain View Hospital | | | | | | | 1,653.40 | $1,653.40 |
| Nevada Medicaid - First Health Services Corp | | 77,641.15 | -944.45 | 1,961.66 | | -0.30 | 111,461.41 | $190,119.47 |
| Nevada State Immunization Program | 49,433.73 | 42,982.69 | 31,348.87 | 21,496.67 | | | | $145,261.96 |
| NV Medicare Part B (J1 - PGBA) | 7,772.24 | 5,415.34 | -1,621.78 | -653.10 | 2,640.24 | 4,542.79 | -1,446.69 | $16,649.04 |
| One Call Medical Transports | 4,700.00 | 550.00 | | | 1,200.00 | | -60.00 | $6,390.00 |
| OptumCare SLC - Mgd MC | 1,881.25 | | 550.00 | | | | | $2,431.25 |
| P3 Health Partners Nevada | | | | 265.00 | | | 17,606.87 | $17,871.87 |
| Quest AlohaCare Mgd Medicaid | | 77,500.00 | | | | | | $77,500.00 |
| Railroad Medicare (PGBA) | | | | 550.00 | | | | $550.00 |
| SELF PAY CUSTOMERS | 3,156.32 | 13,273.96 | 4,328.31 | 4,750.17 | 8,783.47 | 10,032.68 | 78,991.41 | $123,316.32 |
| Sierra Health and Life - Commercial | | 70,347.00 | | | 3,969.00 | | | $74,316.00 |
| Sierra Health and Life - Mgd Medicaid | 48,182.75 | | | | | | | $48,182.75 |
| Silver Summit HP - Mgd MCD | | | | 20,500.00 | | | | $20,500.00 |
| Tricare East Region | | | | | 1,747.50 | | | $1,747.50 |
| Tricare for Life | | 294.39 | 200.83 | 292.17 | | 396.73 | 256.73 | $1,440.85 |
| Tricare West | 13,800.00 | 8,725.00 | | | | 1,268.73 | 722.41 | $24,516.14 |

# OptimuMedicine

## A/R Aging Summary

### As of February 26, 2025

| | CURRENT | 1 - 30 | 31 - 60 | 61 - 90 | 91 - 120 | 121 - 150 | 151 AND OVER | TOTAL |
|---|---|---|---|---|---|---|---|---|
| UMR | | 86,868.75 | 4,476.25 | 5,863.75 | 4,746.25 | | 17,689.20 | $119,644.20 |
| United Healthcare-PPO | | | 83.29 | | | | | $83.29 |
| UnitedHealthcare - COMMERCIAL | 4,076.25 | 275.00 | -815.00 | | 2,352.87 | | | $5,889.12 |
| UnitedHealthcare - Mgd MC | | | 275.00 | | | | 8,408.48 | $8,683.48 |
| UnitedHealthcare AARP MC | | 3,986.25 | | 1,100.00 | 1,000.00 | | | $6,086.25 |
| UnitedHealthcare Community Plan / Dual Complete Mgd MC | 2,372.50 | 250.00 | | | | 275.00 | | $2,897.50 |
| UnitedHealthcare MC | 3,416.25 | | | | | | | $3,416.25 |
| VA Fee Basis Programs | 3,962.50 | 3,750.00 | 150.00 | 5,612.50 | 9,437.50 | 12,480.96 | 3,757.50 | $39,150.96 |
| VA Pacific Islands Health Care Systems | | | | 23,981.23 | | | | $23,981.23 |
| Wakefield & Associates | | | | | | | 11,476.10 | $11,476.10 |
| Wellcare by Allwell | | | | | | 463.03 | | $463.03 |
| Zurich | | | 2,126.25 | | | | | $2,126.25 |
| TOTAL | $529,226.16 | $775,199.73 | $290,005.31 | $171,800.95 | $93,710.83 | $116,803.62 | $597,351.25 | $2,574,097.85 |

# EXHIBIT B

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT SUBMITTER (optional) |
|---|
| |
| B. E-MAIL CONTACT AT SUBMITTER (optional) |
| |
| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) |

**SEE BELOW FOR SECURED PARTY CONTACT INFORMATION**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OptimuMedicine, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 175 East Reno Ave, Suite C-# | Las Vegas | NV | 89119 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| HIghtail Air Charter, LLC | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1011 South Wolf Rd | Wheeling | IL | 60090 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:

Accounts Recievable, now existing or hereafter arising.

5. Check only if applicable and check only one box:  Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)**

# EXHIBIT 4

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| Filed in the Office of | Initial Filing Number |
|---|---|
| *F.V. Aguilar* (signature) | **2025465805-0** |
| | Filed On |
| | **April 10, 2025 03:25 PM** |
| Secretary of State | Number of Pages |
| State Of Nevada | **1** |

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
JONATHAN STRAUSS

**B. E-MAIL CONTACT AT FILER (optional)**
Jonathan@JonathanStraussLaw.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

Jonathan Strauss
20 N. Clark Street
Suite 3300
Chicago, IL 60602

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OptimuMedicine, LLC | | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 175 East Reno Ave., Suite C-# | Las Vegas | NV | 89119 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hightail Air Charter, LLC | | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 200 S. Wacker Drive; Suite 2450 | Chicago | IL | 60606 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All accounts receivable, now existing or hereafter arising.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)     International Association of Commercial Administrators (IACA)

# EXHIBIT 5

# FIRST AMENDMENT TO THE

## MUTUAL SERVICES AGREEMENT

**THIS FIRST AMENDMENT TO THE MUTUAL SERVICES AGREEMENT** (the "**First Amendment**") is made and entered into this March 6th, 2025 (the "**Execution Date**") by and between **OptimuMedicine, LLC**, a Nevada limited liability company (the "**Optimum**") and **Hightail Air Charter, LLC**, a Delaware limited liability company, d/b/a Chronos Air Group, LLC (the "**Chronos**"). Optimum and Chronos may each be referred to as a "**Party**," and collectively as the "**Parties**."

### RECITALS

**WHEREAS**, Optimum and Chronos executed a Mutual Services Agreement on September 11, 2024 (the "MSA"). The First Amendment and the MSA, taken together, shall hereinafter be referred to as the "Amended Agreement.";

**WHEREAS**, on February 13, 2025 Chronos issued to Optimum a Notice of Termination and Notice of Default, whereby Chronos alleged that Optimum committed various acts of default under the MSA and provided notice of the termination of the MSA;

**WHEREAS**, Optimum acknowledges that as of the Execution Date, Optimum owes Chronos monies under the MSA for unpaid Chronos Expenses and Chronos' share of the Distributable Cash Flow in an amount as reflected in Exhibit 1, attached hereto and by this reference made a part hereof (the "Debt").

**WHEREAS**, Optimum and Chronos executed a Security Agreement as of February 21, 2025 whereby Optimum granted Chronos a first security interest in its accounts receivable ("Security Agreement"); and

**WHEREAS**, Optimum and Chronos have negotiated a settlement of their differences and have agreed to reinstate the MSA by amending the MSA under the terms and conditions set forth below:

### AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, the receipt and sufficiency of which consideration is hereby acknowledged, the Parties hereby agree as follows:

1.    **LLC MEMBERSHIP**

a.    On or prior to March 25, 2025, Optimum shall arrange to assign to Chronos (or a designated affiliate of Chronos owned more than 50% by Scott Saldana or owned by a trust for which Scott Saldana is a beneficiary with more than a 50% beneficial interest) a 3% membership interest in OptimuMedicine, LLC.

b.    On or before March 11, 2025, Optimum shall provide Chronos with otherwise unlimited, read-only electronic access to all bank accounts of Optimum.

## 2.    ACCOUNTS RECEIVABLE

a.    On or before May 1, 2025, Optimum shall pay Chronos a one-time 13% surcharge on the Debt.  Said surcharge shall increase to 18% if not paid in full by May 1, 2025, to 23% if not paid in full by June 1, 2025, to 28% if not paid in full by July 1, 2025, and increasing by 5% each month thereafter until the Debt is paid in full.

b.    Optimum shall pay Chronos a 5% surcharge on all monies owed Chronos under the Amended Agreement that accrue after the Execution Date and are not paid to Chronos within five business days of Reimbursement.  Said surcharge shall increase to 10% on that balance remaining on unpaid obligations more than 30 days old, to 15% on that balance remaining on unpaid obligations more than 60 days old, and increasing by 5% each month thereafter.

c.    Optimum is currently paying $19,000 per week to Credit Line Capital Group, $12,500 to BridgeCap Advance LLC, and $12,500 to Kingdom Kapital in accordance with terms set forth in various merchant credit agreements Optimum has entered into (each one a "Merchant Credit Agreement" and collectively the "Merchant Credit Agreements.")  As each Merchant Credit Agreements expires or is paid in full, Optimum shall commence paying Chronos, in identical weekly installments, an amount equal to that which it was paying on the expiring Merchant Credit Agreement.  That means that Optimum will be paying Chronos $44,000 per week once the Merchant Credit Agreements are paid in full with weekly payments continuing until the Debt and all monies owed Chronos under the Amended Agreement that accrue after the Execution Date are paid in full.

d.    As provided in the Security Agreement, if Optimum secures additional financing beyond its current obligations, Optimum shallimmediately pay Chronos all monies Optimum owes Chronos under the Amended Agreement before paying Optimum any funds from the loan.

e.    All partial payments made by Optimum to Chronos shall be applied first to the surcharge on the Debt as set forth in Paragraph 2a above; secondly to the surcharge on late payments accruing after the Execution Date as set forth in Paragraph 2b above; thirdly, to newly accruing obligations under the Amended Agreement; and fourthly, to the Debt (oldest to newest).

f.    Concomitantly with the execution of this First Amendment, Optimum shall execute an ACH authorization to effectuate automatic payments to Chronos from its Account No. ----2718 at Bank of Nevada to be applied consistent with the terms

2

and conditions of this First Amendment and continuing until the Debt and all monies owed Chronos under the Amended Agreement that accrue after the Execution Date are paid in full. Until such time as the ACH authorization is in place, Optimum shall wire funds to Chronos.

g. Chronos may, at its discretion, waive all surcharges imposed on Optimum as set forth in Sections 2(a) and 2(b) above, if Chronos is satisfied that Optimum is performing in good faith.

## 3. REPRESENTATIONS

a. Optimum represents and warrants that the schedule of monies owed Chronos attached hereto as Exhibit 1 is a true and complete schedule of all monies owed Chronos under the MSA as of the Execution Date.

b. Optimum represents and warrants that the Operating Agreement attached hereto as Exhibit 2 is a true and correct copy of its current operating agreement of Optimum and that the Operating Agreement has not been amended or modified since its execution.

## 4. TERMINATION

a. Paragraph 4.1 of the MSA is hereby amended by modifying the Original Term to two (2) years from the Execution Date.

b. Paragraph 4.3 (d) of the MSA is hereby amended by allowing termination of the Amended Agreement by modifying the thirty-day cure period to a ten (10) day cure period for failure to make timely Reimbursements or other monetary payments either Party is obligated to make under the Amended Agreement.

c. Paragraph 11.3 of the MSA is hereby amended to reflect Chronos' new address of 200 S. Wacker Drive, Suite 2450, Chicago, IL 60606.

d. Chronos may, upon twenty-four hour written notice to Optimum, suspend service (i.e. those obligations and responsibilities as are set forth in paragraph 3.1 of the MSA) if, in Chronos' reasonable belief, Optimum is not honoring its obligations under the Amended Agreement.

e. Chronos may, upon ten-day written notice to Optimum, suspend service (i.e. those obligations and responsibilities as are set forth in paragraph 3.1 of the MSA) if its Payments (i.e. the sum of Chronos' reimbursement of Chronos' Expenses, Chronos' share of Distributable Cash Flow, and any surcharges imposed on late payments) are less than $125,000 in any rolling thirty-day period.

f.    In the event of an act of default by Optimum under the Amended Agreement, Chronos may, at its option, declare that all obligations shall be accelerated and become due and payable immediately, including but not limited to reimbursement of *Chonos' Expenses and Chronos' share of the Distributable Cash Flow*, notwithstanding as to whether Optimum has been reimbursed by insurance vendors for the services rendered.

## 5.    MISCELLANEOUS

a.    If there is any discrepancy between the terms and provisions contained in this First Amendment and the MSA, those terms and conditions contained herein shall prevail.

b.    Terms and phrases used in this First Amendment shall have the same meaning as used or defined in the MSA.

c.    Upon execution of this First Amendment, the MSA shall be deemed reinstated and in full force and effect, except as amended herein.  Such reinstatement shall not be deemed a waiver by Chronos of any breach of any term, covenant, or condition of the Amended Agreement, whether now existing or arising after the Execution Date.  Chronos retains all remedies available to it by law or by the terms and provisions of the Amended Agreement.


**IN WITNESS WHEREOF,** and intending to be legally bound, the Parties hereto affix their signatures below and execute this First Amendment as of the Effective Date.


**Hightail Air Charter, LLC,**
A Delaware limited liability company


*Scott Saldana*
**By:**_____
**Name: Scott Saldana, Manager**

**OptimuMedicine, LLC,**
a Nevada limited liability company


**By:**_____
**Name: Devon Eisma, CEO**

4

| trip number | DOS | amt due to Chronos |
|---|---|---|
| 24-001289 | 10/8/2024 | $27,148.51 |
| 24-001296 | 10/9/2024 | $39,053.19 |
| 24-1322 | 10/12/2024 | $10,020.40 |
| 24-1328 | 10/13/2024 | $14,473.09 |
| 24-1332 | 10/14/2024 | $1,569.55 |
| 24-1334 | 10/14/2024 | $8,690.98 |
| 24-1363 | 10/21/2024 | $26,612.22 |
| 24-1392 | 10/26/2024 | $5,078.51 |
| 24-1429 | 11/2/2024 | $5,351.58 |
| 24-1443 | 11/5/2024 | $13,420.31 |
| 24-1470 | 11/10/2024 | $10,233.62 |
| 24-1509 | 11/18/2024 | $10,802.59 |
| 24-1511 | 11/19/2024 | $9,813.86 |
| 24-1512 | 11/20/2024 | $16,219.99 |
| 24-1531 | 11/25/2024 | $11,914.19 |
| 24-1534 | 11/26/2024 | $12,449.70 |
| 24-1539 | 11/27/2024 | $30,355.50 |
| 24-1548 | 11/28/2024 | $10,847.33 |
| 24-1560 | 12/1/2024 | $12,035.08 |
| 24-1578 | 12/6/2024 | $28,091.83 |
| 24-1582 | 12/7/2024 | $16,230.57 |
| 24-1631 | 12/17/2024 | $27,692.06 |
| 25-004 | 1/2/2025 | $10,239.51 |
| 25-008 | 1/3/2025 | $11,348.46 |
| 25-0079 | 1/16/2025 | $13,965.23 |
| 25-00127 | 1/27/2025 | $13,167.50 |

*Exhibit 1*

| TOTAL | | $396,825.36 |
|---|---|---|

# Chronos.Optimum MSA Amendment final

Final Audit Report                                                      2025-03-07

| | |
|---|---|
| Created: | 2025-03-07 |
| By: | Scott Saldana (scott@iflychronos.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbitSgJlcC5ksnJQyptancYKvcvONOi2p |

## "Chronos.Optimum MSA Amendment final" History

🗅 Document created by Scott Saldana (scott@iflychronos.com)
2025-03-07 - 3:13:06 AM GMT

🖾 Document emailed to Devon Eisma (devon@optimumedicine.com) for signature
2025-03-07 - 3:14:27 AM GMT

🗅 Email viewed by Devon Eisma (devon@optimumedicine.com)
2025-03-07 - 3:25:22 AM GMT

🖉 Document e-signed by Devon Eisma (devon@optimumedicine.com)
Signature Date: 2025-03-07 - 3:27:12 AM GMT - Time Source: server

🖾 Document emailed to Scott Saldana (scott@iflychronos.com) for signature
2025-03-07 - 3:27:15 AM GMT

🗅 Email viewed by Scott Saldana (scott@iflychronos.com)
2025-03-07 - 12:15:55 PM GMT

🖉 Document e-signed by Scott Saldana (scott@iflychronos.com)
Signature Date: 2025-03-07 - 12:16:33 PM GMT - Time Source: server

✅ Agreement completed.
2025-03-07 - 12:16:33 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT 6



November 19, 2025

**SENT VIA EMAIL AND FEDEX OVERNIGHT DELIVERY**

Hightail Air Charter, LLC
d/b/a Chronos Air Group LLC
Attn: Scott Saldana
Email: scott@iflychronos.com
200 S. Wacker Drive, Suite 2450
Chicago, IL 60606 2

Natalie L. Winslow, Esq.
Atlas | Solomon LLC
7674 W. Lake Mead Blvd., Suite 220
Las Vegas, NV 89128
Email: nwinslow@atlas-solomon.com

RE:    **NOTICE OF MATERIAL DEFAULT AND DEMAND FOR CURE**
       **Amended Mutual Services, as amended (the "*Amended MSA*")**

Mr. Saldana,

OptimuMedicine, LLC ("*Optimum*") hereby delivers this formal Notice of Default pursuant to Section 4.3(d) of the Amended MSA. Chronos Air Charter, LLC ("*Chronos*") is in material breach of the Amended MSA and must cure the following default within **thirty (30) days** of receipt of this Notice, or Optimum will be entitled to terminate the Amended MSA.

**Chronos's Material Breach: Unauthorized Conversion of Optimum's Property**

Chronos is in breach for the unauthorized seizure and retention of Optimum's equipment and for exercising an unauthorized self-help remedy:

1.  **Retention of Sole Property:** Optimum owns two (2) medical beds (the "*Med Beds*") currently installed in Chronos aircraft. Pursuant to <u>Section 10.1</u> of the MSA, this Equipment "*shall be and remain the sole property of Optimum*".

2.  **Unauthorized Retention:** Chronos has explicitly refused to return Optimum's Equipment, citing monies allegedly owed to Chronos. The Amended MSA does not grant Chronos the right to retain, seize, or place a lien on Optimum's property for security or collection purposes. This action is an unauthorized exercise of an equitable lien and a breach of Chronos's duty to honor Optimum's ownership rights.

**DEMAND FOR CURE:** Chronos must cure this material default by *immediately* returning and making available the two Med Beds to Optimum at a mutually acceptable location. Failure to cure this breach within thirty (30) days will entitle Optimum to pursue all available remedies in law and equity, including termination of the Amended MSA.

**OPTIMUMEDICINE.COM**



**Warning Regarding UCC Enforcement**

Optimum is in receipt of a letter from your counsel dated November 18, 2025, threatening to enforce collection rights against Optimum's account debtors pursuant to NRS 104.9607.

**Chronos's current material default of the Amended MSA (the contract underlying the accounts receivable) renders Chronos's attempt to enforce the security interest premature and wrongful.**

- The remedy under NRS 104.9607 is available only "after default" by the debtor. Chronos's uncured material breach of the Amended MSA vitiates its claim that Optimum is in an excusable default and exposes Chronos to defenses arising from the transaction.

- Any attempt by Chronos to enforce the security interest in accounts receivable while in its own uncured material breach will be deemed to be undertaken in a manner that is **not commercially reasonable** pursuant to NRS 104.9607(3) and will subject Chronos to immediate claims for damages, including for tortious interference with contractual relations.

Optimum demands that Chronos refrain from sending any notice of payment demand to Optimum's account debtors until this material default is cured.

Sincerely,

OPTIMUMEDICINE, LLC

DEVON EISMA, CEO

# EXHIBIT 7



# EXHIBIT 8

| | |
|---|---|
| **Reservation #** | RES-9727948 |
| **Invoice #** | LIT-C-B-90-7948007 |
| **Invoice Date** | 01/04/2026 17:39 |
| **Customer** | OptimuMedicine LLC |
| | 175 East Reno Avenue |
| | Suite C-6 |
| | Las Vegas, NV  89119 |
| | United States |
| **Registration** | N55FJ |
| **Account Number** | 188034 |
| **Trip/Reference#** | |
| **Loyalty Status** | Gold |
| **Operator ID** | Dana  A |

# SIGNATURE AVIATION

2401 Crisp Drive
Little Rock, AR 72202
Phone 501.374.6582

---

Services provided by Signature Aviation - LIT On 27 Nov 2025 13:38 local

| Description | Fuel Program | Quantity | List price | Unit Discount | Unit Price | Tax | Total price |
|---|---|---|---|---|---|---|---|
| **Handling Fee** Tenant | | 1 | 560.00 | $(560) | 0.00 | 0.00 | 0.00 |
| **Infrastructure Fee** Tenant | | 1 | 27.00 | $(27) | 0.00 | 0.00 | 0.00 |
| **Ground Power Unit** Tenant | | 1 | 110.00 | $(110) | 0.00 | 0.00 | 0.00 |
| **Jet A (with additive)** ASR Number - 227117038 | BRAVO by Signature | 440 | 4.78560 | $(0) | 4.78560 | 180.88 | 2286.54 |
| **Ground Power Unit** | | 1 | 110.00 | $(110) | 0.00 | 0.00 | 0.00 |

|  |  |
|---|---|
| Total Amount (USD): | $2286.54 |
| Total Amt includes Fuel Tax of | $0.00 |
| Total Amt includes Sales Tax of | $180.88 |
| Paid with AvCard-2933(USD): (3195462-01742515) | $2286.54 |

I agree to the statement of services and charges as shown and have provided
payment to Signature in the amount outlined above.

_____

**Customer Signature**



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Reservation #** | RES-9930702 | | | | | | |
| **Invoice #** | LIT-C-B-90-0702080 | | | | | | |
| **Invoice Date** | 01/04/2026 11:35 | | | | | | |
| **Customer** | OptimuMedicine LLC | | | | | | |
| | 175 East Reno Avenue | | | | | | |
| | Suite C-6 | | | | | | |
| | Las Vegas, NV  89119 | | | | | | |
| | United States | | | | | | |

**SIGNATURE AVIATION**

| | |
|---|---|
| **Registration** | N90J |
| **Account Number** | 188034 |
| **Trip/Reference#** | |
| **Loyalty Status** | Gold |
| **Operator ID** | Verver Charles (SFS-LIT090)  V |

2401 Crisp Drive
Little Rock, AR 72202
Phone 501.374.6582

---

Services provided by Signature Aviation - LIT On 04 Jan 2026 09:57 local

---

| Description | Fuel Program | Quantity | List price | Unit Discount | Unit Price | Tax | Total price |
|---|---|---|---|---|---|---|---|
| **Handling Fee** | | 1 | 360.00 | $(360) | 0.00 | 0.00 | 0.00 |
| **Infrastructure Fee**<br>Tenant | | 1 | 27.00 | $(27) | 0.00 | 0.00 | 0.00 |
| **Ground Power Unit**<br>Tenant | | 1 | 110.00 | $(110) | 0.00 | 0.00 | 0.00 |
| **Jet A (with additive)**<br>ASR Number -<br>153122596,153204964 | BRAVO by Signature | 220 | 4.65909 | $(0.00001) | 4.65908 | 88.04 | 1113.04 |

|  |  |
|---|---|
| Total Amount (USD): | $1113.04 |
| Total Amt includes Fuel Tax of | $0.00 |
| Total Amt includes Sales Tax of | $88.04 |
| Paid with AvCard-2941(USD): (3194007-01741208) | $1113.04 |

I agree to the statement of services and charges as shown and have provided
payment to Signature in the amount outlined above.

_____

**Customer Signature**



**We'd love feedback on your experience at Signature today.
Please scan this QR code to fill out a brief survey.**

1 of 1

01/04/2026 11:35

# EXHIBIT 9

**From:** Scott <Scott@iflychronos.com>
**Date:** Thursday, January 8, 2026 at 08:36
**To:** Devon Eisma <devon@optimumedicine.com>, Owen McKeany <Owen.McKeany@optimumedicine.com>, Jon Rosati <jon.rosati@optimumedicine.com>
**Subject:** Payment Plan

| [EXTERNAL]: |
|:---:|

Gentlemen,

It's time to figure out how we are going to handle the monies Optimum owes Chronos.

I'm open to a reasonable payment plan.  Optimums default on payment for our services has put Chronos in a financial bind.

Absent any payment from Optimum we have no choice to go directly to Optimums payers.

I suggest we have a group meeting to discuss our options.

I'm free later today and tomorrow.

See Optimums balance due below,

Scott

| Due to Chronos | Source |
|---:|:---|
| 415,446.11 | Nina, 11/13/25 email |
| 28,250.00 | Surch 25 09; Sep |
| 24,639.96 | Surch 25 10; Oct |
| 23,238.96 | Surch 25 11; Nov |
| 23,150.91 | Surch 25 12; Dec |
| 2,357.64 | WFS bill, 25-001081 |
| 238.58 | Landing Fees |
| 731,164.69 | OM unpaid trips due now |
| | **Total Due to Chronos** |
| **$ 1,248,486.85** | **12/31/25** |

CAUTION: This email originated from outside of OptimuMedicine. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CSERV**

DISTRICT COURT
CLARK COUNTY, NEVADA

| | |
|---|---|
| Optimumedicine, LLC,<br>Plaintiff(s)<br><br>vs.<br><br>Hightail Air Charter, LLC,<br>Defendant(s) | CASE NO: A-26-937783-C<br><br>DEPT. NO.  Department 20 |

**<u>AUTOMATED CERTIFICATE OF SERVICE</u>**

This automated certificate of service was generated by the Eighth Judicial District Court. The foregoing Ex Parte was served via the court's electronic eFile system to all recipients registered for e-Service on the above entitled case as listed below:

Service Date: 1/26/2026

| | |
|---|---|
| Mark Hutchings | mhutchings@hutchingslawgroup.com |
| Helen Perez | helen@hutchingslawgroup.com |
| Makayla Rodriguez | Assistant@hutchingslawgroup.com |
| John Lanning | John@HutchingsLawGroup.com |